IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JOSH M. BRYANT,                          )
                    Plaintiff            )
                                         )
        vs.                              )          Case No. 07-1285-WEB
                                         )
EMCASCO INSURANCE COMPANY,               )
                    Defendant.           )
_____)

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW the defendant, by and through Allen G. Glendenning of the law firm of Watkins Calcara, Chtd., its attorneys, and submits its Memorandum in Support of Motion for Summary Judgment.

**UNCONTROVERTED CONTENTIONS OF FACT**

1.      On July 8, 2002, a collision occurred between a pickup being driven by plaintiff – Josh Bryant – and a motorcycle being ridden by Jim Nungesser.  (Stipulation, PTO 4 a i.)

2.      Bryant was a minor at the time of the accident.  (Josh Bryant 3-29-04 Depo. 7:3-13.)

3.      Bryant was an insured under a policy of insurance issued by EMCASCO to Bryant's parents.  The Bryant family's auto policy with EMCASCO had a $300,000 single liability limit. (Stipulation, PTO 4 a iii.)

4.      For a period of time after the accident, Nungesser was hospitalized at Wesley Medical Center in Wichita.  (Stipulation, PTO 4 a ii.)

5.      After Nungesser was discharged, Wesley filed notice of a $45,532.85 hospital lien and served Nungesser, Bryant, and EMCASCO.  (Stipulation, PTO 4 a ii; RFA to Bryant 7-9.)

6.      EMCASCO received notice of the collision and Nungesser's claim two days after the accident, and its claims adjuster, Bruce Fischer, began his investigation.  (Stipulation, PTO 4 a iv.)

7.      During the week of August 2002, when Fischer learned the extent of Nungesser's injuries, he suggested to EMCASCO that potential liability to Nungesser would exceed the policy limit and that EMCASCO should settle the claim.  (Stipulation, PTO 4 a v.)

8.      On August 27, 2002, EMCASCO – through Fischer – extended an offer to settle for the policy limit.  (RFA to Bryant 10, 12-13.)

9.      On August 27, 2002, Fischer also sent a letter to Bryant's parents advising them of the potential for excess exposure beyond the policy limits.  (JT Tx. Vol. III, 52:16 through 54:9 and Ex. 65.)

10.     Fischer confirmed EMCASCO's earlier offer to settle for the policy limit in a September 4, 2002, letter to Crockett, Nungesser's attorney, which stated in part:

> As we discussed, we are tendering our $300,000.00 combined single limit of coverage on our insured's auto policy to your client in settlement of this claim.

(Stipulation, PTO 4 a vi; JT Tx. Vol. II, 70:19 through 71:14, Ex. 64.)

11.     Crockett never responded to Fischer's September 4 letter.  (JT Tx. Vol. II 78:17-22.)

12.     On September 25, Fischer called Crockett to inquire as to the progress of the matter. (Crockett 6-23-08 Depo. 22:3-6.)

13.     On October 23, 2002, Fischer sent another letter to Crockett stating in part:

> . . . We are again writing to you tendering our $300,000.00 policy limit to settle this matter in exchange for a release of all claims.

(RFA to Bryant 14.)

14.     Bruce Fischer made four offers of the policy limits, two written and two oral.  (RFA to Bryant 11.)

15.     EMCASCO's policy limits offer was never withdrawn.  (JT Tx. Vol. II, 222:7-9.)

16.     On October 23, 2002, Fischer sent a letter to Mr. and Mrs. Bryant advising them that the policy limits had been offered in exchange for a release of all claims.  (JT Tx. Vol. I, 54:10 through 56:19 and Ex. 62.)

17.     On October 28, 2002, Wesley served on Nungesser, Bryant, and EMCASCO an amended lien notice in the amount of $49,993.  (Stipulation, PTO 4 a ix.)

18.     Graybill was first retained to represent Nungesser in November of 2002.  (Stipulation, PTO 4 a ix.)

19.     When the case first came into Mr. Graybill, he viewed it as a case in which the insurance company was offering to pay the limit of insurance.  The hang up was the hospital lien.  (Graybill 6-5-08 Depo. 57:25 through 58:6.)

20.     After Graybill was retained by Nungesser he began getting ready to sue Wesley for consumer protection violations in connection with the assertion of the lien.  Graybill believed that claim was worth "six figures."   (Graybill 6-5-08 Depo. 66:12 through 67:4.)

21.     Graybill was excited about the prospect of the claim against Wesley.  (Graybill 6-5-08 Depo. 66: 7-11.)

22.     Graybill intended to sue Wesley even if the case against Bryant settled for the policy limits.  (Graybill 6-5-08 Depo. 66:12 through 67:4.)

23.     Graybill believed that if Wesley's name were included on the settlement check it would interfere with and cause all kinds of complications with the contemplated claim by Nungesser against Wesley.  (Graybill 6-5-08 Depo. 71:4-10.)

24.     On December 18, Fischer and Crockett had a telephone conversation in which Crockett indicated that Nungesser was willing to accept the policy limit but wanted the settlement check to be issued to him or his law firm and Mr. Nungesser without Wesley's name on the check. (Fischer 6-6-08 Depo. 6:2-10.)

25.     All Crockett can recall of the December 18 conversation is what he wrote in his notes shortly after the conversation.  (JT Tx. Vol. II.  98:1-21.)

26.     Crockett's notes of the December 18 conversation state:

> Told him we'd like to work out payment without paying Wesley because we dispute their position.  Could we reserve some of the Wesley claim, for example, e.g., in my trust account?  He didn't think so because Curtis Loub had been so aggressive, but he's leaving for vacation later this week and he'll get back to me tomorrow.  Told him a letter would be great.

(JT Tx. Vol. I 80:10 through 81:10.)

27.     In previous conversations, Fischer and Crockett had discussed the lien but December 18 was the first time Crockett had conveyed the sentiment that he could not live with Wesley on the check.  (Crockett 6-23-08 Depo. 30:18 through 31:5.)

28.     Fischer did not consider the conversation with Crockett to be an offer but an inquiry as to how the check would be issued.  (JT Tx. Vol. II, 184:24 through 185:1; 202:8-22.)

29.     Following the December 18 conversation with Crockett, Fischer's understanding was that it had been agreed that the policy limits had been offered and were available to conclude this

matter and the only wrinkle was whether Wesley's name needed to be on that check.  (Fischer 6-6-08

Depo. 6:23 through 7:7)[1]

      30.     Graybill considered it a "likelihood"  that if EMCASCO issued a check  without

Wesley's name, it could goad Wesley into suing on the lien.  (Graybill 6-5-08 Depo. 71:21 through

72:16.)

      31.     Graybill believed that goading  Wesley into suing would "make all the difference in

the world in a Consumer Protection case where you're trying to collect a Consumer Protection

violations if you – if the – if the wrongdoer files suit against the innocent person."  (Graybill 6-5-08

Depo. 71:24 through 72:10.)

      32.     Crockett understood that a possible consequence of issuing a settlement check

without Wesley's name could be that EMCASCO and/or Bryant would be sued by Wesley.

(Crockett 6-23-08 Depo. 46:15-21.)

      33.     Wesley has in the past sued insurers who issued settlement checks without Wesley's

name on the check.  (Loub, JT Tx. Vol. III, 65:10-25.)

      34.     After talking to Crockett on December 18, Fischer contacted attorney Steve Pigg for

his opinion on whether EMCASCO could issue a settlement check that did not include Wesely's

name in light of its claimed lien.  (Pigg Depo. 8:8-20; Fischer 6-6-08 Depo. 11:19 through 3:17.)

      35.     Pigg understood from his conversation with Fischer  that the case had been  settled

and they were in the process of issuing payment.  (Pigg Depo. 11:17-22; 17:10-12.)

---

[1]Defendant does not contend that a settlement was actually reached.  That issue was finally resolved in the State Court Proceeding.  However, since the circumstances must be viewed as they appeared to Fischer in assessing whether he acted in bad faith, his understanding itself is relevant.

36.     Neither Pigg nor Fischer knew Crockett or had worked with him before.  (Pigg Depo. 11:23 through 12:18.)

37.     Pigg advised Fischer in a telephone conversation and an e-mail that Wesley's name should be on the settlement check or EMCASCO could remain liable to Wesley for the amount of the lien.  (Fischer 6-6-08 Depo. 21:25 through 22:10; 24:1 through 25:25, Ex 1.)

38.     On December 19, Fischer called Crockett.  Crockett was not in and Fischer left a phone message with Crockett's receptionist indicating that EMCASCO could not issue a settlement check without Wesley's name on it.  (Crockett 6-23-08 Depo. 9:22 thru 10:6; Crockett 3-2-04 Depo. 57:16-22 )

39.     EMCASCO had a right to be concerned about possible double liability.  (RFA 38-39; JT Tx. Vol. II 89:8-16.)

40.     There would be a risk to EMCASCO associated with issuing a check without Wesley's name on it.  (Sharp Depo. 73:10 through 75:5.)

41.     Crockett did not call Fischer back in response to the phone message.  (Crockett 6-23-08 Depo. 31:13-15.)

42.     On December 31, 2002, Crockett sent a letter to Fischer which stated in part:

> This letter will recap our conversation on December 18 and your telephone message on December 19. . . . When we spoke on December 18, I told you that we were willing to accept your offer of coverage limits . . . but that we needed to make some arrangement with [EMCASCO] in order that we could do so without allowing Wesley Medical Center to control the settlement proceeds. . . . I offered to escrow money in my trust account so that we could settle with [EMCASCO] without capitulating to Wesley's demands. You told me you would look into this and call back the following day since you were getting ready to take some vacation time over the holidays. You did express some concern because you said Wesley's

attorney, Curtis Loub, had been very aggressive in asserting Wesley's claims against our settlement proceeds.

On December 19 you did call, and you left a message stating that, because of Wesley's demands, [EMCASCO] would not pay the settlement proceeds unless Wesley were named on the check – right along with Jim Nungesser–as a joint payee!  Obviously this would mean that the only way Jim could receive any money from [EMCASCO] would be if he surrendered to all the claims of Wesley.
. . . .

"It would . . . seem to me that Wesley has interfered with Mr. Bryant's legitimate expectation that the limit of his liability insurance would be available to buy his release from a claim that obviously exposes him to literally millions of dollars of liability.

"By persuading [EMCASCO] to refuse to pay the limit of Mr. Bryant's insurance policy directly to Mr. Nungesser, Wesley has deprived Mr. Bryant of what will probably be the only opportunity he will ever have to purchase his complete release in return for the proceeds of a policy of insurance he paid for.  "In light of the foregoing, Mr. Nungesser has no alternative but to evaluate other alternatives."

(Stipulation, PTO 4 a x).

43.     Crockett never contacted Wesley to see if they would agree to his suggestion that he hold money in his trust account pending resolution of the lien. (JT Tx. Vol. II 46:10-20; JT Tx. Vol. III, 67:6-18; Crockett 6-23-08 Depo. 46:22 through 47:2.)

44.     Fischer received Crockett's December 31 letter on January 2, 2003.  (JT Tx. Vol. II 208:14-23.)

45.     On January 2, 2003, Fischer contacted attorney Chuck Milsap to see what he could do to get the settlement concluded.  (JT Tx. Vol. II 225:18-21.)

46.     Chuck Milsap called Crockett on January 2, 2003.  (JT Tx. Vol. II 25:9-15.)

47.     Crockett did not inform Milsap on January 2  that settlement negotiations were no longer underway and that he intended to file suit in a few days.  (Crockett 3-2-04 Depo. 88:13-17.)

48.     Crockett did not indicate to Milsap on January 2 that he no longer had any settlement authority.  (Crockett 3-2-04 Depo. 85:24 through 86:2.)

49.     In the January 2 conversation, Milsap discussed various ways to deal with the lien issue that would protect EMCASCO.  (JT Tx. Vol. II 27:20 through 28:25.)

50.     The January 2 conversation between Milsap and Crockett ended inconclusively.  (JT Tx. Vol. II. 30:19:23.)

51.     Nungesser filed suit against Bryant on January 6, 2003, the Monday following that Thursday conversation between Milsap and Crockett.  (Stipulation, PTO, 4 a xi.)

52.     The Petition contained only 4 numbered paragraphs.  (Petition, 3-CV-49 In The Eighteenth Judicial District, District Court, Sedgewick County, Kansas, attached as Exhibit A.)

53.     No summons was issued and service of process was not attempted.  (Stipulation, PTO 4 a xi.)

54.     When the Petition was filed Crockett did not obtain a summons as he was still hoping to get the claim resolved.  (Crockett 6-23-08 Depo. 41:11 through 42:9.)

55.     Shortly after the filing of the Petition against Bryant on January 6, active leadership in that lawsuit was taken over by Graybill and Hazlewood.  (Crockett 6-23-08 Depo. 42:10-13; 47:11-15.)

56.     Graybill believed that if the case against Bryant were settled for the policy limits, the claim against Wesley would have substantially less value.  (Graybill 6-5-08 Depo. 70:9 through 71:4.)

57.     On January 15, 2003, Graybill sent a lengthy letter to Millsap, enclosing a copy of the petition filed by Nungesser against Bryant. Among other things, Graybill's letter stated:

> If it appears from the facts presented, that a prima facie case can be made that a tortfeasor's liability insuror has, as a result of negligence or bad faith, deprived its insured an opportunity to escape uninsured liability , an attorney representing  injured party "must advise his client to terminate negotiations to settle for the limit of available insurance . . . Consequently, I have had no other choice but to give that advice, and Jim  has followed that advice and has instructed me to inform you that any further negotiations calculated to relieve Mr. Bryant of the full measure of his liability in return for payment" of the policy limit of $300,000.[2]

(Stipulation, PTO 4 a xiii; Graybill 6-5-08 Depo. Ex 19, p.7 para. 1.)

58.    Upon receipt of this letter, Fischer sent a copy to Bryant's parents.  (JT Tx. Vol I 56:20 through 57:3 and Ex. 48.)

59.    Graybill's letter of January 15 indicated that Graybill agreed that Wesley appears to be the "bad guy."  (Graybill 6-5-08 Depo. Ex 19, p.7 para. 2.)

60.    Until Fischer's phone message of December 19, a claim against EMCASCO for bad faith or negligence was not on Graybill's radar screen or thought about at any level of seriousness. (Graybill 6-5-08 Depo. 59:14 through 60:13.)

61.    On January 13, 2003, one week after the suit was filed and before it was served, Wesley filed a second amended lien notice, reducing the amount to $180. It released its lien altogether a month later.  Neither Bryant nor EMC received notice of this until late January 20, 2003. (Stipulation, PTO 4 a xii.)

62.    On January 20, 2007, Fischer first learned that Wesley's lien had been reduced to $180.  (Id.; JT Ex. 32, 1/20/03 note.)

_____

[2]This letter bears a striking resemblance to the letter Mr. Graybill sent in the *Wade* case, which is discussed below and is controlling authority in this case.

63.     On January 21, 2007, EMCASCO's attorney sent a letter to Graybill which stated in part:

> . . . I was informed that the hospital lien has been reduced to $180.00. I hope that this change in circumstances has removed all obstacles to settlement of Mr. Nungesser's claim.
>
> ***
>
> EMC continues to be ready to pay its policy limits to settle Mr. Nungesser's claim, and if necessary to absorb the $180.00 hospital lien in addition to those limits.

(Graybill 6-5-08 Depo. Ex 20.)

64.     When Hazlewood found out about the reduced lien, he gave no thought to how that might affect the possibility of getting the policy limit settlement concluded because, as far as he was concerned, "the horse was already out of the barn."  (Hazlewood Depo. 21:5-12.)

65.     Graybill does not recall whether he did any substantive work on the case between January 1, 2003, and January 21, 2003, other than the preparation of the January 15 letter.  (Graybill 6-5-08 Depo. 74:19 through 78:10.)

66.     The only work Crockett did on the case between January 6, 2003 and February 1, 2003 was review Graybill's January 15 letter and participate in a telephone conversation with Milsap on January 20.  (Crockett 6-23-08 Depo. 47:16-25.)

67.     Hazlewood's work on Nungesser's behalf from January 1, 2003 to January 21, 2003, was in regards to Nungesser's claims against Wesley. (Hazlewood 6-5-08 Depo. 29:15 through 30:20.)

68.     The claim against Wesley would have been pursued even if the case against Bryant settled for the policy limits.  (Graybill 6-5-08 Depo. 66:12 through 67:4.)

69.    Nungesser's claims against Wesley were settled for an undisclosed amount. (Hazlewood 6-5-08 Depo. 32:20-25.)

70.    In March 2003, Josh Bryant hired a personal attorney, Jeff Carmichael.  (Carmichael Depo. 6:2 through 8:8.)

71.    Mr. Carmichael talked to Nungesser's attorney's several times about whether there was any possibility of getting the policy limits settlement back on track to save Bryant from excess exposure.  (Carmichael Depo. 24:4-12)

72.    The response to Carmichael's inquires about getting the policy limits settlement back on track was that ship had sailed, they had tried to settle the case in a reasonable manner, it had not been accepted and that offer was no longer on the table.  (Carmichael Depo. 24:4-12 and 25:13 -21.)

73.    Following a trial, verdict, appeal, reversal and remand, on August 17, 2007, the state trial court entered judgment against Bryant, by confession, in exchange for a covenant not to execute, and  with EMCASCO's written consent, in the reasonable amount of $2,000,000 plus the costs of the action. EMCASCO paid its $300,000.00 policy limit to Nungesser in partial satisfaction of the judgment. $1,700,000 of the judgment remains unsatisfied.  (Stipulation, PTO 4 a xv.)

### Representation of attorneys[3]

74.    In December 2004, Graybill undertook the representation of Bryant against EMCASCO.  (Graybill 6-5-08 Depo. 5:1-19.)

---

[3]Defendant does not offer these facts to allege that any improper representation occurred. The common representation of Nungesser and Bryant, even when their interests diverged, and opposing EMCASCO's position on issues where Bryant and EMCASCO would have been expected to be aligned, is relevant  to show that the reason EMCASCO's multiple policy limit settlement offers, particularly the one in January, 2003, were rejected or not accepted, was to manufacture a claim against EMCASCO, contrary to the law as set forth in *Wade, infra.*

75.    On April 30, 2007, Graybill and Hazlewood withdrew from the representation of Bryant. (Graybill 6-5-08 Depo. 5:20 through 6:2 and Depo. Ex 6.)

76.    Between December 2004 and the withdrawal in April 2007, Graybill and Hazelwood represented Bryant continuously. (Graybill 6-5-08 Depo. 6:3-7.)

77.    Graybill does not remember if he advised Nungesser after January 15, 2003, to accept a policy limits offer. (Graybill 6-5-08 Depo. 56:8-15.)

78.    During the appeal of the State Court case, Graybill represented Bryant. (Graybill 6-5-08 Depo. 79:6-8.)

79.    In the State Court proceeding, EMCASCO had also argued that a policy limits settlement had been reached on Bryant's behalf in the December 18 phone call. The finding was also appealed by EMCASCO in its own right and by Bryant through the defense counsel appointed by EMCASCO to represent Bryant. (Carmichael Depo. 43:2 through 46:12.)

80.    During the appeal of the state court case, Graybill  argued against a finding that a settlement had been reached for the policy limits. (Graybill 6-5-08 Depo. 79:13-16.)

81.    If a settlement had been found to have occurred, Bryant,  would have been relieved from any liability to Nungesser. (Graybill 6-5-08 Depo. 79:17-20.)

82.    Bryant's Personal attorney wrote a letter to Bryant's EMCASCO appointed attorney to "straighten out what was happening" and indicate that Bryant did not wish to participate or have his name used in pursuit of the defense that the case against him had been settled for policy limits in 2002. (Carmichael Depo. 43:2 through 46:12.)

83.    After the Kansas Supreme Court abrogated all previous agreements between the parties, Graybill and Hazlewood withdrew as attorneys for Bryant. (Graybill 6-5-08 Depo. Ex 10.)

84.     Hazelwood and Graybill, then representing Nungesser, began again to negotiate a settlement with Bryant, then represented by Carmichael.  (Carmichael Depo, 55:1-15; 59:1 through 60:1.)

85.     Hazlewood indicated  that the previous agreement for a judgement of $2,000,000.00 may no longer be good and a larger  judgement might be sought against his former client. (Carmichael Depo, 55:1-15; 59:1 through 60:1.)

86.     Following a renewal of the agreement to confess judgement for $2,000,000.00 in exchange for a covenant not execute, Graybill and Hazlewood entered an appearance for Bryant on June 4, 2008.  (Graybill 6-5-08 Depo. 4:11-16.)

## ARGUMENTS AND AUTHORITIES

### Introduction

In this breach of contract case, an insurance company promptly and properly investigated a serious accident and offered its policy limits within 51 days after the accident occurred.   That offer was never withdrawn.  In fact, in the following months,  EMCASCO followed up three times – twice in writing – reiterating its willingness to settle the case for the policy limits.

The reason the case did not settle then was that Wesley asserted a statutory lien under K.S.A. 65-406 *et. seq*. against the settlement proceeds.  Nungesser contested the lien.

In  December  of  2002,  Nungesser  requested  EMCASCO  to  become  involved  in  the  lien dispute by issuing a settlement check payable only to the patient and his attorney and allow the attorney for the patient to hold back a portion of the settlement money until the lien issue was resolved.    It was anticipated by Graybill that this would goad Wesley into suing on its lien. Crockett understood that EMCASCO and its insured could be sued by Wesley.   In fact, Wesley has

in the past sued insurer's who have issued checks without Wesley's name on them.  EMCASCO

would have been put at risk of liability beyond its policy limits.  (SOF 30-33 and 39-40.)

> K.S.A. 65-408 provides:
>
>> Any person or persons, firm or firms, corporation or corporations,
>> including an insurance carrier, making **any payment** to such **patient
>> or to his attorneys or heirs or legal representatives** as compensation
>> for the injury sustained, after the filing and mailing of such notice
>> without paying to such hospital the amount of its lien or so much
>> thereof as can be satisfied out of the moneys due under any final
>> judgment or compromise or settlement agreement, after paying the
>> amount of any prior liens, shall, for a period of one year from the
>> date of payment to such patient or his heirs, attorneys or legal
>> representatives, as aforesaid; be and remain liable to such hospital
>> for the amount which such hospital was entitled to receive as aforesaid.
>> (Emphasis added.)

This statute "imposes a duty upon insurance carriers to ensure that hospital liens are satisfied when

an insurance carrier compensates an injured party.  *Kearny County Hosp. v. Allstate Ins. Co.* 38

Kan.App.2d 641, Syl 2., 642-643, 170 P.3d 900, 903 (Kan.App.,2007).  That case also expressly held

that paying the money into court rather than to the patient or his attorney did not satisfy this

obligation or relieve the insurer from liability:

> Allstate focuses its argument on the language of K.S.A. 65-408 that the
> statute applies to "[a]ny person or persons, firm or firms, corporation or
> corporations, including an insurance carrier, *making any payment to
> such patient or to his attorneys or heirs or legal representatives* as
> compensation for the injury sustained. . . ." (Emphasis added.) Allstate
> contends that K.S.A. 65-408 is inapplicable to this case because Allstate
> paid the money *into the trial court* for equitable distribution to the injured
> parties in its interpleader action. Allstate maintains that because all
> payments were made at the discretion and the hands of the trial court
> and not by Allstate, this case does not come within K.S.A. 65-408.
>
> If this court were to accept Allstate 's argument, an insurance
> company could circumvent K.S.A. 65-408 and avoid liability on a

hospital lien by having a third party distribute  the insurance policy
proceeds to the injured parties. On the other hand, an insurance
company sending a check straight to the patient or to his attorneys,
heirs, or legal representatives as compensation for the patient's injury
would be subject to K.S.A. 65-408.  Under both situations, the
insurance company has failed to include the hospital in determining
the payment of policy proceeds. Nevertheless, the insurance company
in the first situation would be able to avoid liability on a properly-filed
hospital lien by using an intermediary to distribute the policy proceeds.
Such an interpretation of K.S.A. 65-408 would produce an unreasonable
result.

38 Kan. App. 2d at 648-649

All agree that under this law, EMCASCO  had a right to be concerned about the exposure

beyond its policy limits.   Because of that concern,  EMCASCO promptly sought legal advice from

Steve Pigg.  Pigg, like Crockett and Graybill understood that issuing a check without Wesley's name

on the check could cause Wesley to sue and that it could sue EMCASCO and/or Bryant.  He advised

Fischer by telephone and e-mail that  EMCASCO should not take the risk of being sued or incurring

liability beyond its policy limits by issuing a settlement check without including Wesley.

EMCASCO followed this advice and Fischer informed Crockett in a  phone message on

December 19, 2002 that EMCASCO could not issue the settlement draft without including Wesley

in light of  Wesley's assertion of a statutory lien.  Plaintiff contends this was in effect a rejection of

a policy limits offer.  However, the "offer" entailed a risk greater than policy limits because of the

lien.   Moreover, Fischer considered the case essentially settled already and believed that it was

simply a matter of working out the  lien issues and determining the manner of payment.  He did not

understand his following the statute to be a rejection of any offer to settle.  He continued with his

efforts to settle the case for its policy limits.  On January 2, 2003, Fischer received Crockett's  letter

in response to his phone message.  That very day Fischer contacted another attorney for the purpose of making contact with Crockett and concluding the policy limits settlement.

But even if the December 19 phone message had been a rejection of a policy limits offer, it was not only reasonable but temporary.  Approximately one month later, EMCASCO learned that the lien issue had been essentially resolved and Wesley had reduced its lien to $180.  Immediately upon learning of this, EMCASCO reiterated its long outstanding offer of its policy limits, added that it would then concede to the demand to leave Wesley off the check and offered to pay the remaining lien in addition to the policy limits.

There was no legitimate reason that the settlement could not be effected at that time. However, Mr Graybill, then representing Nungesser, had already decided on or before January 15, 2003, that there was a *prima facie* case against  EMCASCO.  He sent a letter to that effect dated January 15, 2003.  The fact that Graybill regarded his claim against Wesley as having less value if the case against Bryant was settled for the policy limits may also have factored into this decision.

The legal cause of the failure of settlement was not any bad faith or negligence on EMCASCO's part but because Nungesser's attorneys were attempting to manufacture a bad faith claim against EMCASCO and/or use it to support a claim against Wesley.

The overarching question presented by this case is whether, under these circumstances, an insurer's contractual obligation to offer policy limits includes a requirement to accept risk beyond the policy limits by issuing a check for the full policy limits to Nungesser and his attorney in violation of the statutory duty to protect Wesley's lien, and to do so immediately without so much as a month's delay while the lien issue was being resolved.

**I.      There has been no breach of any contractual obligation as a matter of law.**

EMCASCO was never presented with an opportunity to settle for the policy limits.   Its repeated offers of policy limits have been rejected or ignored.   The only opportunity that plaintiff contends EMCASCO received was the "offer" alleged to have been extended in the December 18 telephone conversation between Crockett and Fischer.   However, even if viewed as an offer, it was not a "policy limits" offer.   It was contingent upon EMCASCO ignoring a statutory obligation and exposing itself and Bryant to a possible lawsuit by Wesley and the possibility of liability above its policy limits by paying the  lien twice.

Even viewing the "offer"  as plaintiff does , there was at most a delay in accepting the policy limits plus offer, not a complete refusal.  Within approximately one month after the alleged rejection of the December 18 "offer,"  EMCASCO did make an offer that was essentially identical when it renewed its longstanding offer of policy, agreed that Wesley could be left off the check and even agreed to pay the remaining part of the lien.   When a case involves a delay in offering policy limits, rather than  a complete refusal, the court must exercise caution in finding liability.   *Wade v. EMCASCO,* 483 F.3d 657, 669 (10th Cir. 2007).

In deciding this case,  EMCASCO's conduct must be evaluated, not with hindsight but  in light of the situation as it reasonably appeared to EMCASCO's agents:

> The conduct of the insurer must not be viewed through hindsight.  Instead, the offer and the strength of the plaintiff's case must be viewed as they fairly appeared to the insurer and its agents and attorneys at the time the offer was refused.  *Rector*, 214 Kan. at 239; *Bollinger*, 202 Kan. at 341.

*Glen v. Flemming*, 247 Kan at 305-306.

Under the circumstances presented, EMCASCO did provide the contractually required consideration to Bryant's interests and complied with the contractual obligation to keep him reasonably informed.

**A.     EMCASCO was never provided an opportunity to settle within the policy limits.**

For EMCASCO to be liable, it must be shown that it had an opportunity to settle within the policy limits and through negligence or bad faith, failed to do so.  None of the cases dealing with bad faith claims even remotely suggest that an insurer has an obligation to accept offers beyond its policy limits.

> 2. . . In this jurisdiction a liability insurer may be held liable in excess of its undertaking under the policy if it acts negligently or in bad faith *when considering offers to compromise* the claim against the insured *for an amount within policy limits*.

*Bollinger v. Nuss*, 202 Kan. 326, Syl 2, 449 P.2d 502, 510 (1969.)   See *Pacific Employers v. Hoidale*, 796 F. Supp.1428, 1433-34 (D. Kan. 1992) (Jury instruction stating an element as "That an opportunity to settle *within the primary policy limits* [emphasis added] existed at a time when a reasonable insurance carrier, exercising due care and good faith, would have settled..."  Moreover, it is simply axiomatic that an insurer cannot be guilty of failing to settle within its policy limits if it is never given an opportunity to settle within the policy limits.

EMCASCO was never given that chance in this case.  EMCASCO's repeated and renewed offers to settle for the policy limits were never accepted.   The only "offer" that plaintiff even contends presented such an opportunity was the alleged offer by Crockett on December 18, 2002.  However, that was not an offer within the policy limits.  It was an offer to settle for the policy limits *plus* incur substantial potential liability on the outstanding hospital lien (approx. $49,000) and

become a target of a lawsuit that Nungesser's attorneys fully expected Wesley would be goaded into filing if EMCASCO issued payment without including Wesley. This is not an offer to settle "within the policy limits." Even though EMCASCO declined the invitation to join Nungesser in attempting to goad Wesley into filing suit, the policy limits were clearly still available. EMCASCO was still trying to settle within its policy limits. And when the lien issue was removed, the policy limits offer was immediately renewed but not accepted. Nungesser rejected multiple offers of settlement and made only one that was beyond the policy limits.

Plaintiff admits that EMASCO tried repeatedly to settle within its policy limits. The only time plaintiff alleges that EMCASCO failed in its duty to attempt such a settlement is when it hesitated to accept an offer that included a condition to ignore a statutory duty and creat the potential for liability beyond the policy limits. Since EMCASCO never had an opportunity to settle within its policy limits, it cannot be said to have acted in bad faith or negligently because it did not do what it never given any chance to do.

**B.** **Even if EMCASCO had an opportunity to settle within policy limits, liability is still inappropriate.**

**1.** **This case involves, at most, a short delay in settling not a refusal.**

Even if the "offer" of December 18 had been an offer made within the policy limits, liability is still inappropriate as EMCASCO attempted to accept that offer approximately one month after it was made.

"Courts should exercise caution 'when the gravamen of the complaint is not that the insurer has *refused* a settlement offer, but that it has delayed in accepting one." *Wade,* 483 F.3d at 669, (quoting Judge Marten's Mem. Op. p. 14 (citing *Adduci,* 424 N.E.2d at 649; *Pavia v. State Farm*

*Mut. Auto. Ins. Co.,* 82 N.Y.2d 445, 626 N.E.2d 24, 28-29, 605 N.Y.S.2d 208 (N.Y. 1993)).   This

caution arises out of the need to avoid creating an incentive to manufacture bad faith claims and turn

them into a game of cat and mouse between claimants and insurers.   483 F.3d. at 669-670 (quoting

from *Peckham v. Continental Casualty Insurance Co.,* 895 F.2d 830, 836 (1st Cir. 1990).)   The bad

faith cause of action is intended as a shield for the insured, not a sword for the claimant.   *Id.*

This is not a case in which EMCASCO decided to take the case to trial rather than attempt

to settle it within the policy limits.   From  51 days of the accident, EMCASCO has had its policy

limits on the table.   When the lien issue was discussed between Crockett and Fischer on December

18, 2002, Fischer promptly sought legal advice on whether EMCASCO should agree to Crockett's

demand that a settlement draft be issued without the lien claimant's name on it.   He followed the

advice he was given and declined.     However, the policy limits were clearly still available.

EMCASCO was still trying to settle, the only issue was how to make the payment and avoid double

liability.

Rather than return Fischer's call and discuss the matter further, Crockett sent his letter dated

December 31.   When Fischer  received Crockett's letter on January 2, 2003, he immediately

contacted an attorney to get in touch with Crockett and continue the dialog aimed at getting the issue

resolved and the settlement concluded.

Less than 20 days later, the lien was reduced to $180.   Within one day of learning of that,

EMCASCO again offered its policy limits and offered to pay the remaining lien in addition.   The

delay from December to January was a result of a condition placed on the settlement by the claimant

– that EMCASCO ignore a statutory obligation – rather than any decision not to settle for the policy

limits.   It was an issue of *how* to conclude the policy limits settlement without incurring additional

liability.  There was no refusal to settle.  There was only a refusal to incur the risk of being sued by Wesley and paying more than the policy limits by ignoring a substantial lien.  And this resulted only in a short delay.

This case, therefore, falls within the delay in settling analysis set forth in a similar and recent Tenth Circuit case, *Wade v. EMCASCO,* 483 F.3d 657 (10th Cir. 2007),  and *Glen v. Flemming,* 247 Kan. 296, 799 P.2d 79 (1990.)  Thus, the admonition to exercise caution in finding liability is applicable.  And when the circumstances of this case are compared to those cases,  it is clear that summary judgement is appropriate here as well.

In *Glen v. Flemming*, 247 Kan. 296, 799 P.2d 79 (1990)  the insurer expressly rejected a policy limits offer.  The parties then engaged in extensive discovery including the hiring and deposing of expert witnesses.  Two years after rejecting the policy limits offer, and after extensive discovery, the insurer made its own policy limits offer.  It was rejected and an excess verdict was obtained against the insured.  Nevertheless, the Kansas Supreme Court upheld summary judgement in favor of the insurer on the ensuing bad faith claim.

In this case it was EMCASCO that offered its policy limits before any case was filed and less than two months after the accident.  At no time did EMCASCO ever indicate that it was not willing to pay its full policy limits for a release of Bryant.  At no time did EMCASCO ever offer less than the policy limits.

As noted above, the situation must be viewed as it reasonably appeared to EMCASCO's agent Fischer.  Fischer believed the case was essentially settled, Bryant's interests had been protected and all that remained was to work out the manner and method of paying the proceeds.  He did not regard his phone message as a rejection of an offer but as a part of ongoing discussions in connection

with his earlier and still open offer of policy limits.  The very day he received Crockett's next communication, Fischer hired another attorney to contact Crockett to continue the discussions toward getting the settlement completed.  But even if the phone message is treated as  a rejection of an offer, EMCASCO's previous offer of policy limits was renewed approximately one month later, far more quickly than the more than two years that past in *Flemming*.  Unlike *Flemming,* no extensive discovery or other significant action occurred during the one month between the December phone message and the renewing of the policy limits offer.  Nungesser did file his lawsuit but was obviously in no hurry to proceed as he took no action to have it served until well after EMCASCO had renewed its offer of policy limits plus payment of the remaining portion of the lien.   During the delay, Crockett did little other than talk to Milsap and file a four paragraph bare bones Petition. Hazlewood was concentrating on the claim against Wesley and Graybill did  nothing other than writing his lengthy letter ending all discussions of policy limits offers and talking to Milsap.

In addition to finding that there had been no bad faith, the *Flemming* court also noted that the claimant's offer itself was unreasonable in that it was premature, imposed conditions and was left open only two weeks.  In this case, the claimant's offer contained a condition – that EMCASCO ignore a statutory duty and allow itself to be sucked into a  lien dispute and incur a risk of  being sued and making a double payment.  The offer also effectively had an arbitrary and short deadline. Nungesser's decision to refuse any further discussion of policy limits offers was made less than one month after Fischer's December 19 phone message, as evidenced by Mr. Graybill's letter dated January 15.  This was reinforced just a few days later when the renewed offer to pay both the policy limits and the remaining lien amount was made by EMCASCO and not accepted.  This short line in the sand,  drawn even before any litigation was joined, is arbitrary and unreasonable.

If judgment as a matter law was appropriate in *Flemming*, it is clearly appropriate here as well.

This case is quite similar to a recent and controlling case from the Tenth Circuit – *Wade v. EMCASCO*, 483 F.3d 657 (10th Cir. 2007.)  Indeed that case involved the same defendant and some of the same attorneys for the plaintiff using similar tactics in an attempt to create a bad faith claim.

In *Wade,* Mr Graybill sent a letter very similar to his letter of January 15, 2003 in this case. In both letters, he indicated that his client could no longer accept a policy limits offer because he already believed that he had a case of bad faith to pursue. (483 F.3d. at 673.)  In *Wade,* the court found that this was evidence that the motive to refuse a policy limits offer after a deadline established by the claimant was to set up a bad faith claim.  (*Id.*)  Likewise, in this case, Mr. Graybill's similar letter of January 15, 2003 indicates that the  motive to refuse the renewed offer made by EMCASCO a few days later was to setup a bad faith claim against insurer.

It is also noteworthy that Graybill was excited about his claim against Wesley and believed: 1) that settling for the policy limits would decrease the value of that claim, 2) that it would enhance that claim if Wesley could be "goaded" into suing on the lien and 3) that convincing or forcing EMCASCO to issue payment without protecting the lien would likely result in goading Wesley into suing.  Graybill clearly did not want the case against Bryant to settle for the policy limits.  He was creating a situation that enhanced his claim against Wesley and also attempting to manufacture an additional claim for bad faith against EMCASCO.

This motive is further shown by the subsequent conduct of Mr. Graybill moving in and out of representing both Nungesser and Braynt.  He began representing Nungesser.  By unreasonably refusing the policy limits offer in January, he set Bryant up for personal liability beyond his policy

limits.  He then negotiated an agreement  between Nungesser and Bryant for such an excess

judgement.    Graybill then became the attorney for the Bryant in the state court trial against

EMCASCO.  After the appeal, the agreement that Graybill had negotiated between Nungesser and

Bryant was abrogated by the Supreme Court and Bryant was, therefore, again facing excess liability

beyond the agreed upon amount.  Graybill and Hazlewood then reverted to representing Nungesser

and began new negations with the  former client.  Initially, Hazlewood indicated that the prior agreed

upon amount for a judgement against Bryant, may not be sufficient and he might be seeking a larger

judgement against his former client than had been previously agreed upon.  When that issue was

resolved, Graybill once again reverted to representing Bryant in this case.  This all indicates that the

strategy has been to manufacture a bad faith claim and that Bryant is simply a pawn in that strategy.

In *Wade*, the court noted that allowing a plaintiff to manufacture a bad faith claim by refusing

reasonable offers of policy limits, even after a deadline, would be inappropriate:

> [The cause of action for failure to settle is] not meant to create an artificial
> incentive for third-party claimants to reject otherwise reasonable settlement
> offers that are within the policy limits. We would be turning the cause of
> action on its head by holding an insurance company liable where it eventually
> offered to settle the claim for the policy limits, but a claimant rejected the
> offer [**47]  precisely in order to manufacture a lawsuit against the insurer
> for bad-faith refusal to settle.

As in *Wade*, the uncontroverted facts show no legitimate reason why the policy limits offer

that was on the table from August 27, 2002 and was acceptable on December 18, 2002, but for the

lien issue, was no longer acceptable in January, 2003, when the only impediment to settlement had

been removed and a clearly reasonable policy limits offer was renewed.   No significant work was

done on the case nor did anything significantly change between December 19, 2002 and January 21,

2003.  The only change – reduction of the lien –  was in favor of accepting the renewed policy limits offer, not cutting off all further discussion of that offer.

As was said in *Wade,* holding EMCASCO liable when it had been offering its policy for five months would be turning "the cause action on its head."  There is no reason that the result in this case should not be the same as it was in *Wade* – judgement for the insurer as a matter of law.  Indeed, fairness and consistency demand it.

### 2.  EMCASCO's honesty and good faith bars plaintiff's claim

"An insurance company acting honestly and in good faith upon adequate information should not be held liable because it failed to prophesy the result.  Something more than mere error of judgment is necessary to constitute bad faith."  *Glen v. Fleming,* 247 Kan at 305-306; *Bollinger v. Nuss,* 202 Kan at 341.

EMCASCO, acting through Fischer, clearly acted honestly and in good faith.   An investigation was promptly conducted and a policy limits offered made.  Fischer repeatedly followed up on the offer he had made.  When Crockett indicated he would not complete the settlement unless Wesley's name was left off of the check, Fischer promptly sought legal advice on whether he could agree to this condition.  He followed the advice he was given.

Moreover, under the terms of K.S.A 65-408, Fischer had an obligation not to pay settlement proceeds to either Nungesser or his attorney unless the lien was satisfied.  (pp.14-15 above.)

At this time, Fischer fairly and honestly believed  Bryant's interests had been protected and the case essentially settled pending resolution of the lien issue and how to issue the check.  The day he received Crockett's response to the phone message, Fischer hired an attorney to contact Crockett and continue efforts to conclude the settlement.

25

Immediately upon notice of the reduction of the lien, Fischer again renewed his policy limits offer, including agreeing to Nungesser's demand to leave Wesley off the check and even agreeing to pay the remaining part of the lien over and above the policy limits.

No reasonable juror could conclude that Fischer's conduct was anything but honest and in good faith.  EMCASCO, therefore cannot be held liable as a matter of law.

**3.      EMCASCO gave its insured's interests proper consideration.**

There are several lists of factors set forth in the cases, many of which are not applicable to this particular case.  However, all of the cases are in agreement that there is no definitive list of factors. The overarching rule is that "the question of liability depends upon the circumstances of the particular case and must be determined by taking into account the various factors present, rather than on the basis of any general statement or definition."  *Wade,* 483 F.3d at 667, quoting from *Bollinger*; The "real question" is the degree of consideration an insurer must give to the interests of its insured. *Wade*, 483 F.3d at 666, quoting from  *Bollinger*, P2d at 510.   And the context within which an insurer must give proper consideration to its insured's interests is when it is evaluating the claim and deciding whether to make or accept an offer that is *within the policy limits.  Bollinger,* 202 Kan at Syl 2 and 4.

While the cases refer to both "negligence" and "bad faith," in the context of a breach of contract by failure to settle claim, the difference is "more a difference in verbiage than results." *Wade v. EMCASCO*, 483 F.3d at 668, quoting from *Bollinger v. Nuss,* 202 Kan. 326, 449 P.2d 502, 510 (1969.)  The two have become essentially conflated with the same factors being considered regardless of which way the standard is phrased.

The dichotomy developed in the early cases, depending on whether the insurer's obligation was measured by good faith or due care, has tended to dissipate. Actually, the divergency between the good faith test and negligence test may be more a difference in verbiage than results. While the terms "negligence" and "bad faith" are not synonymous or interchangeable in a strict legal sense, they share common hues in the insurer's spectrum of duty, and the distinction between the tests is less marked than the terms would suggest. Professor Keeton, in his article *Liability Insurance and Responsibility For Settlement*, 67 Harv. L. Rev. 1136 (1954), emphasizes the lack of distinction by pointing out that even those jurisdictions following the bad faith rule recognize, at least by implication, that the company must, if it fails to settle, defend with ordinary care, and that negligence in investigation which leads to a mistake in failing to settle is also a breach of this duty of ordinary care of defense. Furthermore, a minimizing effect of the distinction is the adoption by some courts of a dual standard requiring not only good faith as to the decision regarding settlement, but also ordinary care in the investigation leading to such decision. [citations omitted]   We further noted in *Bennett v. Conrady*, supra, that in the more recent cases the two tests have tended to coalesce, so that even those courts which reject the negligence test and apply exclusively the test of good faith, nonetheless, consider the insurer's negligence relevant in determining whether or not the insurer exercised the requisite good faith.
(202 Kan. at 335.)

                                    ***

In respect to what particular acts, conduct or circumstances are sufficient to charge the insurer with liability to the insured because of the failure of the insurer to accept an offer of compromise, much the same factors are generally relied upon in those cases finding a breach of good faith as in those finding negligence on the part of the insurer. [citation omitted.] While negligence has been used by some courts to mean the same thing that other courts have designated as bad faith, it would appear that the two rules have tended to merge. In the final analysis, the question of liability depends upon the circumstances of the particular case and must be determined by taking into account the various factors present, rather than on the basis of any general statement or definition.

202 Kan. at 338.

The nut of plaintiff's first two theories as set forth in the Pretrial Order is that EMCASCO failed to give proper consideration to his interests.  The leading case in Kansas, relied upon heavily by the Tenth Circuit in *Wade,* is *Bollinger v. Nuss, supra.*  A concise statement of the applicable standard is contained in syllabi  2 and  4:

> 2.        . . . In this jurisdiction a liability insurer may be held liable in excess of its undertaking under the policy if it acts negligently or in bad faith *when considering offers to compromise* the claim against the insured *for an amount within policy limits*.
>
> ***
>
> 4.        . . . The rule in this jurisdiction is that *in acting on offers of settlement within policy limits,* the insurer may properly give consideration to its own interests, but it must also give at least *equal* consideration to the interests of the insured. This means that the insurer must *evaluate the claim* without looking at the policy limits  and as though it alone would be responsible for the entire amount of any judgment rendered on the claim. Thus, under the negligence test the insurer must conduct itself with that degree of care which would be used by an ordinarily prudent person in the management of his own business,  with no policy limits applicable to the claim. Likewise, under the good faith test, the insurer must in good faith view the situation as it would if there were no applicable policy limits. (Emphasis added.)

Plaintiff's phrasing of the issues and the law  consistently overlooks that the rules apply to how an insurer must *evaluate* the claim and consider offers that are "*within the policy limits*." "This rule of equal consideration means *the claim should be evaluated* by the insurer without looking to the policy limits and as though it alone would be responsible for the payment of any judgment rendered on the claim." *(Emphasis added.)  Rector v. Husted*, 214 Kan 230, 239, 519 P.2d 634 (1974.)

Plaintiff seeks to create entirely new duties on insurers to accept risks beyond the policy limits and to interject themselves  into issues between third-party claimants and their healthcare providers.  Plaintiff seeks to accomplish this by taking sentences from the case law out of context

and applying standards for evaluation of a claim and of offers *within the policy limits* to other matters and decisions.

Clearly, EMCASCO gave full consideration to the interests of its insured when it made a timely investigation and decided to offer its policy limits 51 days after the accident.  And when it reiterated its offer repeatedly in the following months.  And when it renewed its offer immediately after the lien issue was resolved.    The point at which plaintiff contends EMCASCO failed to properly consider his interests was in responding to Nungesser's December 18 demand that EMCASCO incur potential risk beyond's its policy limits by leaving Wesley's name off of the check and giving an adverse patient's  attorney the full settlement proceeds despite the outstanding lien claim, and in not immediately interjecting itself into the lien dispute between Wesley and Nungesser.

Plaintiff is apparently arguing that EMCASCO had an obligation to concede to the demand to ignore its statutory duty concerning the lien and incur additional risk simply because he would have benefitted thereby.  There is no controlling legal authority establishing any duty on the part of an insurer to accept the risks associated with releasing settlement proceeds to an adversary or his attorney while a statutory lien is still outstanding.  Moreover, the lien statute itself – K.S.A. 65-408 – clearly states that if EMCASCO paid  any settlement proceeds to Nungesser **or his attorney or representatives,** it would remain liable on the lien.  There is nothing in the statute to indicate that the situation changes if the claimant or his representative agree to hold back part of the money until the lien is resolved.  In fact, the case law expressly states that this statute imposes a duty on the insurer to not even pay money into court without ensuring that the lien is satisfied.  *Kearny County Hosp. v. Allstate Ins. Co.* 38 Kan.App.2d at Syl 2.

29

But plaintiff's argument actually goes further, insisting that the demand to leave Wesley's name off the check not only be accepted but that it be accepted **immediately**.  In this case, an offer was made to pay the policy limits and leave Wesley's name off of the check within approximately one month after Crockett made the demand.   But prior to that, Nungesser's attorneys had already decided the bad faith die was cast by the December 19 phone message and that, therefore, they would no longer accept an offer that met the demands they had made on December 18.  As discussed above, this would, at most be a delay and caution should be exercised in finding liability.  And during that short delay, nothing had happened that would legitimately make the "counteroffer" made in December suddenly unacceptable when it was offered back in January.

"[I]f a claimant arbitrarily withdraws an initial settlement offer and later rejects an identical proposal from the insurer, the claimant's conduct is the legal cause of the failure to settle."  *Wade*, 483 F. 3d. at 674.   In *Wade* the court specifically addressed whether Graybill's determination that he already had a *prima facia* case against the insurer is sufficient reason to reject a later policy limits offer.  The court held that it did not.

Plaintiff also seems to be contending that the insurance contract between Bryant and EMCASCO obligated Fischer to insert EMCASCO into the lien dispute between Nungesser and his healthcare providers.  Again, there is no legal authority interpreting insurance contracts to include such an obligation after the policy limits have been offered.  Certainly, there is nothing to indicate that he was obligated to do so within less than the one month it took to get the lien issue resolved anyway.

This suggestion that Fischer should have immediately conceded to the demand in December or that he should have quickly interjected himself into the dispute between Nungesser and Wesley

within the one month following the December 18 conversation is exactly the kind of claim manufacturing that the Tenth Circuit found improper in *Wade*.  It is also contrary to the holding in *Flemming* that no duty to an insured was breached even though two years and much discovery elapsed after the insurer expressly rejected a policy limits offer.

   This suggestion also runs afoul of the rule that more than a mere error judgement is required to establish a failure to settle claim.  At most the one month hesitation and the failure to  interject himself into the dispute between Nungesser and his healthcare providers was a temporary error in judgement in handling an unusual situation.  And even then he did not carelessly decide how to respond but obtained and followed legal advice and then hired another attorney to continue efforts to get the case settled.

   Plaintiff's phrasing of the first theory of recovery in the Pretrial order makes it  appear that he intends  to  lift a sentence in the case law from its context and use it to argue for a result that is clearly contrary to the teaching of the cases as a whole.  In the course of expounding on the duty to give *equal* consideration to the insured's interests, the courts have used the phrase that an insured should use "that degree of care which would be used by an ordinarily prudent person in the management of his own business, with no policy limits applicable to the claim." *Bollinger v. Nuss*, *supra*.  However, what plaintiff overlooks is that the language applies to the "*evaluation of the claim*" and the decision to make or accept offers *"within the policy limits."*    That language does not require an insurer who has offered its policy limits to go further and pay more than the policy limits or even put itself at risk of being called upon to do so by ignoring a lien.   Nor does it require an insurer that has already offered its policy limits to inject itself into a lien dispute between an

injured claimant and his healthcare providers.  The prompt evaluation and the repeated offer of the policy limits fully satisfied this contractual obligation.

If that sentence is lifted from the context as plaintiff seeks to do, it would effectively abolish policy limits in the state of Kansas despite the fact that premiums are based upon policy limits.  For example, assume  an insured paid the premiums for a policy with $100,000 limits but caused damages and injuries for which the insurer's investigation indicated the probable verdict would be at or above $5,000,000.  The insurance company promptly offers its policy limits.  But the claimant responds with an offer of  $3,000,000.   If the obligation to conduct itself as though there were no policy limits  is divorced from the context of considering an offer "within the policy limits" it could be used to insist that it would be bad faith for the insurer to reject  an offer of $3,000,000, despite having policy limits of only $100,000 – obviously if a reasonably prudent person were facing a $5,000,000 dollar judgement and had no policy limits, he would be happy to take a $3,000,000 and save himself $2,000,000.   Thus, if the language plaintiff relies upon is taken out of context  and applied beyond the decision to offer policy limits, there is no such thing as a policy limit.

But if that language is considered  in its proper context – the consideration of whether to offer policy limits –  it is clear that  what the court was saying is that an insurer cannot gamble with its insured's money  by accepting a high  risk of an excess judgement in order to take a lesser chance at obtaining a judgement **below the policy limits**.   In other words, the cited language does not mean that an insurer must pay more than its policy limits or accept conditions on a settlement offer that put it at risk of paying more than its policy limits by having to satisfy a hospital lien after having paid its policy limits   Nor does it mean that the insurer's contract with its insured creates  an obligation,

after offering its policy limits, to interject itself into a dispute between a third party claimant and his healthcare providers or other lien claimants.

The admonition to act as one would if there were no policy limits applies to the decision to offer the policy limits or something less and is intended to make that evaluation more objective. That duty is satisfied when the policy limits are offered. At that point, the insurer has placed its full obligation on the table and is not required to go beyond its policy limits to provide additional benefit to its insured who selected the policy limits and paid only for the coverage afforded by the limits he selected. Holding otherwise would essentially abrogate policy limits in this state. Then insurers would have to also calculate premiums as though there were no policy limits and citizens of the state would be deprived of the right to pay lower premiums by agreeing to lesser amounts of coverage. This is clearly not a result the courts intended.

At no time did EMCASCO violate its duty to give proper consideration to its insured's interests. It did evaluate the claim as if no policy limits applied. It then made its decision to promptly offer its policy limits. It was even willing to consider Crockett's demand for a check that did not include Wesley. It sought legal advice on that issue. But it was entitled to consider its own interests and not expose itself to payments beyond the policy limits by ignoring its statutory duty on the lien. And when the lien issue was resolved a short time later, EMCASCO immediately made it clear that its policy limits offer was still open and even agreed to pay the remaining portion of the lien in addition. This conduct clearly fully satisfied its obligations under the contract to give Bryant's interests equal consideration.

When the circumstances are viewed as they reasonably appeared to Fischer, at the time, it is clear that even here, equal consideration was given to Bryant's interests. At the time of Fischer's

Dec 19 phone message, it reasonably appeared to him that the case was settled. He had been trying to get a response to his policy limits offer for months.  And his conversation with Crockett on December 18 was clearly to the effect that Nungesser was willing to settle for the policy limits.   At that point Fischer reasonably believed that Bryant's interests had been protected and he rightly also gave consideration to protecting EMCASCO's legitimate interest in avoiding double liability.

Fischer's phone message on December 19 was not a discussion ending rejection of a policy limits offer, it was part of an ongoing discussion of how to best resolve or get around the line issue.  This is demonstrated clearly by the fact that his response to the very next communication from Crockett was to hire an attorney for the specific purpose of contacting Crockett and continuing the dialog and efforts to complete the settlement.  This is further demonstrated by the fact that when the lien issue was resolved, the policy limits offer was again renewed with no requirement that Wesley's name be on the check

Not  until receipt of Graybill's January 15 letter – arbitrarily drawing a line in the sand and indicating there would be no more talk of policy limits settlements – was it indicated that the case was not going to settle for the policy limits EMCASCO had been offering since the previous August. Up to that point, Fischer had no reason to believe that Bryant's interests had not been fully protected and the case on track to be settled for the policy limits.   In *Wade,* the fact that the insurer's agents has no reason to believe a policy limits offer would not be accepted, even after a deadline had run, was cited as a factor indicating a lock of bad faith or negligence on the part of the insurer.

> EMCASCO, through Mr. Cooper, had no reason to believe that
> Plaintiff's counsel would refuse to accept a settlement offer on
> account of the additional  delay between August 20 and
> November 1. The Plaintiffs had extended their offer before, and
> circumstances had not changed in any relevant respect.

*Wade,* 483 F.3d at 672-673.

### 4.        EMCASCO did not fail to keep Bryant properly advised.

Plaintiff's third theory of recover is that EMCASCO failed to communicate all settlement offers it received.  However, it is undisputed that within days of making the initial policy limits offer in August, 2002, Fischer promptly notified Bryants parents[4] of the fact that the case could involve personal exposure above the policy limits.  (SOF 9.)   In October, he advised them of the policy limits offer.  (SOF 16.)  The only event that could even be remotely argued to have been a settlement offer received by EMCASCO and not communicated to plaintiff is the conversation of December 18 in which Crockett indicated Nungesser would settle for the policy limits already offered but insisted that Wesley be omitted from the settlement check.  As indicated above, Defendant believes that to characterize this as a counter offer is inaccurate.  However, whether it was or was not, in hindsight, is irrelevant.  As already mentioned, in assessing Fischer's conduct, the situation must not be viewed in hindsight.  Rather, it must be viewed as it reasonably appeared to Fischer.  The whole conversation was consistent with a general agreement to settle for the policy limits followed by a discussion of how to make the check payable.  Fischer reasonably viewed it just that way.  In fact, he believed the case had been settled at that point pending working out the details of payment. As he reasonably viewed the situation, there was no new offer to communicate.  Rather, the details of payment of the August offer,  of which he had already advised Bryant's mother, were being hashed out.  When the situation is viewed as it reasonably appeared to Fischer, there was no offer to communicate and it was not bad faith or negligence or unreasonable to failure to communicate with Bryant at that time about ongoing conversation concerning the details of payment.  Crockett did

---

[4]At that time, Bryant was a minor (SOF 2.)

not call back to tell Fischer the negotiations were over.  His letter of December did not clearly so

indicate.  He did not say so in his conversation with Milsap on January 2.  Upon receipt of Graybill's

January 15 letter clearly indicating for the first time, that the policy limits offer would not be taken,

Fischer sent a copy of that letter to Bryant's parents.  (SOF 58.)

## II.    Plaintiff cannot prove causation

Even if plaintiff's contentions concerning the duties placed upon EMCASCO are accepted,

summary judgement is still required because the complained of conduct is not the legal cause of the

plaintiff's damages.

Since this is a breach of contract claim, the rules of contract law apply, including the

requirement of causation.  *Wade,* 483 F.3d at 673.  An insured may recover "only for those excess

judgment losses directly and naturally resulting from the breach." Id.; *Sours v. Russell*, 25 Kan. App.

2d 620, 967 P.2d 348, 351(1998.)  There must be a causal link between the insurer's conduct and

the excess judgement.  *Hawkins  v. Dennis*, 258 Kan. 329, 905 P.2d 678, 690 (Kan. 1995);

*Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 15 Kan. App. 2d 153, 804 P.2d 1012, 1021-22 ( 1991).

It is "settled beyond serious question that, in order to warrant recovery for an insurer's bad faith

settlement negotiations, it must be shown that the insurer's conduct caused the ensuing excess

judgment." *Peckham v. Continental Casualty Insurance Co.,* 895 F.2d 830, 836 (1st Cir. 1990).

In particular, in light of the purposes of the bad faith cause of action, courts cannot presume

that any failure to reach a settlement when the insurer did not meet a deadline unilaterally imposed

by the third-party plaintiff--no matter how arbitrary or manipulative the deadline may be--may

reasonably be blamed on the insurer.  *Wade,* 483 F.3d at 670.

> Permitting an injured plaintiff's chosen timetable for settlement to govern the bad-faith inquiry would promote the customary manufacturing of bad-faith claims, especially in cases where an insured of meager means is covered by a policy of insurance which could finance only a fraction of the damages in a serious personal injury case. Indeed, insurers would be bombarded with settlement offers imposing arbitrary deadlines and would be encouraged to prematurely settle their insured's claims at the earliest possible opportunity in contravention of their contractual right and obligation of thorough investigation.

*Wade,* 483 F.3d at 670, (quoting from *Pavia v. State Farm Mut. Auto. Ins. Co.,* 82 N.Y.2d 445, 626 N.E.2d 24, 28-29, 605 N.Y.S.2d 208 (N.Y. 1993)).

In analyzing the causation issue, it is "necessary to take into consideration ... the reasons the plaintiff had for declining to entertain an offer after the expiration of the deadline." *Wade,* 483 F.3d at 670.

"[I]f a claimant arbitrarily withdraws an initial settlement offer and later rejects an identical proposal from the insurer, the claimant's conduct is the legal cause of the failure to settle." Id. at 674. In *Wade* the court specifically addressed whether Graybill's determination that he already had a *prima facia* case against the insurer is sufficient reason to reject a later policy limits offer. The court held that it did not.

In *Wade*, Mr. Graybill had sent a letter very similar to his January 15 letter in this case expressly stating the reason that there would be no further discussion of policy limit offers. The court noted that this was an admission that the plaintiff's motive in rejecting a policy limits offer after a deadline had past was to "setup a bad faith claim against the insured." 483 F.3d at 673.

The Tenth Circuit went on to hold that when the rejection of policy limits settlement offer, even after a deadline and a delay, was a part "of a strategy to establish a bad faith claim against

EMCASCO for its failure to settle the case earlier," liability "would be inconsistent with the cause of action for bad-faith or negligent failure to settle."  483 F.3d 674.

The *Wade* court concluded by stating that it would be "turning the cause of action on its head by holding an insurance company liable where it eventually offered to settle the claim for the policy limits, but a claimant rejected the offer  precisely in order to manufacture a lawsuit against the insurer for bad-faith refusal to settle." *Id.*

That is exactly the situation in this case with one notable exception making the result of no liability all the more appropriate.  In this case, it was EMCASCO that made the first offer long before any deadline was set by the claimant.  That offer was renewed repeatedly and never withdrawn.  Even if the December 18 conversation is regarded as a counter offer by the claimant which was rejected by EMCASCO in the December 19 phone message, EMCASCO undisputedly made another offer of its policy limits without condition on January 21.  And there is no reason in the facts to indicate why that offer was rejected other than Mr. Graybill's letter of a few days earlier – January 15 – indicating that no more discussions of policy limits would be entertained because he believed he already had a claim against EMCASCO for failure to settle one month earlier without including Wesley on the check.

Between December 19 and January 21 very little had happened and nothing of significance had changed except that the lien was no longer an issue.  If anything the removal of the lien gave Nungesser more reason to accept the policy limits in January than he had in December.  With the lien reduced by Wesley, he now knew for certain that he would not have to share a policy limits settlement with Wesley.  Nungesser's attorney had filed a Petition against Bryant.  But they were clearly in no hurry to get it served as they had made no attempts to have it served by the time the

policy limits offer was renewed in January.  They had simply filed it as part of the strategy to set up the bad faith claim they clearly intended to pursue.  Rejecting the offer of January 21 was for no other reason than to further the strategy of setting up this claim.

In *Adduci v. Vigilant Insurance Co., 98 Ill. App. 3d 472, 424 N.E.2d 645, 53 Ill. Dec. 854 (Ill. App. Ct. 1981)*,  cited with approval in *Wade,* the court held that it  could not "fairly place the blame for failure of settlement upon Insurer" when the plaintiff did "not show why the offer would have been good on May 7, 1976, but was not acceptable on June 18."   424 N.E.2d at 649. In this case the blame for failure to settle cannot be placed on EMCASCO when it cannot be shown why an offer good on December 18 was not acceptable on January 21.

The result must be the same as it was in *Wade.*  This is made even more clear when the facts of this case are compared to *Glen v. Flemming, supra,* in which it was held that there could be no liability when the company made an offer more than  two years after expressly rejecting one, during which time extensive expense and discovery was incurred.

Mr Fischer's declination to issue a check without a lien claimant's name on the check, reversed by the offer a month later is simply not the legal cause of the excess settlement.  Nor was any failure to tell Bryant of the discussion of December 18.   This was also remedied by the subsequent offer.

Nor was any failure to get involved in the lien dispute a cause of plaintiff's Nungesser's refusal of the January offer.   By that time the lien dispute had been resolved and there was nothing further that need to be done.  Moreover, previously Fischer had tried to get a release that would permit him to talk to Wesley but it was never returned.  And Wesley's attorney has indicated it would not have done any good anyway as he would not have negotiated Nungesser's lien with

EMCASCO.  Thus, the failure to get involved in the lien dispute between December 18 and January 21 is the cause of plaintiff's refusal of the policy limits offer.  The sole reason Nungesser rejected the offer in January was the improper attempt to set up this very claim.  EMCASCO is, therefore, entitled to summary judgement.

As already argued above, the fact that EMCASCO was never given an opportunity to settle *within its policy limits*, also prevents any finding that any conduct on its part was a cause of the excess judgement against Bryant.

## CONCLUSION

For the reasons set forth above, EMCASCO is entitled to summary judgement.

WATKINS CALCARA, CHTD.

s/  Allen G. Glendenning
      Allen G. Glendenning, #12187
      1321 Main - Suite 300
      P.O. Drawer 1110
      Great Bend, Kansas  67530
      (620) 792-8231
      Attorneys for Defendant