IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JOSH M. BRYANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 07-1285-WEB |
| | ) | |
| EMCASCO INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## **RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** the Plaintiff, Josh M. Bryant by and through his attorneys of record, Jacob S. Graybill and N. Russell Hazlewood, of Graybill & Hazlewood L.L.C., and  hereby submits his response in opposition to the motion for summary judgment filed by Defendant EMCASCO Insurance Company.  The affidavits, exhibits, and transcripts attached hereto are each incorporated by reference herein.

### **Introduction and Summary of Argument**

Under Kansas law, an insurer is liable for the full amount of its insured's resulting loss, even if that amount exceeds the limits of the insurance policy, for negligence or bad faith in defending or settling actions against its insured.  There is no formula or litmus test.  The issue is fact sensitive and must be determined in light of the facts in each case.  Whether an insurer acted in bad faith or was negligent in the handling of settlement negotiations is a question for the trier of fact.  The summary judgment record demonstrates that triable issues remain; and Bryant's claims herein are not susceptible of summary adjudication.

Bryant's evidence, viewed in a light most favorable to him, provides solid ground for a jury to find that EMCASCO's lack of due care and/or good faith in handling of settlement negotiations for Bryant resulted in a judgment against him that exceeded the limit of his insurance by $1,700,000. (Indeed, in this unusual circumstance, one jury already reached that conclusion).  Consequently, summary judgment is unwarranted, and the matter should proceed to trial on the merits.

### Controverted and Uncontroverted Facts

**A.     Bryant's Response to EMCASCO's Statement of Uncontroverted Facts**

1.      Uncontroverted.

2.      Uncontroverted.

3.      Uncontroverted.

4.      Uncontroverted.

5.      Uncontroverted.

6.      Uncontroverted.

7.      Uncontroverted.

8.      Controverted in part.    Uncontroverted that Fischer communicated an offer to Nungesser's counsel on August 27, 2002.  However, the cited reference does not support the incomplete asserted fact, as stated.  The offer was expressly conditioned upon Nungesser's acceptance of a single check made jointly payable to Nungesser and Wesley.  (Crockett Depo. 07/11/03 at p. 54:14 - 55:10; Fischer Depo. 8/13/03 at p. 44:12-17; Crockett Depo. 3/2/04 at p. 38:21-39:5, 109:3-10; JT Tx Vol. 1, p. 81:17-22; Finding of fact in *Nungesser v. Bryant*, 283 Kan. 550, 552, 153 P.3d 1277 (2007)).[1]

---

[1] As this issue was decided by the state district court, and affirmed by the Kansas Supreme Court, the doctrine of collateral estoppel precludes EMCASCO from relitigating it.  *See* argument at section II(B), *infra.*

9.      Uncontroverted.

10.     Uncontroverted.    However, per the discussion, referred to in Fischer's letter, EMCASCO's offer was expressly conditioned upon Nungesser's acceptance of a single check made jointly payable to Nungesser and Wesley.  (Crockett Depo. 07/11/03 at p. 54:14 - 55:10; Fischer Depo. 8/13/03 at p. 44:12-17; Crockett Depo. 3/2/04 at p. 38:21-39:5, 109:3-10; JT Tx Vol. 1, p. 81:17-22; Finding of fact in *Nungesser v. Bryant*, 283 Kan. at 552, 153 P.3d 1277 ).[1]

11.     Uncontroverted as narrowly stated, but misleading and irrelevant.  Crockett and Fischer did have continuing discussions about settlement in September of 2002.  (*See, e.g.*, response to 12, *infra*).

12.     Controverted in part.  Uncontroverted that Crockett and Fischer spoke by telephone on September 25, 2002.  Controverted to the extent that EMCASCO improperly truncated the cited question and answer and cited Crockett's testimony out of context.  Crockett  testified:

Q.      What was the substance of the September 25th discussion with Mr. Fischer?

A.      Mr. Fischer had contacted me to see how progress was.  At that point in time Mr. Nungesser had been, if I recall this correctly, just very recently released from the hospital.  He had been in physical therapy in Oklahoma, but just released from that process.   The medical bills were still coming in.  I think Mr. Fischer asked for some employment records and basically reiterated the position that he had taken throughout our conversations, that any payment would be subject to putting Wesley on the check because of the hospital lien which Wesley had filed.

(Crockett 6/23/08 Depo. 22:3-18).

13.     Uncontroverted.  However, EMCASCO's offer was conditioned upon Nungesser's acceptance of a single check made jointly payable to Nungesser and Wesley.  (Crockett Depo. 07/11/03 at p. 54:14 - 55:10; Fischer Depo. 8/13/03 at p. 44:12-17; Crockett Depo. 3/2/04 at p. 38:21-39:5, 109:3-10; JT Tx Vol. 1, p. 81:17-22; Finding of fact in *Nungesser v. Bryant*, 283 Kan. at 552-553, 153 P.3d 1277 ).[1]

14.     Controverted in part.   Uncontroverted that Fischer communicated an offer to Nungesser on four occasions.   However, the cited reference does not support the incomplete, asserted fact as stated.  The offer was (or offers were) also conditioned upon Nungesser's acceptance of a single check made jointly payable to Nungesser and Wesley.  (Crockett Depo. 07/11/03 at p. 54:14 - 55:10; Fischer Depo. 8/13/03 at p. 44:12-17; Crockett Depo. 3/2/04 at p. 38:21-39:5, 109:3-10; JT Tx Vol. 1, p. 81:17-22; Finding of fact in *Nungesser v. Bryant*, 283 Kan. at 552, 153 P.3d 1277).[1]

15.     Controverted in part as misleading.  Uncontroverted that EMCASCO's offer was not "withdrawn." However, EMCASCO rejected Nungesser's counter offer and made no subsequent offer before Nungesser filed suit.  (Crockett Depo. 3/2/04 at 73:20-74:19, 109:21-110:14).

16.     Controverted in part as misleading.  Fischer's October 23, 2002, letter did not fairly advise the Bryant family of EMCASCO's offer in that it failed to disclose the offer was conditioned upon Nungesser's acceptance of a single check made jointly payable to Nungesser and Wesley. (Exhibit 62).

17.     Uncontroverted.

18.     Uncontroverted.

19.     Uncontroverted.

20.     Uncontroverted.

21.     Uncontroverted.

22.     Uncontroverted.

23.     Uncontroverted as qualified.  Graybill agreed with Crockett that, if Wesley's name had been on a single settlement check, Wesley would have been able to exert leverage on Nungesser to capitulate  by refusing to endorse the settlement check and thus denying Nungesser access to *any*

of the money (while the check went stale).  (Crockett Depo. 3/2/04 at 112:14-113:16; Graybill Depo. at 71:4-24).

24.     Uncontroverted.  Crockett also offered to escrow money to address Wesley's lien in his trust account to facilitate the settlement.  (JT Tx Vol. 1, 88:4 - 90:10; Fischer Depo. 8/13/03 at p. 65:17-22; Exhibit 19).

25.     Controverted.   Crockett sent a letter memorializing the December 18, 2002, conversation shortly after it occurred.  (Exhibit 19).   Crockett and Fischer have both testified that Crockett's December 31, 2002, letter accurately reflects what occurred in their December 18, 2002, telephone conversation,  (Fischer Depo. 8/13/03 at p. 43:13 - 44:17; JT Tx Vol. 2, p. 192:6 - 194:8). "There is no dispute between the parties that Crockett's December 31, 2002, letter accurately described the events of December 18 and 19."  (Finding of fact in *Nungesser v. Bryant,* 283 Kan. at 554, 153 P.3d 1277).[1]

26.     Uncontroverted.

27.     Uncontroverted.

28.     Controverted.  Fischer's testimony in other settings confirms he understood that Crockett was making an offer that EMCASCO could accept or reject.

Q     Was it your understanding that as of approximately December the 18th or 19th of the year 2002 that Mr. Crockett had authority from his clients to accept [a policy limit] offer if only EMC had agreed with his condition that the check be made payable to him and that he would place the amount of the Wesley medical lien in his client account?

A     True.  That's correct.

(Fischer Depo. 8/13/03 at 195:11 - 196:1; Exhibit 19; Fischer Depo. 8/13/03 at 43:19-44:8; JT Tx., Vol.2, 191:10-194:6).

29.     Controverted.  This statement is incomplete and oversimplified.  A fair assessment of Fischer's state of mind requires consideration of his prior testimony.  (Fischer Depo. 8/13/03 at 43:19-44:8; 195:11 - 196:1; Exhibit 19; JT Tx. Vol. 2,  191:10-194:6).

30.     Controverted.  The asserted fact is not supported by the cited reference.  Graybill's testimony relates to Wesley being "[goaded] into filing a lawsuit against Jim Nungesser."  (Graybill Depo. at 72:4-5) (emphasis added).  Graybill said nothing about Wesley "suing on the lien," or suing EMCASCO.  Furthermore, Graybill testified he could not recall whether the issue of goading Wesley into suing Nungesser was every actually contemplated back in 2002.  (Graybill Depo. at 72:17-24).

31.     Controverted.  The cited testimony is taken out of context.  It would be accurate to say Graybill speculated it "makes all the difference in the world in a consumer protection case where you're trying to collect consumer protection violations if you – if the – if the wrongdoer files suit against the innocent person."  Graybill testified (six years after the fact) he could not recall whether the issue of goading Wesley into suing Nungesser was every actually contemplated back in 2002. (Graybill Depo. at 72:17-24).   However, Graybill's letter of January 15, 2003, reflects his contemporaneous understanding of the rationale behind Nungesser's unwillingness to accept a check he could not cash without Wesley's endorsement: "If [Nungesser] accepted a check payable both to himself and Wesley, Wesley would be in a position to extort a payment from Jim it was not entitled to receive by refusing to endorse the check."  (Exhibit 41).

32.     Controverted.  This statement distorts the cited reference.  Crockett's answer was "I suppose that's a possibility" (that he understood EMCASCO and/or Bryant could be sued by Wesley).

33.     Uncontroverted.

34.     Uncontroverted.

35.     Uncontroverted.

36.     Uncontroverted.

37.     Uncontroverted, but incomplete.  Pigg's advice was based on an inaccurate and incomplete disclosure of the material facts and circumstances. (Additional Fact ¶ 118, *infra*).

38.     Controverted.  The cited reference does not support the asserted fact.  Crockett did not testify the message said EMCASCO *could* not issue the check, the operative message was that EMCASCO "would not" issue the check.  (*See also* Exhibit 19 ("On December 19 you did call, and you left a message stating that, because of Wesley's demands, [EMCASCO] would not pay the settlement proceeds unless Wesley were named on the check – right along with Jim Nungesser – as a joint payee!")).

39.     Controverted, in part, as stated.  The cited references make no mention of a "right" to be concerned.  Bryant has admitted that EMCASCO "had a legitimate concern in protecting itself from having to pay the lien in addition to the policy limits."  That concern was addressed by Crockett's proposal to escrow funds to address the lien.  (JT Tx. Vol. 2, 89:8-18; see also Additional Fact ¶ 114)

40.     Uncontroverted.

41.     Controverted.  This purported uncontroverted fact should be ignored because it does not identify the "phone message."  If it is intended to refer to the message Fischer left with Crockett's assistant on December 18 or 19, 2002, there is no evidence that Fischer requested a return call or expected a return call.  In any event, Crockett did respond to that message in writing. (Exhibit 19).

42.     Uncontroverted.

43.     Uncontroverted.  There was no reason to do so – EMCASCO was unwilling to enter into that type of arrangement.  (Exhibit 19).

44.    Uncontroverted.

45.    Controverted.  Fischer's contemporaneous note of his telephone conversation with Millsap indicates only that Fischer authorized Millsap to "call [Crockett] to discuss this matter further and get a feel for how he intends to put money into a trust account and work out an agreement with Wesley to go after [Nungesser]'s health insurance."  (Exhibit 245).

46.    Uncontroverted.

47.    Controverted, in part.  The issue did not come up during the subject call.  However, before the call, Millsap read Crockett's December 31, 2002, letter to Fischer; and it was Crockett's perception that Millsap was "obviously pretty familiar with the status of [the matter] at that point."(JT Tx. Vol. 2, p. 27:20-29:4).  Millsap testified that when he read Crockett's December 31, 2002, letter he noted that it "included a statement something to the effect now the only opportunity to settle this case with the policy limits had passed . . ."  (JT Tx., Vol. 3, 140:25-141:13).

48.    Uncontroverted as qualified by Bryant's response to No. 47, above.

49.    Controverted.  The cited reference does not support the asserted fact.  The cited reference indicates that Millsap speculated, without explanation, that someone might be able to "approach the Court."  (JT Tx. Vol. 2, 121:22-122:19).  There is no indication in the cited reference of a discussion of "various ways to deal with the lien issue that would protect EMCASCO."

50.    Uncontroverted.

51.    Uncontroverted.

52.    Uncontroverted.

53.    Uncontroverted, in part.   No summons was issued when suit was filed.  However, ultimately, service was obtained by agreement.  (Carmichael Depo. 6/05/08 at 19:16-20:1).

54.    Uncontroverted.

55.    Uncontroverted.

56.    Uncontroverted.

57.    Controverted.  EMCASCO has misquoted the letter.  The letter states, in pertinent part:

> When an insurer fails to exercise due care in the handling and/ or defense of claims against its insured or when it acts in bad faith toward its insured by failing to give equal consideration to the insured's interests, it becomes liable to save its insured harmless from any subsequent judgment regardless of the amount or the limit of the insurance. *See* Syl. 1, Koppenheffer, *supra.*
>
> If it appears from the facts presented, that a prima facie case can be made that a tortfeasor's liability insuror has, as the result of negligence or bad faith, deprived its insured of an opportunity to escape uninsured liability, an attorney representing a grievously injured person whose injuries were inflicted by the insuror's policyholder must advise his client to terminate negotiations to settle for the limit of available insurance and pursue a different course calculated to lead to a full, just, recovery. The conscientious exercise of an attorney's professional responsibility demands as much.  Consequently, I had no other choice but to give that advice, and Jim has followed that advice and has instructed me to inform you that any further negotiations calculated to relieve Mr. Bryant of the full measure of his liability in return for the payment of the limit of EMC's insurance policy are terminated. Forced to pursue an alternative remedy, Jim has reluctantly instructed us to file suit against Bryant. . . . .

(Exhibit 41).

58.    Uncontroverted.

59.    Uncontroverted.

60.    Uncontroverted.

61.    Uncontroverted.

62.    Uncontroverted.

63.    Uncontroverted.

64.    Uncontroverted.

65.    Controverted.   A fair summary of the cited authority is that at the time of his deposition (June 5, 2008), Graybill could not recall the specifics of his activities between January 1 and January 21 more than five years prior.  Since his deposition was taken, a review of available

9

file material reveals he drafted two letters to Millsap dated January 15, 2003 and January 16, 2003;

he participated in a phone conference with Crockett and Millsap on January 20, 2003; and he worked

on a 34-page petition against Wesley that was intertwined with Nungesser's lawsuit against Bryant.

(Graybill Affidavit; Exhibit 41; Exhibit 42).

      66.     Uncontroverted.

      67.     Uncontroverted.

      68.     Uncontroverted.

      69.     Uncontroverted.

      70.     Uncontroverted.

      71.     Uncontroverted.

      72.     Uncontroverted.

      73.     Uncontroverted.

      74.     Uncontroverted.

      75.     Uncontroverted.

      76.     Uncontroverted.

      77.     Uncontroverted.

      78.     Uncontroverted.

      79.     Uncontroverted.

      80.     Controverted, in part, as misleading.  The subject argument was expressly made

exclusively on Nungesser's behalf.  (Exhibit 241 ("With regard to the issue of settlement, Bryant

stands mute.  The following response in this Section I is Nungesser's alone.")).

      81.     Uncontroverted, but irrelevant.  Bryant's liability to Nungesser had already been

reduced to a confessed judgment that was entered with the written approval of EMCASCO.  In

exchange, Nungesser had given Bryant a covenant not to execute.  As part of the bargain,

EMCASCO agreed that the covenant wold not prejudice Bryant's right to recover the excess judgment amount from EMCASCO.  (Exhibit 240).

82.     Uncontroverted.

83.     Uncontroverted.

84.     Uncontroverted.

85.     Uncontroverted.

86.     Uncontroverted but incomplete.  Bryant's second confession of judgment was also entered with EMCASCO's prior written consent.  EMCASCO agreed that Bryant's rights against it would not be prejudiced by the confession of judgment.  (Exhibit 240).

**B.     Bryant's Statement of Additional Uncontroverted Facts.**

Bryant hereby sets forth his Statement of Additional Uncontroverted Facts demonstrating that material factual issues preclude summary judgment for EMCASCO.

87.     Bryant caused the accident when he failed to yield right of way to Nungesser.  (JT Tx. Vol. 1, 38:2-39:23).

88.     Nungesser suffered orthopedic injuries and a serious brain injury in the accident.  (Pretrial Order Stipulations 4(a)(I); JT Tx. Vol. 2, 158:12-160:19).

89.     Nungesser was a real estate executive earning a six-figure income prior to the accident, which rendered him unable to work.  (Carolyn Nungesser Affidavit).

90.     Bryant never disputed he was responsible for causing the accident.  (JT Tx Vol. 1, 39:11-40:24; 41:14-25).

91.     After the accident, Nungesser was transported via ambulance to Via Christi Regional Medical Center, where he was stabilized.  (Carolyn Nungesser Affidavit).

92.     On or about June 22, 2002, Nungesser was transferred from Via Christi's Surgery Intensive Care Unit to the Surgery Intensive Care Unit at Wesley Medical Center, at the direction of his health maintenance organization ("HMO").  (Carolyn Nungesser Affidavit).

93.     Wesley was a contracting provider for Nungesser's HMO.  (Pretrial Order Stipulations 4(a)(ii)).

94.     When Nungesser's wife, Carolyn, received Wesley's $45,532.85 lien notice, she assumed Nungesser's HMO had failed to pay his bill, and she contacted the HMO to inquire. Carolyn was told the HMO had already paid Via Christi's charges; that it had not received a claim from Wesley; and that it would pay Wesley's charges if and when the hospital submitted a claim. (Carolyn Nungesser Affidavit).

95.     Under Kansas law and the terms of his HMO agreement, Nungesser was not obligated to pay Wesley for covered services he received.  (K.S.A. 40-3209(b); Exhibit 13 at p. 24 ("inpatient hospital: "you pay nothing")).

96.     Any action by Wesley to collect or attempt to collect any sum from Nungesser that was owed by his HMO was, by statute, *per se*, an unconscionable act in violation of the Kansas Consumer Protection Act.  (K.S.A. 40-3209(b)).

97.     By August 22, 2002, Fischer learned from his investigation that Nungesser suffered a fractured left femur, fractured pelvis, fractured left wrist, fractures of the C-1 and C-2 vertebrae and traumatic head injury in the collision; that Nungesser was in a rehabilitation hospital and was unable to walk or use his arms; that Nungesser spoke, but not intelligibly; that Nungesser was being fed through his stomach, because his swallow reflex didn't work; that it was indicated Nungesser would not be able to return to work; that Nungesser's medical bills already totaled at least $157,000; and that the property damage to Nungesser's motorcycle was around $20,000.00.  (Fischer Depo. 8/13/03 at p. 159:23-163:20; JT Tx. Vol. 2, 158:12-160:19).

98.     During the third week of August, 2002, Fischer and his superiors concluded from their investigation that Bryant was "clearly at fault" and that Nungesser's claims had a "value in excess of the $300,000.00 policy limit". (Fischer Depo. 8/13/03 at 159:23 - 170:24; Exhibit 35; JT Tx Vol. 2, 198:4-199:14;). Fischer prepared internal reports estimating that there was a "zero percent" chance of a successful defense for Bryant. (Exhibit 35).

99.     Fischer never changed his assessment of Bryant's liability. (Fischer Depo. 8/13/03 at 168:1-5).

100.    When EMCASCO made its first offer in August of 2002, Fischer understood that there was a "significant risk to [Bryant] of the possibility of exposure from [Nungesser] if the claim went forward." (Fischer Depo. 8/13/03 at p. 184:3 -7).

101.    Fischer testified that he understood that as an adjustor for EMCASCO, he had the responsibility to protect Bryant from the possibility of financial exposure on the claim. (Fischer Depo. 8/13/03 at p. 184:16 - 185:11).

102.    On August 27, 2002, Fischer sent a letter to Bryant's parents stating, in pertinent part:

Dear Mr. & Mrs. Bryant:

We are handling the above referenced injury auto accident claim in our office.

We are writing to advise you that there is potential exposure of up to and in excess of your $300,000.00 combined single limit of liability on your automobile policy with EMCASCO for the bodily injury sustained by James Nungesser. The Nungesser's are now represented by attorney, Dave Crockett.

We thank you for your time and attention to this matter.

(Exhibit 65).

103.    Fischer's August 27, 2002, letter to Bryant's parents is a *pro forma*, boilerplate document. While the letter did reference a "potential exposure of up to and in excess of the . . .

13

liability limit," it did not disclose EMCASCO's estimation that of the "probability" of a significant excess judgment was 100%. (Exhibit 65; Exhibit 35).

104.    David Crockett is a Wichita attorney who does mostly real estate, business, and construction law. Crockett had assisted Nungesser in various real estate matters in the past and was a family friend. Shortly after the accident, Carolyn contacted Crockett for help. (JT Tx Vol. 1, 71:12-73:3).

105.    Crockett discussed EMCASCO's August 27, 2002, offer with Fischer, including the Wesley lien. Crockett was investigating the validity of the lien, which he believed was contrary to law. (Finding of fact in *Nungesser v. Bryant*, 283 Kan. at 552, 153 P.3d 1277 ;[1] Crockett Depo. 7/11/03 at p. 29:12-30:19, 49:21-50:11).

106.    EMCASCO's offer was always conditioned upon Nungesser's acceptance of a single check made jointly payable to Nungesser and Wesley. (Crockett Depo. 07/11/03 at 54:14 - 55:10; Fischer Depo. 8/13/03 at 44:12-17; Crockett Depo. 3/2/04 at 38:21-39:5, 109:3-10; JT Tx Vol. 1, 81:17-22; Finding of fact in *Nungesser v. Bryant*, 283 Kan. at 552, 153 P.3d 1277 ).[1]

107.    On September 5, 2002, Carolyn Nungesser contacted Quinlynn Foules at Wesley's business office and asked her to immediately submit a claim to Nungesser's HMO. Foules refused to do so, stating that the hospital did not intend to file a claim with the HMO "in this case." Foules explained that, instead, Wesley intended to seek payment of its charges from auto liability insurance proceeds. (Carolyn Nungesser Affidavit).

108.    Crockett concluded that Nungesser did not owe a debt to Wesley; and settling with Bryant for a check made jointly payable to Wesley would significantly impair Nungesser's ability to avoid paying Wesley's lien. (JT Tx Vol. 2, 10:25-12:14).

109.    In early October, 2002, Carolyn Nungesser received a document from Wesley suggesting it had billed Nungesser's HMO, and $180 was due from Nungesser. (Exhibit 6).

110.    On October 9, 2002, Carolyn hand-delivered a $180 check to Foules, at Wesley, along with a copy of the document she received from Wesley, and a note stating:

> I am enclosing our check for $180.00 to pay the enclosed bill.
>
> Your hospital lein [sic], "Wesley's" will not let EMC pay $300,000 to Jim for our settlement.
>
> This check should take care of Wesley's bill.  Please notify EMC that you have withdrawn immediately so we can conclude our settlement.  Thank you so much!
>
> In the memo section of her check, Carolyn noted that it was "payment in full."

(Exhibit 7).

111.    Wesley rejected Carolyn's check.  It did not withdraw its lien as Carolyn requested.  On October 11, 2002, it served an amended lien notice, *increasing* its asserted lien by almost $5,000.  (Exhibit 8; Exhibit 9).  In the Verification of Account attached to Wesley's amended lien notice, the hospital asserted that Nungesser was personally indebted to the hospital for $49,993.00.  (Exhibit 9).

112.    On October 30, 2002, Fischer wrote to Wesley's attorney, Curtis Loub, acknowledging EMCASCO's receipt of the amended lien notice and stating that EMCASCO was waiting for Nungesser to accept its policy limit offer.  (Exhibit 61).

113.    On December 18, 2002, Crockett and Fischer spoke on the telephone.  Crockett told Fischer that Nungesser disputed Wesley's lien and would not allow Wesley to control the proceeds of a settlement by refusing to endorse a settlement check.  Crockett advised Fischer that Crockett didn't want a check jointly payable to Nungesser and Wesley, because Crockett wanted to push Wesley to obtain payment from Nungesser's HMO rather than through a lien on Nungesser's personal injury settlement. (JT Tx Vol. 2 at 186:3-187:13; Exhibit 19).

114.    During the December 18, 2002, call between Crockett and Fischer, "Crockett orally offered to settle Nungesser's claim in exchange for a $300,000 check payable to Nungesser and

Crockett rather than Nungesser and Wesley.  Crockett also offered to escrow money in his trust account to address Wesley's $49,993 lien." (Finding of fact in *Nungesser. v. Bryant*, 283 Kan. at 553, 153 P.3d 1277 ;[1] Exhibit 242 at p. 13; JT Tx Vol. 1, 88:4 - 90:10; Fischer Depo. 8/13/03 at 65:17-22; Exhibit 19).

115.    During the December 18, 2002, call between Crockett and Fischer, Fischer advised Crockett that he was leaving town for vacation at the end of the week.  Fischer expressed doubt that EMCASCO would agree to Crockett's proposal.  Fisher volunteered to look into the matter and get back to Crockett as soon as he could.  (JT Tx Vol. 2, 7:6 - 8:5; 187:17 - 188:3; Exhibit 19).

116.    Crockett did not set a deadline for Fischer to respond to the December 18, 2002, offer.  (JT Tx Vol. 2, 7:6 - 8:5; 187:17 - 188:3; Exhibit 19).

117.    Crockett did request a written response to his December 18, 2002, offer from Fischer, but he never received one.  (Crockett Depo. 3/2/04 at 57:13-15).

118.    After he spoke with Crockett, Fischer called attorney Steve Pigg, on December 18, 2002, for advice about how he should respond to Crockett's offer.

a.    Fischer misinformed Pigg that Nungesser's claim against Bryant had already been settled.  (Pigg Depo. at 17:6-12; *Nungesser v. Bryant*, 283 Kan. at 568, 153 P.3d 1277 (affirming state court's finding that no binding pre-suit settlement was reached); Exhibit 242 at p. 13).

b.    Fischer did not inform Pigg there was an open policy limit settlement offer from Nungesser.  (Pigg Depo. 15:20-16:3).

c.    Fischer did not inform Pigg that Fischer and his superiors had concluded from their investigation that Bryant was clearly at fault, and Nungesser's claims had a value in excess of the $300,000 policy limit. (Pigg Depo. at 14:21-15:5, 14:9-19).

d.    Fischer did not inform Pigg that Crockett had offered to escrow money in his trust account to address Wesley's lien.  (Pigg Depo. at 18:9-19:2).

16

e.      Fischer did not ask Pigg about establishing an escrow to facilitate settlement of Nungesser's claims against Bryant.  (Pigg Depo. at 20:14-15).

f.      Fischer did not ask Pigg to suggest alternative ways to complete a settlement. with Nungesser, *e.g.,* by issuing more than one check.    (Pigg Depo. at 20:8-13).

g.      Fischer did not ask Pigg whether Fischer should do anything at all before rejecting Nungesser's policy limit offer.  (Pigg Depo. at 21:6-12).

h.      Fischer did not inform Pigg that Nungesser disputed the amount of Wesley's hospital lien.  (Pigg Depo. at 17:13-15).

i.      Fischer did not inform Pigg that Fischer had not made, and did not intend to make, Bryant or his parents aware of Nungesser's open settlement offer.  (Pigg Depo. at 16:10-14).

j.      Pigg's advice to Fischer in December of 2002 was not predicated on an understanding that there was an open offer from Nungesser to settle for the policy limit.  Pigg never considered the consequences of rejecting Nungesser's offer.  (Pigg Depo. at 21:13-21).

k.      As a consequence of what Fischer told him, Pigg understood, incorrectly, that "there had been a settlement and they were just in the process of issuing payment."  (Pigg Depo. at 11:17-22).

119.     After speaking with Pigg, on December 18, 2002 or December 19, 2002, Fischer called Crockett's office and left a message to the effect EMCASCO "would not agree to settle unless Wesley was named as a joint payee on the check." (Fact finding in *Nungesser v. Bryant*, 283 Kan. at 553, 153 P.3d 1277 ;[1] Exhibit 19; Fischer Depo. 8/13/03 at 43:13-44:17, 64:23-65:7; JT Tx Vol. 1, 10:25 - 11:12).

120.     At trial, Fischer testified that he responded to Crockett's proposal the same day he received it, after discussing the matter with his supervisor and consulting counsel.  (JT Tx Vol. 2, 188:4-16).

121.    There is no evidence it was inconvenient for Fischer to respond to Nungesser's offer when he did or that he needed or requested additional time.

122.    Crockett testified that escrow arrangements are commonly employed to facilitate the completion of transactions which might otherwise be derailed by issues relating to liens.  (JT Tx Vol. 1, 18:12-20:11).

123.    Crockett would have preferred to escrow money with EMCASCO's attorney. Crockett would have recommended that alternative to Nungesser if EMCASCO had proposed it. (JT. Tx. Vol 2,  29:10-25).

124.    Wesley's lawyer, Curtis Loub considers placing money in an attorney's trust account a viable way to allow a settlement transaction to proceed in spite of a hospital lien if he trusts the lawyer. (JT Tx Vol. 3, at 87:3-88:3).  Loub considers Crockett someone acceptable to place $50,000 in his trust account pending a dispute over a hospital lien.  (JT Tx Vol. 3, at 88:4-89:9).

125.    Fischer understood that Nungesser's claim did not settle, "because [Crockett] would not agree to the way the check was to be issued."  (Fisher Depo. 8/13/03 at p. 186:14-19).

126.    Fischer never attempted to contact Wesley or Loub to discuss Crockett's proposed escrow arrangement before he rejected Nungesser's offer. Fischer testified as follows:

Q    If the Wesley lien and the possibility of having to include Wesley on the check was the only thing that was keeping the settlement from being finalized, why didn't anybody think of calling Wesley?

A    Who are you referring to with anybody?

Q    Anybody.  Why didn't you?

A    Really had no reason to.  It was at that point up to plaintiff's attorney to agree to the terms of the settlement.  We had offered our limit.

(Fischer Depo. 8/13/03 at 55:22-56:7).

127.    Fischer did not communicate the specifics of his investigation indicating liability in excess of policy limits to Bryant or his parents before he rejected Nungesser's December 18, 2002, offer.  (JT Tx. Vol. 1, p. 55:1-60:3).

128.    Fischer did not communicate Nungesser's December 18, 2002, offer of settlement to Bryant or his parents so they might take proper steps to protect Bryant's interests.  (JT Tx. Vol. 1, p. 61:18-21).

129.    Fischer made no attempt to invite Bryant or his family to contribute to a settlement with Nungesser, *e.g.,* by bonding around any risk incident to Crockett's proposal.   (JT Tx. Vol. 1, p. 61:18-21).

130.    On December 31, 2003, Crockett wrote to Fischer, recounted his December 18, 2002, conversation with Fischer and Fischer's message, and advised that in light of EMCASCO's refusal to accept Nungesser's offer, Nungesser intended to evaluate other alternatives.   Crockett's letter stated, in pertinent part:

> Dear Bruce,
>
> This letter will recap our conversation on December 18 and your telephone message on December 19.  As you will recall, I had placed a call to you on December 17, which you were kind enough to return on December 18.  When we spoke on December 18, I told you that we were willing to accept your offer of coverage limits in the above matter but that we needed to make some arrangement with [EMCASCO] in order that we could do so without allowing Wesley Medical Center to control the settlement proceeds.  I explained that we dispute Wesley's claim to the settlement proceeds, and I offered to escrow money in my trust account so that we could settle with [EMCASCO] without capitulating to Wesley's demands.  You told me you would look into this and call back the following day since you were getting ready to take some vacation time over the holidays.  You did express some concern because you said Wesley's attorney, Curtis Loub, had been very aggressive in asserting Wesley's claims against our settlement proceeds.
>
> On December 19 you did call, and you left a message stating that, because of Wesley's demands, [EMCASCO] would not pay the settlement proceeds unless Wesley were named on the check – right along with Jim Nungesser – as a joint payee!  Obviously, this would mean that the only way Jim could receive any money from [EMCASCO] would be if he surrendered to all of the claims of Wesley.

I don't know what Mr. Loub said to you, nor do I know what [EMCASCO] has done proactively in an attempt to get this matter resolved.  It does appear to me that Mr. Loub has interfered with Mr. Nungesser's legitimate expectation that matters concerning subrogation rights of his health insurance are between him and his carrier, and Wesley has no right to interfere.

It would also seem to me that Wesley has interfered with Mr. Bryant's legitimate expectation that the limit of his liability insurance would be available to buy his release from a claim that obviously exposes him to literally millions of dollars of liability.

It would appear to me that Wesley, through its unjustified posturing and threats, has deprived Mr. Bryant of the benefits of his liability insurance with your company and, at the same time, has deprived Mr. Nungesser of his right to his health insurance.

By persuading [EMCASCO] to refuse to pay the limit of Mr. Bryant's insurance policy directly to Mr. Nungesser, Wesley has deprived Mr. Bryant of what will probably be the only opportunity he will ever have to purchase his complete release in return for the proceeds of a policy of insurance he paid for.

In light of the foregoing, Mr. Nungesser has no alternative but to evaluate other alternatives.

(Exhibit 19).

131.    "There is no dispute between the parties that Crockett's December 31, 2002, letter accurately described the events of December 18 and 19."  (Finding of fact in *Nungesser v. Bryant,* 283 Kan. at 554, 153 P.3d 1277).  Fischer testified that Crockett's December 31, 2002, letter accurately reflects what occurred in their December 18, 2002, telephone conversation and in Fischer's subsequent telephone message to Crockett.  (Fischer Depo. 8/13/03 at 43:13 - 44:17; JT Tx Vol. 2, 192:6 - 194:8).

132.    Crockett decided to file suit against Bryant around December 31, 2002.  (Crockett Depo. 6/23/08 at 17:7-14).  He intended the final sentence of his December 31, 2002, letter to communicate that intent.  (JT Tx Vol 2, 24:5-20).

133.    On January 2, 2003, upon receipt of Crockett's letter, Fischer changed lawyers for undisclosed reasons.  He contacted EMCASCO's lawyer, Charles Millsap, and asked for his

assistance.  (Millsap Depo. at 65:6-78:6).  After the telephone call with Millsap, Fisher faxed documents to Millsap, including Crockett's December 31, 2002, letter to Fischer and the Wesley lien documents.  (Millsap. Depo. at 79:6-80:22).

134.    Millsap knows Crockett well and thinks he is an honorable man.  (JT Tx Vol. 3, 141:14-20).

135.    By January 2, 2003,  (*i.e.*, the first day of his involvement in the matter), Millsap had identified that one legitimate way to "address the problem with the Wesley lien and allow the parties to complete the settlement" was to "put the money in [Crockett's] trust account until such time as the Wesley lien was taken care of ."  (JT Tx Vol. 3, 122:14-:22).  He explained: "[M]y reading of the [hospital lien] statute where it says about the insurance company has to pay, that could be satisfied if we put money in [Crockett's] trust account, and along with that, we had a kind of an agreement in place that . . . at least the amount of money recommended for the size of the lien wouldn't come out of the trust account until the deal with Wesley was resolved."  (JT Tx Vol. 3, p. 122:14-123:5).

136.    Millsap concluded the Kansas hospital lien statute "wouldn't have been any kind of barrier at all to working out some kind of an escrow arrangement . . . ."  (JT Tx Vol. 3, 139:5-15).

137.    At Millsap's request, Fischer authorized him to "call [Crockett] to discuss this matter and get a feel for how he intends to put money into a trust account and work out an agreement with Wesley to go after [Nungesser's] health insurance for payment of the hospital bill."  (Fischer Depo. 8/13/03 at 51:14-52:7).

138.    Millsap understood that he had no specific authority from EMCASCO to resolve Nungesser's claim in any particular manner.  (JT Tx. Vol. 3, 148:1-18).

139.    Millsap called Crockett to discuss the matter on January 2, 2003.  Millsap made no offer of settlement to Crockett.  (Crockett Depo. 3/2/04 at p. 89:4-22; JT Tx., Vol. 2, 27:20-31:3).

140.    Had Millsap made an offer, Crockett would have conveyed it to Nungesser. (Crockett Depo. 3/2/04, at 89:4-22).

141.    Millsap did suggest that Crockett contact Jacob Graybill to sue Wesley.  (Crockett Depo.3/2/04, at 89:4-22).

142.    Millsap did not ask Crockett to follow up with him after the January 2, 2003 telephone call.  Instead, Millsap told Crockett that he would "think about it and maybe get back to [Crockett]."  (JT Tx. Vol. 2, 30:19-23).

143.    Millsap was supposed to "get back" with Fischer after discussing the matter with Crockett, but he never did.  (Fischer Depo. 8/13/03 at p. 51:22-52:10).

144.    Crockett filed suit against Bryant in the District Court of Sedgwick County, Kansas, on January 6, 2003, seeking damages for bodily injury and property damage suffered by Nungesser as a result of Bryant's negligence and/or recklessness. (Exhibit 243).

145.    Between January 2, 2003 and January 15, 2003, Millsap had no further contact with Fischer regarding settlement of Nungesser's claim, and no contact of any sort with Crockett. (Fischer Depo. 8/13/03 at 51:22-52:10).

146.    EMCASCO first became aware of Nungesser's suit against Bryant when Millsap received a letter from Graybill dated January 15, 2003, enclosing a copy of the Petition.  (Exhibit 41).

147.    On January 15, 2003, Nungesser filed a 34-page petition against Wesley, asserting claims for abuse of process, tortious interference with economic expectancy, violations of the Kansas consumer protection act, breach of fiduciary duty, and fraud by silence.  (Exhibit 244).

148.    Nungesser's attorney, Jacob Graybill, delivered a copy of Nungesser's Petition against Wesley to Millsap in a letter dated January 16, 2003.  (Exhibit 41).

149.     Bryant's parents did not hire personal counsel for Bryant in December of 2002, because they "didn't think it was necessary because [Diane Bryant] had been told by Bruce Fischer that legal counsel would be provided for Josh." (JT Tx. Vol. 1, p. 61:9-21).

150.     If Fischer had fully informed Bryant's parents about the status of the settlement negotiations, they would have hired personal counsel sooner. (JT Tx. Vol. 1, p. 62:3-11).

151.     On January 21, 2003, Fischer called Diane Bryant and notified her that suit had been filed against Bryant. (JT Tx. Vol. 1, 58:4-17). He followed up the conversation with a letter dated January 22, 2003. At that point, the Bryant's parents did hire attorney Jeffery Carmichael to represent their son, because they were "really worried about the liability part of it." (JT Tx Vol. 1, p. 62:12-16).

152.     The Bryant family retained Carmichael on an hourly fee basis. (Carmichael Depo. 5/19/05 at p. 15:24-16:11; Exhibit 249).

153.     After Carmichael was retained by the Bryant family, he learned that there had been a settlement offer that had been rejected. (JT Tx Vol. 3, 21:8-18).

154.     Had EMCASCO made the Bryants aware of the offer before rejecting it, there were a number of things Carmichael and his firm could have done to resolve the problem for Bryant. (JT Tx Vol. 3, 22:3-23:11). Because EMCASCO rejected the offer before Carmichael became involved, he had no opportunity to address a solution. (JT Tx Vol. 3, 23:12-25:1).

155.     Carmichael asserted third-party claims for Bryant against EMCASCO and Wesley in the state district court. (Exhibit 248).

156.     On September 12, 2003 EMCASCO filed an action in United States District Court for the District of Kansas against Bryant, Nungesser, Nungesser's wife, and two of Nungesser's insurors who claimed subrogation interests in any recovery that Nungesser might obtain against Bryant. When it filed the federal action, EMCASCO deposited its $300,000 policy limit with the

Clerk of the U.S. District Court.  EMCASCO's Complaint asserted two causes of action: the first seeking specific performance of an alleged oral settlement agreement between it and Nungesser; the second seeking relief in the nature of interpleader, pursuant to 28 U.S.C. 1335.  The federal action was assigned to the Honorable Sam Crow and designated as Case No. 03-CV-04174-SAC.

157.    EMCASCO threatened to deplete the funds available to Bryant to satisfy Nungesser's claim against him by seeking recover of an attorney's fee to be paid out of the $300,000 policy limit it deposited with the clerk of the court.  (Graybill Affidavit).

158.    On March 4, 2004, Judge Crow granted Bryant's and Nungesser's motions, in part, and ordered that all proceedings in the federal action be stayed until final judgment is entered in this case.  In so ruling, Judge Crow held that EMCASCO's conduct had "raise[d] the specter of forum shopping."  (*EMCASCO Ins. Co. v. Dairyland Ins. Co.*, No. 03-4174-SAC, 2004 WL 838060, * 4 (March 4, 2004)).

159.    On September 22, 2004, in the state case, in response to a defense claim that EMCASCO had reached a pre-suit settlement with Nungesser, he filed a motion for partial summary judgment seeking a determination that he had not agreed to settle or compromise his claims against Bryant prior to the filing of the action.  EMCASCO and Bryant filed counter-motions seeking a summary determination that an enforceable pre-suit settlement had been reached. If granted, EMCASCO's motion would have resulted in dismissal of the state action. (*Nungesser v. Bryant*, 283 Kan. at 556-57, 153 P.3d 1277; Exhibit 242)).

160.    On November 4, 2004, all parties participated in a mediation that produced a three-way agreement.  The agreement was conditional.  It provided in part that if Nungesser were to prevail on his assertion that there was no pre-suit settlement, then: 1) a reasonable estimate of the damages Bryant would be found liable to pay Nungesser would be $2 million; 2) EMCASCO agreed that Bryant could confess judgment in the amount of $2 million in exchange for a covenant not to

execute, without impairing any rights Bryant might have against EMCASCO, including a claim of negligence or bad faith.  (*Nungesser v. Bryant*, 283 Kan. at 556-57, 153 P.3d 1277).

161.    Bryant and Nungesser also entered into an agreement between themselves which provided in part that: if EMCASCO did not prevail on its pending motion for summary judgment, Bryant would confess judgment in the amount of $2 million; Bryant could pursue such claims as he may have against EMCASCO for payment of the judgment; Nungesser would indemnify Bryant for the costs to prosecute the action; Bryant would grant Nungesser a partial assignment of his contractual rights against EMCASCO so Nungesser would have standing to join Bryant as a party plaintiff against EMCASCO; Nungesser would refrain from execution on Bryant's wages or property until a final judgment were entered against EMCASCO.  (*Nungesser v. Bryant*, 283 Kan. at 556-67, 153 P.3d 1277).

162.    On November 18, 2004, the state district court granted Nungesser's summary judgment motion, finding that Nungesser had not entered into a settlement contract with EMCASCO.  (Exhibit 242).

163.    In November of 2004, Bryant delivered $9,500 to Carmichael's firm as partial payment of his outstanding attorney fee obligation, which would ultimately amount to more than $28,000.  (Carmichael Depo. 05/19/05 at p. 71:11-18; Exhibit 249).

164.    On December 1, 2004, Bryant served Nungesser with an offer to confess judgment for $2 million in the state action. Nungesser accepted the offer the following day, and the state court entered judgment in Nungesser's favor against Bryant in the amount of $2 million.  (*Nungesser v. Bryant*, 283 Kan. at 556-57, 153 P.3d 1277).

165.    A jury trial had been scheduled to begin January 11, 2005, to resolve Bryant's third party claims against EMCASCO.  (Graybill Affidavit).

25

166.    Graybill and Hazlewood began representing Bryant in December, 2004, when it became apparent that Carmichael would be disqualified due to the necessity of his trial testimony and no other counsel were readily available to try Bryant's third party claims against EMCASCO. (Carmichael Depo. 05/19/05 at p. 72:6-73:20, 146:8-149:15).

167.    Before agreeing to dual representation of Nungesser and Bryant, Graybill and Hazlewood obtained appropriate written conflict waivers from Nungesser and Bryant, who each consulted with their own personal counsel as necessary to give informed consent.  Nungesser and Bryant each retained independent counsel to represent their respective interests in the event a conflict arose.  (Graybill Affidavit).

168.    On January 11, 2005, Judge Crow entered an order to disburse funds in the federal action in accordance with the parties' agreement.  Pursuant to the order, the clerk disbursed $110,000 to Nungesser's insurers and $190,000 to Nungesser.  (Graybill Affidavit).

169.    On January 11, 2005, a jury trial of Bryant's third-party claims against EMCASCO was commenced in state court. The jury found EMCASCO had acted negligently, but did not act in bad faith. The state court entered judgment for $2 million against EMCASCO and in favor of Bryant, subject to a credit of $300,000 paid pursuant to the mediated settlement agreement. (*Nungesser v. Bryant*, 283 Kan. at 558, 153 P.3d 1277).

170.    On July 29, 2005, the state district court entered judgment to Bryant for his fees incurred in prosecuting his claims against EMCASCO.  (*Nungesser v. Bryant*, 283 Kan. at 557-58, 153 P.3d 1277).

171.    Bryant had a significant personal interest in seeing the state district court's judgment upheld.  Had the state district court's fee award been upheld, Bryant would have been relieved of any further obligation to pay Carmichael's firm for the services he received; and he would have been

26

entitled to recover the $9,500.00 he previously paid.  (Hazlewood Depo. at. p. 49:7-24; Carmichael Depo. 05/19/05 at p. 145:14-146:1, 149:18-25).

172.    EMCASCO appealed to the Kansas Supreme Court, claiming, among other things, that Bryant's third party petition had been filed prematurely. The Kansas Supreme Court agreed, finding that "an insured's action against his or her insurer for negligent or bad faith failure to settle a case must wait for the liability of the insured to be decided.  A defendant in an auto liability case may not sue his or her insurer on such claims until the tort claim against him or her has been reduced to judgment."  The Court said it could not determine how EMCASCO's presence in the case had altered subsequent events, and as a result the jury's verdict and the $2 million judgment must be vacated and the mediation agreement declared "null and void."  Lastly, the Court said the district court was correct insofar as it found that Nungesser and EMCASCO had not made a binding settlement prior to the filing of the  lawsuit. The case was remanded to the state district court for further proceedings. (*Nungesser v. Bryant*, 283 Kan. 550, 153 P.3d 1277).

173.    On July 12, 2007, after a journal entry on the Supreme Court's mandate, Nungesser, Bryant and EMCASCO participated in a second mediation, and they entered an agreement under which EMCASCO again consented that Bryant could confess judgment in favor of Nungesser without prejudicing Bryant's right to pursue an excess claim against EMCASCO or his right to assign such a claim.  (Exhibit 241).

174.    On August 17, 2007, the state trial court entered an order simultaneously granting Bryant leave to file a third party petition against EMCASCO, *instanter*, and granting Nungesser a judgment against Bryant, by confession, in the amount of $2,000,000.00, plus the costs of the action, subject to an immediate credit in the amount of $300,000.00 for the amounts previously paid by EMCASCO in accordance with this Court's order to disburse funds.  (Memorandum and Order entered 12/7/07 (Docket 18) at ¶ 19).

175.    On September 11, 2007, Bryant served his (second) third party petition on EMCASCO.  (Memorandum and Order entered 12/7/07 (Docket 18) at ¶ 20).

176.    On November 19, 2007, EMCASCO removed the action the to this Court.  At the same time, EMCASCO moved Judge Crow to lift the stay in the interpleader action.  (Memorandum and Order entered 12/7/07 (Docket 18) at ¶ 21).

177.    On November 19, 2007, Judge Crow denied a motion by EMCASCO to lift the stay in the federal action, 03-4174-SAC.  (Memorandum and Order entered 12/7/07 (Docket 18) at ¶ 22).

178.    On Dec. 7, 2007, this Court denied Nungesser's and Bryant's motion to remand. Nungesser has been dismissed from this lawsuit, and the parties have been realigned with Bryant as plaintiff and EMCASCO as defendant.  (Pretrial Order (Docket 74)).

179.    Nungesser has covenanted not to execute on Bryant's wages or property, except his rights against EMCASCO, if and so long as Bryant diligently prosecutes his claims in this action and on appeal.  (Graybill Affidavit).

180.    Bryant is prepared to offer expert testimony at trial from Rex A. Sharp to support his claim that EMCASCO's failure to settle Bryant's claim was a foreseeable result of its negligence and/or bad faith.  (Exhibit 247).

## STANDARD OF REVIEW

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©.  The party seeking summary judgment carries the burden of showing the "absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986)).  If "the moving party has met its burden, the burden shifts to the nonmoving party to show

that there is a genuine issue of material fact."  *Bacchus Indus.*, 939 F.2d at 891.

"In assessing motions for summary judgment, both trial and appellate courts must consider

factual inferences tending to show triable issues in the light most favorable to the existence of those

issues."  *Id.*  In determining whether there exists a genuine issue of material fact, "if an inference

can be deduced from the facts whereby the non-movant could recover, summary judgment is

inappropriate."  *Smith v. Atlantic Richfield Co.*,  814 F.2d 1481, 1488 (10th Cir. 1987)

> Credibility determinations, the weighing of the evidence, and the drawing of
> legitimate inferences from the facts <u>are jury functions, not those of a judge</u>, whether
> he is ruling on a motion for summary judgment or for a directed verdict.  <u>The
> evidence of the non-movant is to be believed, and all justifiable inferences are to be
> drawn in his favor.</u>

*Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added).

When a defendant moves for summary judgment, "the judge must ask himself not whether

he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury

could return a verdict for the plaintiff on the evidence presented."  *Anderson*, 477 U.S. at 252, 106

S.Ct. at 2512.

> It is only where it is perfectly clear that there are no issues in the case that a summary
> judgment is proper.  Even in cases where the judge is of opinion that he will have to
> direct a verdict for one party or the other on the issues that have been raised, he
> should ordinarily hear the evidence and direct the verdict rather than attempt to try
> the case in advance on a motion for summary judgment, which was never intended
> to enable parties to evade jury trials or have the judge weigh evidence in advance of
> its being presented.

*Pierce v. Ford Motor* Co., 190 F.2d 910, 915-916 (4th Cir. 1951).

Since the evidence of the nonmoving party is deemed true and all reasonable inferences are

drawn in his favor, the nonmoving party "need only present evidence from which a jury might return

a verdict in his favor." *Anderson*, 477 U.S. at 2514, 106 S.Ct. 2505.  "Where different, ultimate

inferences may be drawn from the evidence presented by the parties, the case is not appropriate for

summary judgment." *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1322-23 (10th Cir.1987).  Likewise, any action examined under Rule 56, that raises real issues of credibility, motive, or intent is not suitable for summary judgment, whatever the nature of the cause may be. *Baum v. Gillman,*  648 F.2d 1292, 1296 (10th Cir. 1981).

## ARGUMENT

**I.     Under well-settled Kansas law, an insurer is liable for the full amount of its insured's loss caused by the insurer's negligence or bad faith in settling actions against its insured, even if that amount exceeds the limits of the insurance policy.**

A contract for liability insurance implicates public policy concerns not present in other contracts, resulting from the insured's entrustment of his interests into the control of the insurer. *Couch On Insurance* 3d (West 1999), § 198:3, p. 198-99.  "Once an insurer steps into the negotiations between its insured and an injured claimant, the insurer must exercise due care to protect the rights of its insured."  *Levier v. Koppenheffer*, 19 Kan. App. 2d 971, Syl. 1, 879 P.2d 40 (1994); *Bennett v. Conrady*, 180 Kan. 485, 489, 305 P.2d 823 (1957).   "In settling and defending actions against an insured, an insurer must act in the best interests of its insured." *Id.*; *Smith v. Blackwell*, 14 Kan. App. 2d, 158, Syl. 3, 791 P2d 1343 (1990).   "This is not a novel issue or one in which Kansas law is not settled." *Id.*, 14 Kan. App. 2d at 163, 791 P.2d at 1347.

Because public policy dictates that the insured be adequately protected, the Kansas Supreme Court has long held that "both due care and good faith are required of the insurer in reaching the decision not to settle.' *Bolllinger v. Nuss*, 202 Kan, 326, 333, 449 P.2d 502 (1969).  "In other words, the insurer, in defending and settling claims against its insured owes to the insured the duty not only to act in good faith but without negligence." *Id.; accord. Smith v. Blackwell*  14 Kan. App. 2d at 162, 791 P.2d at 1346; *Bennett,* 180 Kan. at 485, Syl. 4, 305 P.2d 823.   "[F]ailure to do either will result in insurer being held liable for full amount of insured's resulting loss, even if that amount exceeds policy limits." *Id.*  "The law on this point has never been seriously challenged . . . ." *Smith v.*

*Blackwell* , 14 Kan. App. 2d at 154, 791 P.2d at 134.  *Accord. Levier* 19 Kan. App. 2d at 975, 879 P.2d at 44; *Bennett*, 180 Kan. at 485, Syl. 3, 305 P.2d 823*; Covill v. Phillips*, 452 F. Supp. 224, 226 (D. Kan.1978).

In *Bollinger v. Nuss*, 202 Kan. 326, 449 P.2d 502 (1969), the Kansas Supreme Court explained the policy underlying the Kansas rule:

> The imposition of liability against an insurer for failing to exercise due care in settling a suit is perhaps a stringent standard by which to measure the insurer's duty.  In fact, it has been said less culpability is involved in the application of the negligence test than the good faith test.  It must be remembered, however, that the insured has surrendered a valuable right: that of conducting an investigation and considering possible offers of settlement.  Since the absolute control of the defense is turned over to the insurer so that it may reject settlements within policy limits, and as a result, expose the insured to payment of all sums in excess of policy limits, surely it is not asking too much to require the insurer to act without negligence.

202 Kan. at 333-334, 449 P.2d at 508 (internal citations omitted) (emphasis added).

When a claim is made against the insured for an amount in excess of the policy coverage, the insurer's obligation to defend creates a conflict of interest on its part.  To protect insureds from this inherent conflict of interest, the Kansas Supreme Court has adopted the "rule of equal consideration," which requires that "[w]hen an insurer determines whether to accept or reject an offer of settlement, it must give at least the same consideration to the interests of its insured as it does to its own interests." *Williams v. American Family Mut. Ins. Co.*,  6 Fed. Appx. 756, 761 (10th Cir. 2001) (quoting *Glenn  v. Fleming*, 247 Kan. 296, 799 P.2d 79, 85 (1990)).  Equal consideration of the conflicting interests of the company and the insured means consideration of each portion of the total risk without regard to who is bearing that portion of the risk.   "This means that 'the claim should be evaluated by the insurer without looking to the policy limits and as though it alone would be responsible for the payment of any judgment rendered on the claim.'" *Farmers Ins. Exchange v. Schropp*,  222 Kan. 612, 620, 567 P.2d 1359, 1366 (1977) (quoting  *Rector v. Husted*, 214 Kan. 30, 519 P.2d [634,] 641 [(1974)]).  "The result is that under the negligence test the insurer must conduct

itself with that degree of care which would be used by an ordinarily prudent person in the management of his own business, with no policy limits applicable to the claim." *Bollinger*, 202 Kan. at 337-38, 449 P.2d 511-512.  "Likewise, under the good faith test, the insurer must in good faith view the situation as it would if there were no applicable policy limits." *Id.*  "In the final analysis, the question of liability depends upon the circumstances of the particular case and must be determined by taking into account the various factors present, rather than on the basis of any general statement or definition." *Id.*, 202 Kan. at 338, 449 P.2d at 511-512.

## II.     There is evidence that EMCASCO was presented with a reasonable opportunity to obtain a release of Nungesser's claims against Bryant within the limit of his insurance.

### A.     Nungesser made a policy limit offer on December 18, 2002.

Viewing the evidence in a light most favorable to Bryant, the summary judgment record reveals that EMCASCO had a reasonable opportunity to purchase a release for Bryant within its insurance limit.  It is undisputed that, by the end of August, 2002, EMCASCO had determined that if Nungesser's claims were not settled his injuries would justify an award in excess of Bryant's insurance limit; and there was a "zero" percent change of a defense verdict if the case went to trial. Responding to that determination, the company offered its limit to Nungesser contingent, however, on Nungesser accepting payment in the form of a single check jointly payable to Wesley.  Nungesser was not personally indebted to Wesley (or at least not for more than $180), and he disputed Wesley's $49,993 lien.  Crockett subsequently expressed his belief to EMCASCO that, if Nungesser agreed to accept such a check, Wesley would be able to exert leverage on him to capitulate  by refusing to endorse the settlement check, effectively denying Nungesser access to <u>any</u> of the money (while the check went stale).

Nungesser's belief that Wesley intended to take funds to which it was not entitled was grounded in fact.  In September of 2002, after learning that Wesley had not submitted a claim to

Nungesser's HMO, Carolyn Nungesser contacted Wesley and asked that it immediately submit its claim.   Wesley advised her that it intended to first pursue payment through the lien.   However, in October of 2002, Nungessers received an invoice from Wesley reflecting a $180 balance. That led them to believe the Wesley lien would be withdrawn if they paid the hospital $180.   They delivered a $180 check to the hospital and asked it to withdraw its lien so they could settle with Bryant.   The hospital summarily returned their check and served them with a notice increasing the amount claimed by its lien by about $5,000.

It was against this backdrop that Crockett spoke with Fischer by telephone on December 18, 2002. Fischer told Crockett he had been communicating with Curtis Loub, Wesley's attorney who filed the lien.   Crockett told Fischer that Nungesser disputed Wesley's lien and would not allow Wesley to control the settlement proceeds by refusing to endorse the proposed check.   Crockett explained that he didn't want Wesley's name on the check, because he wanted to push Wesley to obtain payment from Nungesser's HMO rather than through a lien on Nungesser's personal injury settlement.   Crockett countered EMCASCO's open offer with Nungesser's offer to settle for a $300,000 check made payable to Nungesser and Crockett.   To protect EMCASCO from the hospital's lien, he offered to escrow money in his trust account.   Fischer agreed to submit the offer to his principal and give Crockett an answer.   It is undisputed that Crockett <u>did not</u> set a deadline by which Fischer was required to respond.       Crockett testified that escrow arrangements are commonly employed to facilitate the completion of transactions which might otherwise be derailed by issues relating to liens.   (It should not be surprising that a lawyer who principally deals in real estate transactions would approach the problem in the manner Crockett did).   Crockett's escrow proposal was a reasonable and proper way to work around the lien issue.   It recognized, respected and protected the rights of Wesley, EMCASCO, and the Nungessers.   Crockett did not require or even suggest that EMCASCO conceal the proposed escrow from Wesley.   He did not discourage

EMCASCO from discussing his proposal with Loub or Wesley before responding to Nungesser's offer.

A reasonable jury could conclude from the evidence that Crockett was attempting, in good faith, to allow Bryant to purchase a release from Nungesser with the liability limit of his insurance policy, while also addressing Nungesser's and EMCASCO's respective legitimate interests relating to Wesley's lien.

EMCASCO has suggested that Crockett's proposal was unreasonable because it involved a conditional offer. A conditional offer is one that attaches conditions beyond the insurer's control, e.g., "I will settle with your for $25,000 if my PIP carrier agrees to waive its lien." Nungesser's December 18, 2002, offer was unconditional. The offer only required EMCASCO to pay its policy limit to Nungesser and Crockett in exchange for a release of Bryant's liability to Nungesser. As an accommodation to Bryant and EMCASCO – but not as a condition of settlement – Crockett offered to escrow funds in his trust account to address the only impediment to settlement. There was no contingency that prevented EMCASCO from accepting Nungesser's offer. No condition beyond EMCASCO's control prevented it from seizing the opportunity to relieve Bryant of his significant excess exposure by accepting the offer.

EMCASCO has suggested that Crockett's escrow proposal would have violated the law. The hospital lien act, K.S.A. § 65-406, *et seq.*, does not prohibit escrow arrangements of the type Crockett suggested. The act did not make Nungesser's offer unlawful. It contains no prohibition or civil or criminal penalty for transferring the moneys as Nungesser requested. Instead, the act merely provides that the "insurance carrier . . .making . . . payment to a patient or to his attorneys . . . as compensation for the injury sustained . . . without paying to such hospital the amount of its lien . . . shall, for a period of one year from the date of payment to such patient or . . . attorneys . . . be and remain liable to such hospital for the amount which such hospital was entitled to receive as aforesaid . . . ." Under

Nungesser's proposed escrow arrangement, the moneys reserved in Crockett's account would arguably have remained the property of EMCASCO until the escrow contingencies had been established, *i.e.*, resolution of the lien dispute or the running of the time for its enforcement.  While the reserve funds were held in escrow in the trust account, they would not have been paid to Nungesser or Crockett "as compensation for the injury sustained."  Moreover, EMCASCO could have suggested a suitable third-party escrow agent if that was a concern.  Crockett testified he would actually have preferred to escrow funds in EMCASCO's attorney's trust account.  In any event, to the extent that EMCASCO would have been or remained liable to Wesley Medical Center for any amount, an escrow would have assured that EMCASCO would be held harmless from any obligation to "pay twice" as a result of the lien, and EMCASCO's attorney would later affirm as much.

When he became involved in the matter, EMCASCO lawyer Charles Millsap immediately concluded that one legitimate way to "address the problem with the Wesley lien and allow the parties to complete the settlement" was to "put the money in [Crockett's] trust account until such time as the Wesley lien was taken care of ."  Millsap explained: "[M]y reading of the [hospital lien] statute where it says about the insurance company has to pay, that could be satisfied if we put money in [Crockett's] trust account, and along with that, we had a kind of an agreement in place that . . . at least the amount of money recommended for the size of the lien wouldn't come out of the trust account until the deal with Wesley was resolved."  (JT Tx Vol. 3, p. 122:14-123:5).

More importantly, according to Loub's trial testimony, if Fischer had simply inquired of Loub, Wesley would have consented to allow EMCASCO to pay the funds into Crockett's escrow account.  With Wesley's consent, the lien would have posed no impediment – not even an illusory one – to a settlement of Nungesser's claims against Bryant for the policy limit.  EMCASCO now seeks to criticize Nungesser's December, 2002, offer based on speculation that it imposed additional risk for EMCASCO.  In reality, there was no such risk.  Or, if there was risk it was both *de minimis*

and easy to resolve.  It would be reasonable to conclude that EMCSACO did not consider Crockett's proposal with an open mind, but instead sought consensual validation for its predetermined intention to say "no."  It would not be unreasonable to conclude that Nungesser's offer could have, and should have, been accepted for Bryant's protection.

> ### B.   EMCASCO is collaterally estopped to deny that Nungesser made a settlement offer on December 18, 2002, that it rejected.

EMCASCO asserts that Crockett did not extend a settlement offer on December 18, 2002, that it later rejected.  The doctrine of collateral estoppel precludes EMCASCO from denying that Crockett communicated an offer of settlement to Fischer on December 18, 2002, or that Fischer rejected the offer in his subsequent message to Crockett.  Collateral estoppel (issue preclusion) prevents a second litigation of the issues once determined between the same parties or those in privity with the parties. Collateral estoppel applies where four elements are established:

> (1) the issue previously decided is identical with the one presented in the action in question; (2) the prior action has been finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Rhoten v. Dickson* ___ Kan. App. 2d. ___, 192 P.3d 679, 687 (2008) (citing *Smith v. Dinwiddie*, 510 F.3d 1180, 1188 (10th Cir.2007), *cert. denied* ___U.S. ___, 128 S.Ct. 2431, 171 L.Ed.2d 235 (2008)).

In the prior state litigation, EMCASCO and Bryant asserted that a pre-suit settlement was effected by the communications between Fischer and Crockett on December 18, 2002.  Nungesser filed a motion for partial summary judgment on that issue.  On December 23, 2008, Judge Paul Clark entered his Journal Entry on Issue of Settlement in the state court proceedings.  In granting summary judgment to Nungesser and against Bryant and EMCASCO, Judge Clark held, *inter alia*:

> In the present action, the uncontroverted facts, supported by a fully-developed record including the sworn deposition testimony of all participants to the subject negotiations, all relevant correspondence, and candid admissions in EMCASCO's claims file and pleadings, conclusively establish that no settlement of [Nungesser's]

claims against Mr. Bryant was reached.  In fact, Mr. Crockett and Mr. Fischer, the only individuals who participated in the settlement negotiations, each testified as to their mutual understanding that Mr. Crockett was not authorized to, and never did, accept EMCASCO's settlement offer on [Nungesser's] behalf.  <u>Instead, Mr. Crockett made a counter offer to EMCASCO in response to its settlement offer – and EMCASCO rejected the counter offer through the message Bruce Fischer left for Mr. Crockett on December 18, [2002].</u>

(Exhibit 242 at p. 13) (emphasis added).

Each element necessary for the application of collateral estoppel is thus established.  The issues decided by Judge Clark, *i.e.*, the legal effect of Crockett's words to Fischer and Fischer's message to Crockett, respectively, are identical to issues presented in these proceedings.  Judge Clark's summary judgment ruling is final – <u>it was affirmed by the Kansas Supreme Court.</u> *Nungesser v. Bryant*,  283 Kan. at 566, 153 P.3d 1277.  EMCASCO was both a party and in privity with a party (Bryant) in the state litigation.  It had every opportunity to and did fully litigate the issue in the prior state action.  EMCASCO is barred by the doctrine of collateral estoppel from relitigating the issue here.

**III.    There is evidence from which a jury could conclude that EMCASCO was negligent in its handling of settlement negotiations for Bryant and/or failed to consider Bryant's interests equal to its own.**

**A.    The evidence supports a conclusion that Fischer mishandled Nungesser's December 18, 2002, offer.**

"Whether an insurer acted in bad faith or was negligent in the handling of settlement negotiations is <u>a question for the trier of fact in each case</u>." *Levier*, 19 Kan. App. 2d at 971, Syl. 6, 879 P.2d 42 (emphasis added); *Rector*, 214 Kan. 230, Syl. 4, 519 P.2d 634; *Bollinger*, 202 Kan. at 341, 449 P.2d at 514; *Insurance Co. of North America v. Medical Protective Co.*, 768 F.2d 315, 321-22 (10th Cir. 1985).   In the recent case of *Roberts v. Printup*  422 F.3d 1211, (10th Cir. 2005), the 10th Circuit reversed the trial court's entry of summary judgment for an insurer on a claim that it negligently mishandled settlement negotiations on behalf of its insured, stating: "Whether an actor's

conduct constitutes negligence is generally a factual question left to a jury. The question should only be answered by the court in rare cases where the evidence is susceptible to only one possible inference." 422 F.3d at 1218.

"Although a motion for summary judgment under Rule 56 may be made in any civil action, it is not commonly interposed, and even less frequently granted, in negligence actions." *Ulissey v. Shvartsman,* 61 F.3d 805, 809, n. 2 (10th Cir. 1995) (quoting 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2729 (1983)). The reason is that the judge and jury each have a specialized function in actions involving issues of credibility, motive, intent, negligence, and comparative negligence. Particular deference is accorded the jury in negligence cases in light of its "unique competence in applying the 'reasonable man' standard" to a given fact situation. *TSC Industries, Inc. v. Northway, Inc.*, 96 S.Ct. 2126, 2133 n. 12, 426 U.S. 438, 450 n. 12 (1976); *see also*, *Hjelle v. Mid-State Consultants, Inc.,* 394 F.3d 873, 879 (10th Cir. 2005) (citing Restatement (Second) of Torts § 328C(b) & cmt. b (1965) (issue of negligence is ordinarily a matter for the jury even when historical facts are undisputed)). "Indeed, the substantive slope of negligence is a treacherous trail upon which to avoid a trial. Its moguls of credibility determinations and subjective reaction provide the perfect course for a jury." *Id.,* at 809.

The evidence in this case provides solid ground for a conclusion that EMCASCO was negligent in failing to settle Nungesser's claim against Bryant. It is undisputed that Crockett did not impose a deadline by which EMCASCO was required to respond to his December 18, 2002, offer. However, EMCASCO wasted no time in rejecting it outright later the same day. When he initially discussed the offer with Crockett, Fischer immediately voiced his doubt that the offer would be acceptable. After he consulted with his supervisors, Fischer called Crockett's office a few hours later and left a message to the effect EMCASCO would not agree to settle unless Wesley was named as a joint payee on the check. Nothing in Fischer's message indicated that EMCASCO had an interest

in pursuing, or fine-tuning, Crockett's proposal; nor did Fischer suggest that Crockett call him back so the two might explore other avenues to a settlement.  In fact, Fischer candidly revealed his lack of interest in searching for a mutually acceptable solution at the time of his deposition:

> Q   If the Wesley lien and the possibility of having to include Wesley on the check was the only thing that was keeping the settlement from being finalized, why didn't anybody think of calling Wesley?
>
> A   Who are you referring to with anybody?
>
> Q   Anybody.  Why didn't you?
>
> A   Really had no reason to.  It was at that point up to plaintiff's attorney to agree to the terms of the settlement.  We had offered our limit.

(Fischer Depo. 8/13/03 at 55:22-56:7).

Viewing the evidence in a light most favorable to Bryant, it was fair for Crockett to interpret Fischer's message as an obstinate ultimatum, *i.e.,* this claim will not settle unless Nungesser accepts a check jointly payable to Wesley.  A jury could also find it was foreseeable that Nungesser would take EMCASCO at its word and proceed to file suit against Bryant.

Crockett sent Fischer a letter dated December 31, 2002, communicating his disappointment with EMCASCO's rejection of Nungesser's offer and suggesting that Nungesser intended to file suit. EMCASCO did not reverse course when Fischer received that letter.  EMCASCO's suggestion that it had a change of heart when Fischer received that letter is belied by its conduct.  While Fischer did ask attorney Charles Millsap to contact Crockett and "feel him out," Millsap was given no specific authority to, and did not, make Nungesser a new offer (even though Millsap had already concluded that an escrow arrangement would be appropriate).  Millsap speculated to Crockett that Nungesser might be able to "approach the court," and that is exactly what he did when he filed suit against Wesley and Bryant, respectively.  Millsap indicated he would "think about it" and get back to Crockett, but he never did.

Crockett filed Nunesser's suit against Bryant a few days after he spoke to Millsap.  However, neither EMCASCO nor Millsap learned about the suit until January 15, 2003. EMCASCO has suggested that contacting Millsap and authorizing him to contact Crockett was done in an atmosphere of urgency and concern.  If that is true, it is curios that Millsap did not report the call to Fischer, and Fischer never contacted Millsap to learn what if any progress Millsap had made.  It is undisputed that from January 2, 2003, when Millsap spoke to Crockett and January 15, 2003, when EMCASCO first learned suit had been filed, Fischer and Millsap had no contact.

EMCASCO has not suggested when, if ever it would have checked with Millsap or done something proactive to move the matter toward a settlement if Nungesser had not filed suit.  It is not certain what significance a jury would attach to the fact that Millsap never reported his progress to Fischer after he spoke with Crockett; and Fischer never proactively inquired.  It is, however, certain that there are no inferences favorable to EMCASCO that can be drawn from that scenario.   The scenario suggests, perhaps, a caviler indifference to the predictable plight in which Bryant was about to find himself.

There is evidence that Crockett's proposal, if accepted, would not have negatively impacted EMCASCO's legitimate interests.  In contrast, the devastating effect EMCASCO's wooden rejection of Nungesser's offer had on Bryant's interests is apparent, and was predictable.  If EMCASCO needed clarification about the specifics or flexibility of Crockett's proposed escrow arrangement, it could have and should have asked before rejecting Nungesser's offer outright.  An ordinarily prudent person in EMCASCO's circumstance, charged with responsibility to look out for Bryant's interests, would have carefully considered and explored Crockett's willingness to escrow funds in trust as necessary to avoid the only impediment to settlement.    An ordinarily prudent person would not reject a $300,000 settlement offer to face certain multi-million dollar liability if there were apparent, reasonable alternatives.   A reasonable person would have explored and weighed other available

methods for resolving the impasse, such as, *inter alia*,  issuing two checks; filing a declaratory judgment action; moving to have the lien reduced or released; or simply picking up the phone and calling the hospital's lawyer to explore whether it would consent to a deposit of the settlement funds in an escrow pending resolution of the lien issue before issuing a hasty, wooden, unequivocal rejection of the offer.

Since an insurer can be liable for mishandling a claim against its insured without an offer to settle having been made, it is illogical to conclude that it cannot be liable for failing or refusing to explore an injured claimant's proposal to settle before rejecting it. *See Farmer's Insurance Exchange v. Shropp*, 222 Kan.at 612, Syl. ¶ 2, 567 P.2d 1359; *Roberts v. Printup*, 422 F.3d 1211, 1219-20 (10th Cir. 2005); *Coleman v. Holecek*, 542 F.2d 532, 536-38 (10th Cir. 1976) (applying Kansas law).

A jury could reasonably conclude that Fischer's handling of Nungesser's offer was incompetent, or cavalier, or careless.  It could find that Fischer was distracted by his vacation plans, or he (or his supervisors) were simply aloof.  All, or any of those conclusions would support a verdict that EMCASCO failed to treat Nungesser's December 18, 2002, offer with due care for Bryant's interests.

> **B.     Because Fischer misinformed attorney Steve Pigg about the relevant facts, Pigg's advice does not justify or excuse EMCASCO's rejection of Nungesser's offer.**

EMCASCO's failure to settle Nungesser's claims against Bryant cannot be excused by the advice it obtained from attorney Steve Pigg.   When Fischer called Pigg, Fischer presented an inaccurate, truncated set of facts for Pigg to work with.  He did not advise Pigg that Crockett had offered to place the amount of the lien in an escrow account.  In fact, he misrepresented to Pigg that Nungesser's claim against Bryant had already been settled.  He did not advise Pigg that Bryant was clearly liable and exposed to an excess judgment if the matter could not be settled.  Fischer did not make Pigg aware that he had already expressed a lack of interest in Crockett's proposal.  Based on

41

Fischer's inaccurate and incomplete report of events, Pigg was unaware there was an open settlement offer or the consequences that would result from an outright rejection of the offer. Pigg had no idea Crockett had offered to establish an escrow to facilitate a settlement in spite of the lien. Fischer did not ask Pigg to suggest alternative ways to complete a settlement with Nungesser, *e.g.*, issuing more than one check. Nor did Fischer ask Pigg whether Fischer should do anything at all before rejecting Nungesser's policy limit offer. Instead, Fischer merely asked Pigg if EMCASCO could ignore a hospital lien. In fairness to Pigg, Fischer's question was rhetorical, and the advice Pigg gave was appropriate in light of the incomplete and inaccurate facts he was given.

Where a client fails to make a full and accurate report of the relevant facts to his attorney in seeking legal advice, the resulting advice is unreliable. *See U.S. v. McClatchey* 217 F.3d 823, 832 (10th Cir. 2000) (advice of counsel defense requires full and accurate report to attorney of all material facts which client knew). Assuming Fischer believed he needed the assistance of a lawyer to appropriately respond to Nungesser's offer, Fischer's failure to inform the lawyer of key facts he knew (*e.g.*, Crockett's willingness to escrow funds) and/or Fischer's affirmative communication of misinformation to the lawyer would support a verdict for Bryant. An ordinarily prudent person exposed to a multi-million dollar claim would disclose all known relevant facts necessary to enable his lawyer to give him a reliable opinion before rejecting a $300,000 settlement offer. It should not be overlooked that Fischer did not ask Pigg to contact Crockett or otherwise remain involved. In light of the fact that Fischer had already expressed doubt that EMCASCO would agree to Crockett's proposal, there is an inference that Fischer was not really interested in Pigg's legal opinion or assistance but was merely seeking validation of Fischer's intention to reject Nungesser's offer and continue to follow a "my way or the highway" negotiation strategy.

**IV.    The evidence reasonably supports a conclusion that EMCASCO's failure to keep the Bryant family informed actually prejudiced their ability to protect Bryant's interests.**

In Kansas, "[a] duty is imposed on the insurer to communicate to the insured the results of any investigation indicating liability in excess of policy limits and any offers of settlement, so that the insured may take proper steps to protect his own interests." *Bollinger v. Nuss,* 202 Kan. 326, Syl. ¶ 6, 449 P.2d 502 (1969).   This duty is not difficult to understand.

The summary judgment record supports a conclusion that EMCASCO failed to keep the Bryant family reasonably informed of the results of its investigation.   EMCASCO's only report that arguably relates to the results of its investigation indicating liability in excess of the policy limit is contained in Fischer's August 27, 2002, which stated:

> Dear Mr. & Mrs. Bryant:
>
> We are handling the above referenced injury auto accident claim in our office.
>
> We are writing to advise you that there is potential exposure of up to and in excess of your $300,000.00 combined single limit of liability on your automobile policy with EMCASCO for the bodily injury sustained by James Nungesser. The Nungesser's are now represented by attorney, Dave Crockett.
>
> We thank you for your time and attention to this matter.

(Exhibit 65).   On its face, that letter is a *pro forma*, boilerplate document.   A jury could easily concluded it did not communicate meaningful information to the Bryant family and was, in fact, misleading.   While the letter did reference a "*potential* exposure of up to and in excess of the . . . liability limit," it did not disclose EMCASCO's estimation of the "probability" of an excess judgment was 100%.   (Exhibit 65; Exhibit 35).   Nor did the letter disclose Fischer's understanding of the severity of Nungesser's injuries.   By the time Fischer sent the letter, he understood from his investigation that Nungesser suffered a fractured left femur, fractured pelvis, fractured left wrist, fractures of the C-1 and C-2 vertebrae and traumatic head injury in the collision; that Nungesser was in a rehabilitation hospital and was unable to walk or use his arms; that Nungesser spoke, but not intelligibly; that Nungesser was being fed through his stomach, because his swallow reflex didn't

work; that it was indicated Nungesser would not be able to return to work; that Nungesser's medical bills already totaled at least $157,000; and that the property damage to Nungesser's motorcycle was around $20,000.00.  A reasonable jury could place significance on the fact that <u>none</u> of those facts made it into Fischer's report to Bryant's parents.  In *Levier*, a similar letter notifying the insured that "claims from the accident could potentially exceed the limits of his insurance policy" did not exonerate the company for its failure to share its estimation that the value of the injured claimant's damages was $2,120,000.  19 Kan. App. 2d at 973, 980, 879 P.2d at 43, 47.

It is uncontroverted that Fischer made no attempt to inform Bryant or his parents about Nungesser's December 18, 2002, offer before Fischer rejected it.  Bryant's parents first learned about Nungesser's offer when they received a copy of Jacob Graybill's January 15, 2003, letter to EMCASCO.  At that point, they became understandably concerned about EMCASCO's handling of the settlement negotiations on behalf of their son.  Accordingly, they hired Jeff Carmichael to represent Brant's interests, at their expense.

EMCASCO's failure to give the Bryant family an opportunity to participate in responding to Nungesser's December 18, 2002, offer limited the options available to Bryant's personal attorney to such a degree that there was little he could do.  By the time Bryant's personal attorney, Jeff Carmichael, became involved, the offer had been rejected.  As such, Carmichael had no opportunity to explore with EMCASCO what it would consider an acceptable escrow arrangement; or attempt to work out an escrow arrangement with Wesley; or explore the possibility of obtaining a surety bond to ensure payment of the lien; or explore other options with Crockett; or explore other options with Wesley.  Carmichael testified that, had EMCASCO made the Bryants aware of the offer before rejecting it, there were a number of things he and his firm could have done to resolve the problem for Bryant.  However, because EMCASCO rejected the offer before Carmichael became involved, he had no opportunity to address a solution.

Similar facts were presented in *Levier v. Koppenheffer*, *supra*,  In *Levier*, Koppenheffer crossed the center line and struck a truck Levier was driving.  19 Kan. App. 2d at 972, 879 P.2d at 42.  Levier and his passenger were injured, and the truck he was driving, owned by his brother, was destroyed.  *Id.*  Koppenheffer's policy had a single limit of $100,000.  19 Kan. App. 2d at 973, 879 P.2d at 43. The insurer estimated Koppenheffer's percentage of fault at 95-100% for the severe injuries suffered by Levier and his passenger.  *Id.*  Shortly after the accident, the insurer settled a claim for the value of the truck.  *Id.*  The insurer determined the value of Levier's claim to be $2,120,000, and the value of his passenger's claim to be $49,965.67.  *Id.*  The insurer offered Levier and his passenger $25,000 each, to settle.  *Id.*  Levier's attorney countered with an offer to settle Levier's claim for $100,000.  *Id.*  The insurer did not respond to that offer, nor did it notify Koppenheffer the offer had been received for three months.  *Id.*

The passenger's attorney promptly accepted the insurer's $25,000 offer.  *Id.*  Kopenheffer subsequently allowed Levier to take a $600,000 consent judgment against him, and Levier filed a garnishment against the insurer.  19 Kan. App. 2d at 974, 879 P.2d at 43. The district court found that the insurer was negligent in settling the relatively small claims of the truck owner and the passenger while refusing to settle Levier's claim.  *Id.*  According to the Court of Appeals:  "the [trial] court stated that [the insurer] exhibited a lack of care in controlling offers and acceptance that was confusing and negligent.  The [trial] court also found that [the insurer] was negligent in handling Levier's offer to settle for $100,000 by not conveying that offer to Koppenheffer for three months.  Furthermore, the [trial] court said "[the insurer] was negligent in not considering the best interests of Koppenheffer or allowing him to participate in the negotiations."  *Id.*  The insurer appealed.

On appeal, the Court of Appeals stated:

In Kansas, "[a] duty is imposed on the insurer to communicate to the insured the results of any investigation indicating liability in excess of policy limits and any offers of settlement, so that the insured may take proper steps to protect his own

45

interests." Bollinger v. Nuss, 202 Kan. 326, Syl. ¶ 6, 449 P.2d 502 (1969). Furthermore, a claim for damages in excess of policy limits creates a duty on the part of the insurer to consider the interests of the insured as equal to its own. Farmers Ins. Exchange v. Schropp, 222 Kan. 612, Syl. ¶ 3, 567 P.2d 1359 (1977). "This means that the insurer must evaluate the claim without looking at the policy limits and as though it alone would be responsible for the entire amount of any judgment rendered on the claim." Bollinger, 202 Kan. 326, Syl. ¶ 4, 449 P.2d 502. In general, the insurer must conduct itself with the same degree of care which would be used by an ordinarily prudent person in the management of his or her own business affairs. 202 Kan. 326, Syl. ¶ 4, 449 P.2d 502.

. . . .

Reviewing the facts of the present case in light of the Bollinger factors shows that the district court had a substantial basis from which to conclude that [the insurer] was negligent. Levier had a very strong case against Koppenheffer both as to severity of injury and to liability, yet [the insurer] made no effort at all to induce Koppenheffer to contribute to the $100,000 settlement. In fact, [the insurer] never even informed Koppenheffer of Levier's compromise offer, nor did it ever inform him that the value of Levier's injuries was $2,120,000. Perhaps the most significant factor of all was that [the insurer] was exposed to no greater financial risk if Levier refused to settle because it was going to expend the entire $100,000 limit in any event.  Koppenheffer, on the other hand, faced the risk of being liable for over $2 million as opposed to only $28,100 if [the insurer] refused Levier's settlement offer. Koppenheffer was not involved in the settlement negotiations at this time, possibly because [the insurer] never informed him of the estimated value of Levier's injuries. [The insurer] owed him the duty to negotiate in his best interests to settle Levier's claim.

[The insurer] breached its duty to communicate Levier's settlement offer to Koppenheffer in a timely manner. Furthermore, The insurer] did not treat the settlement offer with the same degree of care it would have used if it were representing its own interests alone. An ordinarily prudent person would not reject a $100,000 settlement offer in order to face liability in excess of $2 million. Instead of protecting Koppenheffer's best interests, [the insurer] acted with indifference towards its insured's ultimate financial liability.

19 Kan. App. 2d at 979-80, 879 P.2d at 46-47.

The facts of this case fall comfortably within the *Levier* framework.  As did Levier, Nungesser had a very strong case against the liability insured.  Yet, the company never informed him of the value of Nungesser's injuries or the 100% probability of an excess verdict if the case did not settle.  Like the insurer in *Levier*, EMCASCO made no effort to invite the Bryant family to participate in settlement negotiations with Nungesser.   To the extent that EMCASCO actually believed

Nungesser's offer subjected the company to risk in excess of its policy limit (which is denied), EMCASCO made no attempt to allow or induce the Bryant family to contribute to the settlement or attempt to address that risk by, for example, hiring an attorney to contact Loub, by offering additional funds to Nungesser, by engaging a different escrow agent, by obtaining a surety bond for the lien amount, or by otherwise making arrangements to indemnify EMCASCO from any remote liability to "pay twice" if, in the off chance, Crockett absconded with the money.

As in *Levier*, EMCASCO was exposed to no greater financial risk if Nungesser refused to settle because it was going to expend the entire $300,000 limit in any event.  Bryant, on the other hand, faced the risk of being liable for $2,000,000 as opposed to the minimal cost of addressing any risk that the Wesley lien would go unpaid under the proposed escrow arrangement.

In light of the foregoing, a reasonable jury could conclude that EMCASCO breached its duty to communicate to the insured the results of any investigation indicating liability in excess of policy limits and any offers of settlement, so that the insured may take proper steps to protect his own interests.  Moreover, the evidence supports an inference that EMCASCO's failure to communicate that information to the insured or to allow him to participate in settlement negotiations actually prejudiced the insured's ability to protect his own interests.  As such, a triable issue is manifest, and summary judgment is unwarranted.

**V.    The evidence supports a reasonable conclusion that the excess judgment against Bryant resulted from EMCASCO's negligent or bad faith failure to settle Nungesser's claim.**

Before liability in excess of the policy limit may be imposed against an insurer for negligent or bad faith failure to settle a claim**,** the insured must show a causal connection between the insurance company's activities and the insured's losses in excess of the policy limit.  Causation may be established by demonstrating that the insurer was afforded an opportunity to settle the injured plaintiff's claim for less than the judgment ultimately imposed.  The test is whether the policyholder

can make a showing there was something the insurance company "could have done and should have done that would have relieved the insured of his excess liability . . . ." *Rider v. State Farm Mutual Auto. Ins. Co.*, 514 F.2d 780, 786 (10th Cir. 1975) (applying Kansas law).

In *Coleman v. Holocek*, the 10th Circuit made clear that the policyholder need not establish with absolute certainty that proper handling of the matter would resulted in a better outcome. 542 F.2d at 538 n.7. Instead, it is sufficient to show that the insurer "had at its disposal the means of eliminating this uncertainty." 542 F.2d at 538 n.7. In affirming an insurer bad faith and negligence judgment the Kansas Court of Appeals recently noted "[w]e will never know what settlement ultimately could have been achieved had [the insurance company] responded to [the injured plaintiff's] overture with some settlement offer." *Ortiz v. Biscanin,* 34 Kan. App. 2d 445, 464, 122 P.3d 365, 9 (2004) (previously filed as an unpublished opinion and published by order of the Kansas Supreme Court on October 14, 2005). *See also Bogle v. Conway*, 199 Kan. 707, 714, 433 P.2d 407 (1967) ("since the course cannot be rerun, it would be futile to attempt to prove or disprove that the insured would have fared better on his own.").

As stated above, the evidence supports a conclusion that EMCASCO had a reasonable opportunity to purchase a release for Bryant within the policy limit. At the very least, there is a fair inference the claim could have been resolved at or around the policy limit if EMCASCO had acted with due care for Bryant's interest. There was no contingency that prevented EMCASCO from accepting Nungesser's December 18, 2002, offer on the spot. Had that occurred, Bryant would have been entitled to a release from Nungesser. As soon as EMCASCO communicated its acceptance of the offer, a legally enforceable contract would have been created; and Nungesser would have had no ability to change his mind. But for EMCASCO's mishandling of the offer, Bryant would never have suffered a judgment that exceeded the limit of his insurance by $1,700,000. Therefore, causation is established.

**VI.   EMCASCO's post-suit offer is immaterial under Kansas law.**

In this diversity action, the court is bound to follow the substantive law of the State of Kansas. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 79, 58 S.Ct. 817, 823 (1938). EMCASCO's suggestion that it cannot be liable for pre-suit negligence because it made a post-suit offer to settle is contrary to Kansas law and should be rejected.

Kansas law provides that an insurance company's alleged pre-suit misconduct must be determined solely by consideration of the events and its contemporaneous conduct before suit was commenced. Post-suit settlement offers do not cure the prior misconduct. *Williams v. American Family Mut. Ins. Co.*, 6 Fed. Appx. 756, 759 n.2 (10th Cir. 2001) (applying Kansas law) ("In evaluating plaintiff's claim that defendant was negligent and acted in bad faith in refusing to pay policy limits before she filed suit, it is immaterial that defendant made an offer to settle for policy limits after plaintiff filed suit."); *Smith v. Blackwell,* 14 Kan. App. 2d at 164, 791 P.2d 1343 (fact that insurer makes offer for policy limits after suit is filed does not cure a pre-suit failure to offer policy limits); *Sloan v. Employers Casualty Ins. Co.*, 214 Kan. 443, 444, 521 P.2d 249 (1974).

In. *Smith v. Blackwell,* 14 Kan. App. 2d. 158, 791 P.2d 1343 (1989), Blackwell's car crossed the centerline and struck a car driven by Smith. 14 Kan. App. 2d at 159-160, 791 P.2d at 1344. Smith was seriously injured. *Id.* The claims adjuster for Blackwell's liability insurer concluded that the accident was a "case of serious injuries and clear liability." 14 Kan. App. 2d at 160, 791 P.2d at 1345.

On August 10, 1985, Smith's attorney wrote to Blackwell's liability insurer and offered to settle for payment of the $25,000 policy limit. *Id.* The insurer did not inform Blackwell it had received a policy limit offer or advise her of any of the settlement discussions or negotiations. *Id.* On January 6, 1986, Blackwell's insurer made a $12,500 counter offer, effectively rejecting Smith's policy limit offer. *Id.* Smith's lawyer responded by filing suit against Blackwell on February 24,

1986.  Less than thirty days after suit was filed, the insurer made an offer to settle for the policy limit, which was rejected by Smith.  *Id.*  Smith obtained an excess judgment and garnished the insurer.  Judgment was entered against the insurer for the amount of the judgment in excess of the policy limit.  *Id.*  The trial court denied Smith's motion for attorneys's fees, and Smith appealed.

In reversing the trial court's denial of fees, the Court of Appeals disagreed with the trial court's finding that the case presented a novel issue of first impression "whether an insurer can 'cure' its negligent failure to offer its policy limits by offering such limits shortly after commencement of suit . . . ."  14 Kan. App. 2d at 162, 791 P.2d at 1346.  The Court of Appeals rejected the finding that this issue was novel: "we believe there are well-established and longstanding precedents which properly justified the earlier finding of bad faith and negligence on [the insurer's] behalf."  *Id.*

In so ruling, the Court of Appeals explained:

> The trial court . . . suggests it is novel to argue that [the insurer] might "cure" its previous negligent conduct and bad faith by following the advice of counsel and offering the policy limits shortly after commencement of suit.  This argument is of no benefit to [the insurer].  The Kansas Supreme Court has said: "[A]ll the good faith and settlement offers in the world after suit is filed will not immunize a company from the consequences of an unjustified refusal to pay which made the suit necessary."  *Sloan v. Employers Casualty Ins. Co.*, 214 Kan. 443, 444, 521 P.2d 249 (1974).
>
> <u>If an insurer were permitted to "cure" an earlier breach of a fiduciary duty, the policy of encouraging an insurer to exercise due care and attempt to settle claims in a fair and expeditious manner would be undermined.</u>  <u>This issue is neither new nor novel</u> . . . .

14 Kan. App.2d at 163-164, 791 P.2d at 1347.

It is worthy to note that the Kansas Supreme Court denied review in *Smith v. Blackwell*.  The Court of Appeals' opinion was originally filed as an unpublished opinion; however the Kansas Supreme Court subsequently ordered that it be published by an order dated January 30, 1990.  14 Kan. App. 2d 158 at Reporter's Note  1.  The above-quoted portion of the opinion was cited with approval by the 10th Circuit in *Williams v. American Family Mut. Ins. Co.*, wherein the 10th Circuit

held: "In evaluating plaintiff's claim that defendant was negligent and acted in bad faith in refusing to pay policy limits before she filed suit, it is immaterial that defendant made an offer to settle for policy limits after plaintiff filed suit."  6 Fed. Appx. at 759 n.2 (emphasis added).

In light of the foregoing, EMCASCO's assertion that Graybill's January 15, 2003 letter drew an arbitrary and unreasonable line in the sand is unfounded.  Graybill did not draw a line at the filing of suit – that bright line was drawn by the Kansas appellate courts in furtherance of the express public policy of "encouraging an insurer to exercise due care and attempt to settle claims in a fair and expeditious manner." *Levier*, 14 Kan. App.2d at 164, 791 P.2d at 1347; *Sloan*, 214 Kan. at 444, 521 P.2d 249.  In context, Graybill's assessment that a *prima facie* case existed when he found it was accurate.  Nungesser's rejection of  EMCASCO's post-suit offer was not materially different from the post-suit rejection that was expressly approved in *Smith v. Blackwell.*  EMCASCO's claim that it can escape responsibility for the harm it caused Bryant because it offered its policy limit shortly after Nungesser filed suit is of no avail by virtue of a line of unbroken Kansas and federal case law going back to 1974.

Because the fact of EMCASCO's post-suit offer has been shown to be immaterial under Kansas law, so too is Nungesser's rejection of an immaterial offer.  EMCASCO's argument that Nungesser's conduct is the "legal cause" of Bryant's damages is antithetical to the substantive law of Kansas.  The causal connection between an original act of negligence and injury to another is not broken by the expected or reasonably foreseeable "intervening" act of a third person.  *George v. Breising*, 206 Kan. 221, 227, 477 P.2d 983 (1970).  Under the circumstances, a reasonable jury could conclude it was foreseeable that if Fischer flatly rejected Nungesser's offer in the manner he did, the opportunity for settlement might be lost.  That conclusion is supported by the opinions of Bryant' expert, Rex Sharp.

Nungesser owed no legal duty and therefore breached no legal duty to EMCASCO or Bryant by refusing to put his offer back on the table after it had been rejected. The Kansas appellate courts have made clear that "third parties who are strangers to an insurance contract cannot maintain an action against an insurer for the failure to negotiate and settle a third party's claim against the insured because the duty of good faith and fair dealing in the handling of claims runs only from the insurance company to its insured." *Benchmark Ins. Co. v. Atchison*, 36 Kan. App. 2d 373, 380, 138 P.3d 1279, 1284 (2006). The flip side of that coin is that the stranger owes no duty of good faith or fair dealing to the tortfeasor who caused his injuries or the tortfeasor's liability insuror; and the stranger's conduct should not excuse the company from its obligation <u>to its insured</u> to use due care in settling and defending the claim. *See generally* 6 Fla. Bar. Journal 18, Liles, Rutger, Insurance Bad Faith: "The Setup Myth (2003).

It should not be overlooked that this action is being prosecuted by Bryant, the policyholder. Nungesser is and was a stranger to him and is not even a party to this lawsuit. Nungesser's actions and motivations are not attributable to Bryant. It would be bizarre if Nungesser, through obstinance or otherwise, was empowered to unilaterally deprive Bryant of rights flowing from his own insurance policy and cause Bryant to suffer an excess judgment.

*Wade v. Emcasco Ins. Co*., 483 F.3d 657 (10th Cir. 2007) is distinguishable from the case at bar in many material respects. *Wade* is neither controlling nor persuasive here. In *Wade*, the injured plaintiff sought to enforce the defendant policyholder's rights by assignment and was denied relief based upon the Court's doubts about the plaintiff's conduct and motivation to manufacture a bad faith claim to advance his interest. In this action, the plaintiff, Bryant, is the insured. His conduct and motivations have never been challenged. If summary judgment is granted to EMCASCO, it is Bryant, the innocent insured, who will suffer the unsatisfied excess judgment. Bryant is much

interested in the outcome of this lawsuit.  He has certainly not been relegated to the status of a merely curious spectator.

The application of *Wade* is limited to so-called "delayed acceptance" cases, where the injured plaintiff refuses to recognize the insurer's delayed acceptance after the expiration of his or her arbitrary time-limited offer.  The *Wade* opinion centers on the panel's conclusion that "delayed acceptance cases necessarily implicate other factors tending to establish or negate bad faith on the part of the insurer.") (internal quotations omitted).  *Wade* admonishes district court's to exercise something it describes as "caution" "when the gravamen of the complaint is not the that the insurer has *refused* a settlement offer, but that it has *delayed* in accepting one."  483 F.3d at 669 (internal quotations omitted; emphasis in original).  Therefore, it is not surprising that EMCASCO has frantically attempted to disguise the case at bar as a delayed acceptance case.  It is not.  In this case, Nungesser's offer was not time limited and did not expire – it was expressly rejected by EMCASCO.

According to the panel in *Wade*, the need for "caution arises from the desire to avoid creating the incentive to manufacture bad faith claims by shortening the length of the settlement offer, while starving the insure of information needed to make a fair apprisal for the case."  *Id.* (internal quotations omitted).   In *Wade*, the injured plaintiff's attorney (not Graybill) admitted he had managed the claim from its inception with the intent to manufacture a bad faith claim.  The panel was concerned that the injured plaintiff starved the insurer of the information needed to make a fair appraisal of the case.  Here, the adjuster testified he had all the information he needed to make a fair appraisal of the case and determine it was worth more than the policy limit long before Nungesser made his policy limit offer.  In contrast, in this case, the uncontroverted facts offered by EMCASCO demonstrate that a bad faith claim was never contemplated by Nungesser's counsel until EMCASCO flatly rejected his December 18, 2002, policy limit offer.  (EMCASCO Uncontroverted Fact ¶¶ 19, 60).  Furthermore, this is not a case where the insurer was "starv[ed] of information needed to make

a fair apprisal for the case." Fischer testified he had all the information he needed to make a fair appraisal of the case and determine it was worth more than the policy limit <u>months before Nungesser made his policy limit offer</u>.

In *Wade*, the Court exonerated the insurer from liability for failing to inform its policyholder of the claimant's settlement offer because the policyholder adamantly denied liability, and there was "no evidence to suggest that failure to inform him affected the course of the litigation." 483 F.3d at 671. In this case, the insured did not waiver in his steadfast acknowledgment of fault. Furthermore, the insured's intention to protect his interests is not illusory. Upon learning of Bryant's imminent excess exposure, his parents immediately hired personal counsel, at their expense. Carmichael, Bryant's personal counsel, testified there were a number of things he could and would have done to resolve the matter for Bryant had he been involved before EMCASCO flatly rejected Nungesser's offer.

EMCASCO argues that summary judgment is justified by a need to exercise "caution." It is unclear what that standard entails in the context of a summary judgment proceeding. Imposing "caution" in favor of granting summary judgment for the movant would appear to turn Rule 56 on its head. No Kansas appellate court has suggested a policyholder can be nonsuited by summary judgment on that basis. Nor has any Kansas appellate court suggested that the duties flowing from an insurance company's contractual undertaking to protect its policyholder against the claims of injured strangers are trumped by the insurance company's naked intimation that the injured stranger had incentive to be unreasonable. Kansas appellate courts have had no problem upholding liability in the face of an a post-suit offer rejected shortly after the filing of suit. Moreover, given the absence or weakness of any evidence to support a "set up" defense (if that is in fact a legally cognizable defense), any modicum of caution to be afforded EMCASCO under the questionable *Wade* rationale is roundly trumped by the unequivocal mandate that all doubt (or caution) be resolved in favor of

Bryant as the non-movant under these Rule 56 proceedings.  If EMCASCO claims it was sandbagged, that is a question for the jury.

**VII.   EMCASCO's assertion that it had no duty to exercise due care or act in good faith because Nungesser's offer was not within the policy limit is unfounded.**

At page 29 in its brief, EMCASCO, citing *Bollinger v. Nuss*, acknowledges that an insurer must act carefully and in good faith when considering settlement offers *within the limit of its insurance policy*.  However, in a contorted and disingenuous argument, EMCASCO attempts to persuade this court that an insurer owes its insured no obligation or duty to exercise due care or act in good faith with respect to offers of settlement it receives from an injured claimant if the offer is in excess of the policy limit, regardless how reasonable the offer is.   If EMCASCO refused to consider Crockett's offer, and rejected it based on that rationale, it is Bryant who is entitled to summary judgment.

To support its untenable proposition, EMCASCO directs this Court's attention to language in *Bollinger*  that discusses the duty and obligations an insurer owes its insured in a situation where the insurer was faced with an offer to settle within the policy limit.  In *Bollinger*, the limit of Nuss' insurance was $25,000.  Prior to trial, Nuss offered to settle for $23,500.  That offer was rejected. The case was tried to a jury, and the trial resulted in a $30,483.84 verdict.  Bollinger garnished Nuss' liability insurer for the amount in excess of the insurance.  In the garnishment proceeding, Bollinger attempted to prove the insurer rejected a policy limit offer negligently or in bad faith.

*Bollinger* dealt with a factual scenario in which the offer in question was well below the limit of the insurance policy.   Considering the *Bollinger* decision in its entirety and the phrases EMCASCO cites such as "a liability insurer may be held liable in excess of its undertaking under the policy if it acts negligently or in bad faith *when considering offers to compromise the claim against the insured for an amount within policy limits*," in context, it seems clear that the *Bollinger* court did

55

not intend to create a bright line that would license a liability insuror to ignore and totally disregard its insured's interest in all settlement negotiations except those where a claimant had proactively offered to settle for an amount within the policy limit.

It is noteworthy, and contrary to the proposition EMCASCO urges this Court to adopt, that the *Bollinger* court generally described the insured's duty in these terms:

> Notwithstanding that the typical liability insurance policy completely subordinates the insured's interests to those of the insurer by a clause giving the insurer full settlement rights, the insurer has a duty to consider the interests of the insured in <u>all settlement negotiations</u>. Whether the conduct of the insurer is measured by good faith or ordinary care, <u>the real question is the degree of consideration which an insurer must give to those interests of the insured which conflict with its own</u>.  Although the decisions run the gamut from the extreme, that the insurer is entitled to regard its own interests as paramount, to the opposite, that the insured's interests must be given priority (Anno. 40 A.L.R.2d 168 s 5), we are inclined to the view that the insurer may properly give consideration to its own interests, but it must also give at least equal consideration to the interests of the insured.

202 Kan. at 336, 449 P.2d 502, 510 (emphasis added).  Similarly, the Kansas Supreme Court's later recitation of the duty in *Glenn v. Fleming* was not so limited as EMCASCO suggests:

> An insurance company may become liable for an amount in excess of its policy limits if it fails to act in good faith and without negligence <u>when defending and settling claims against its insured</u>.  When an insurer determines <u>whether to accept or reject an offer of settlement</u>, it must give at least the same consideration to the interests of its insured as it does to its own interests.

247 Kan. at 305, 799 P.2d 79, 85 (emphasis added).

EMCASCO's argument is also contrary to the holding in *Coleman v. Holececk*, wherein the 10th Circuit explained that an insurer's duty of care is not contingent upon the existence of a policy limit settlement offer:

> The duty to consider the interests of the insured arises *not because there has been a settlement offer from the plaintiff* but <u>because there has been a claim for damages in excess of the policy limits</u>.  This claim creates a conflict of interest between the insured and the carrier which requires the carrier to give equal consideration to the interests of the insured.  This means that "the claim should be evaluated by the insurer <u>without looking to the policy limits</u> and as though it alone would be responsible for the payment of any judgment rendered on the claim.  When the carrier's duty is

measured against this standard, it becomes apparent that <u>the duty to settle does not hinge on the existence of a settlement offer from the plaintiff</u>. Rather, the duty to settle arises if the carrier would initiate settlement negotiations on its own behalf were its potential liability equal to that of its insured.

*Coleman v. Holecek,* 542 F.2d at 537 (emphasis added; internal citations and quotations omitted; quoting *Bollinger* and *Rector v. Husted*, 519 P.2d at 641). Moreover, its analysis ignores the Kansas Court of Appeals opinion in *Levier v. Koppenheffer*, *supra*, a later case that squarely addresses the nature of the duty a liability insurer owes an insured when conducting settlement negotiations where the injured claimant's offers to settle exceed the policy limit. In *Levier*, the Court of Appeals held the insurer liable for the resulting loss for its mishandling of a settlement offer that exceeded the policy limit by $28,100. 19 Kan. App. 2d at 981, 879 P.2d at 47. If there was any confusion, *Levier* made clear that the duty to consider the interests of the insured in an excess cases encompasses <u>all settlement negotiations</u>, including offers in excess of the policy limit.

Despite EMCASCO's protestations, the foregoing approach does not eviscerate the policy limit. A careful and prudent insurer can protect its insured without ignoring the limit. For example, suppose that Nungesser had offered to settle with Bryant for $301,000, payable any way EMCASCO desired. That offer would have been outside of the policy limit, but it would have been most reasonable in light of the strength of Nungesser's case and the extent of his damages. EMCASCO could appropriately address the offer by sharing it with Bryant and his parents and asking them whether they would prefer to accept the offer and contribute the additional $1,000 or permit EMCASCO to make a counter offer within the limit and risk the possibility that, if the counter offer was rejected, the initial offer might not be made again. Under that approach, Bryant's interests would be given due consideration, and EMCASCO's policy limit would remain inviolate. On the other hand, if EMCASCO simply rejected the $301, 000 offer in this hypotheical outright, without

permitting Bryant and his family to participate, it could be, and should be, liable for a resulting excess judgment.

**VIII.   Graybill & Hazlewood's dual representation of Nungesser and Bryant is irrelevant.**

Graybill & Hazlewood's dual representation of Nungesser and Bryant is not nefarious and was not surprising in light of the disqualification of Bryant's counsel shortly before the jury trial in the state court proceedings.  At that time, Bryant was heavily indebted to Carmichael and his firm. No other lawyer was familiar with the case.  It would have been economically unfeasible and impracticable for Bryant to hire new counsel to digest the complicated factual scenario and tortuous procedural path within the time remaining before the commencement of trial on January 11, 2005. In any event, it is patently apparent that Graybill & Hazlewood's undertaking to represent Bryant in December of 2005 had no influence on Fischer's decision to reject Nungesser's offer three years earlier.

**IX.   EMCASCO has not met its burden of establishing entitlement to judgment as a matter of law.  A fair-minded jury could easily return a verdict for Bryant on the evidence presented.**

In this unusual circumstance, one jury already determined that EMCASCO was liable to Bryant for negligence in its handling of settlement negotiations with Nungesser on his behalf.  That jury's verdict was the product of a proceeding in which no trial error was alleged, and in which EMCASCO conceded the jury was properly instructed.  The resulting judgment was reversed on other grounds.  The prior jury determination of liability is certainly not binding on this court. However, the fact of a prior verdict begs the question: How can EMCASCO seriously contend that another jury could not reasonably reach the same conclusion on the same facts? Clearly, EMCASCO has not met its burden of establishing that the absence of evidence from which a jury could (again) find that EMCASCO failed to use due care in handling settlement negotiations for Bryant.  As such summary judgment for EMCASCO is unwarranted.

WHEREFORE, Plaintiff Josh Bryant respectfully prays that Defendant EMCASCO Insurance Company's Motion for Summary Judgment be denied, and for such other and further relief as the Court deems just and necessary.

Respectfully submitted,

GRAYBILL & HAZLEWOOD L.L.C.
245 N. Waco, Suite 406
Wichita, Kansas  67202
Telephone:  (316) 266-4058
Facsimile:  (316) 462-5566

/s/ Jacob S. Graybill
/s/ N. Russell Hazlewood
By: _____
Jacob S. Graybill, S. Ct. No. 06595
N. Russell Hazlewood, S. Ct. No. 18664
*Attorneys for Plaintiff*

## REQUEST FOR ORAL ARGUMENT

Pursuant to D. Kan. Rule 7.2, Bryant hereby requests oral argument on EMCASCO's Motion for Summary Judgment.

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of January, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF which will send a notice of electronic filing to the following:

J. Steven Pigg
Steven R. Fabert
Fisher, Patterson, Sayler & Smith
3550 S.W. Fifth Street
P. O. Box 949
Topeka, Kansas  66601-0949
Phone: (785) 232-7761
Fax: (785) 232-6604
E-mail: sfabert@fisherpatterson.com; spigg@fisherpatterson.com
*Attorneys for Defendant EMCASCO Insurance Company*

Allen G. Glendenning
Watkins, Calcara, Chtd.
1321 Main Street
P.O. Drawer 1110
Great Bend, Kansas 67530-1110
Phone: (620) 792-8231
Fax: (620) 792-2775
E-mail:  aglenden@wcrf.com
*Attorney for Defendant EMCASCO Insurance Company*

Matthew Miller
Shook, Hardy & Bacon L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108-2613
Telephone: (816) 474-6550
Fax: (816) 421-5547
E-mail:  dmmiller@shb.com
*Attorney for Intervenor Coventry Healthcare of Kansas*

By: ___/s/ N. Russell Hazlewood_____
N. Russell Hazlewood, S.C. No. 18664

60