Search:
Go

The Florida Bar Journal
Advertising Rates • Lawyers Marketplace • Submission Guidelines • Archives • Subscribe • *News*
Journal HOME

June, 2003 Volume LXXVII, No. 6

## Insurance Bad Faith: The "Setup Myth"
### by by Rutledge R. Liles

Page 18

When testifying in insurance bad faith cases, allegations to the effect that the carrier has been set up by the insured and the insured's attorney and/or the third-party claimant and his or her attorney are frequently encountered. Such allegations are generally accompanied by an acrimonious charge of foul play, charade, dirty pool, contrivance, and so on.

Much has been written about insurance bad faith and the alleged "setup." As one writer correctly observed: "No subject is more likely to stir up controversy between plaintiffs' lawyers and insurance companies than the honored and reviled practice of setting up an insurance company for a bad faith claim."[1]

The angst created by the bad faith environment always seems to be laid at the doorstep of the insured or third-party claimant. In my experience, however, it is the insurance carrier that sets itself up for bad faith. The insured or claimant merely presents the opportunity by simply doing what should be done. Carriers never quite seem to be up to the challenge of responding in kind—a course of conduct that could provide comfortable insulation.

Under Florida law, any person may bring a civil action against an insurer when such person is damaged by the insurer's failure to attempt "[i]n good faith to settle claims when, under all circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for his interests."[2]

Until the 20th century, actions for breaches of insurance contracts were treated the same as any other breach of contract action, and damages were generally limited to those contemplated by the parties at the time they entered into the contract.[3] With the passage of time, however, insurance contracts began to be viewed as distinguishable from other types of contracts because they came to "occupy a unique institutional role" in modern society and affected a large number of people whose rates were dependent upon the acts of not only themselves, but also the acts of other insureds.[4] This became especially true when liability policies began to replace traditional indemnity policies as the standard form of insurance policy.

With indemnity policies, the insured defended the claim, and the carrier simply paid the claim upon conclusion. With liability policies, however, carriers assumed the obligation of defending the insured, with the insured surrendering control of the handling of the defense. This gave rise to an understandable vulnerability on the part of the insured which, in turn, gave rise to the existence of a fiduciary relationship between the carrier and the insured not unlike that between a lawyer and client.[5]

Consequently, courts began to recognize that carriers owed a duty to the insured to act in the insured's best interests rather than their own. In recognition of the fact that courts uniformly have acknowledged that carriers owe their insureds a duty of good faith and fair dealing, this duty evolved into the requirement that good faith be exercised or bad faith avoided.

In Florida, third-party bad faith actions were recognized as early as 1938.[6] Florida, however, is in the minority in holding that an action against an insurer for bad faith failure to settle sounds in contract rather than tort.[7] Most states treat such an action as a tort claim or a combination of tort and contract.[8] Third-party bad faith claims are recognized under both Florida common law and Florida statute. First-party bad faith claims, however, are entirely a creature of the legislature.

In Florida, there is neither a "setoff" defense nor an affirmative defense of comparative bad faith.[9] Similarly, while evidence of negligence may be considered by the jury as it may bear on the question of bad faith, a cause of action based solely on negligence, which does not rise to the level of bad faith, does not lie.[10]

In sum, in determining whether an insurer has "acted fairly and honestly towards its insured and with due regard for his interests," the Florida Supreme Court applies the "totality-of-the-circumstances" standard, and not a "fairly debatable" standard.[11] Each case is determined on its own facts, and the question of the insurer's failure to act in good faith with due regard for the interests of the insured is for the jury.[12]

Enough said about the law of bad faith. Simply stated, jurors do not like or trust insurance companies. In a recent case in which this author engaged in jury selection in a case involving a large national corporation suing multiple carriers for mass tort coverage. The claim was that the carriers were refusing to pay claims as required by the insurance contract. Issues aside, it took five full days to select a jury, with the number of strikes for cause approaching 100. Additional jurors were required to complete the process. Jurors generally believed that if someone pays a premium, that person is entitled to coverage, and that insurance companies jerk their insureds around. This juror mindset developed through personal experience with insurance companies.

This should surprise no one. Certainly, carriers are aware of the environment and prejudice built in to the system. Insurance companies are also manifestly aware of the fiduciary relationship that exists with an insured and with the law of bad faith. Yet, carriers continue to commit acts amounting to bad faith and complain of being set up by plaintiffs' attorneys.

While there are cases where courts and juries have concluded that a "setup" existed and no bad faith occurred, those cases are obvious in their contrivance and based on unreasonable demands containing unreasonable conditions with unreasonable time limits. There, the "totality of the circumstances" made it obvious what was going on. Generally speaking, however, insurance companies set themselves up for the fall in a fashion that could easily be avoided or remedied.

What, then, are insurance companies doing to set themselves up for bad faith liability and how can they maximize their opportunity to prevail?

The duty to protect the insured does not begin with the receipt of an offer (or demand, depending on the point of view) to settle from the plaintiff's lawyer. It begins with receipt of notice of a claim. It is at that point that a prudent carrier will (or should) actively begin to investigate and evaluate the claim with a mind to obtaining a release for the insured.

The checklist of activities that should be performed by claims handlers during the course of handling the claim include:

1) *Prompt and full investigation of the claim.* A number of carriers wait for things to be brought to them. They want to be spoon fed, not necessarily with regard to a general overview of the case which they gather from an accident report, but with regard to details surrounding the accident and injury—the details required to make a

decision. Carriers need to be proactive in the investigation of a claim. Reactive claims handling is dangerous.

2) *Timely evaluation of the claim and potential exposure with prompt response.* Often, reserves are promptly set at policy limits in recognition of the case potential, with offers to settle being well below what is viewed as the actual value. This author recently testified in a case where there was clear liability with catastrophic injury. The reserve was set at the policy limit within a week of the accident. The insured was informed of the potential for an excess exposure. The case clearly merited the policy limit, which was modest as compared to the potential exposure. Policy limits were not offered for five months, at which time they were rejected. The excuse given was that "we needed more *documentation* of the injury" and "plaintiff's counsel had said he would not accept the limits earlier in time." Suffice it to say that the alleged "need" for documentation was not represented by attempts to obtain the information. Further, even when the decision was made to tender the limits, the carrier neglected to do so, saying plaintiff's counsel had boasted that they would not be accepted in any event.

In this author's opinion, this amounted to compounding the potential for bad faith. How did the carrier know that the limits might not be accepted if tendered? The attorney's letter was written only three weeks post accident, was an obvious attempt to start the bad faith clock running, and, standing alone, would not have supported a bad faith claim. Had the limits been offered earlier in time, even though they may have been rejected, it would have drawn the line at when bad faith arguably may have occurred, rather than extending the time over months. This was especially true, given the fact that when the limits were tendered, the carrier was in possession of no greater information or "documentation" than it had earlier in the case. Presumably, someone in control ultimately awakened to the fact that there had been unreasonable delay.

The importance of a prompt and timely response to an offer to settle cannot be overemphasized. If one truly requires additional information, request an extension. If one has what is needed, make a decision and make an offer.

3) *An organized and professional approach to claims handling: having a plan and uniformly sticking to it.* Momentary oversight, given the volume of claims, is understandable. No one is perfect or expected to be so. However, there is repeated inexcusable neglect and carelessness in claims handling; so obvious, in fact, that one might conclude that it was intentional, at best, or grossly neglectful, at least.

Examples of this abound. The person responsible for the file leaves for vacation at the very time a time demand matures. No one is alerted to the deadline, the assumption being that either it is not serious or it will keep until the claims handler returns. Why was it not handled before the claims handler left? Why was a substitute claims handler not alerted? Why was there no requested extension? Neglect under these circumstances is inexcusable.

Another example can be seen in a carrier's mail handling procedures. On occasion, mail goes to a central location which is different from the location of the claims handler, resulting in unnecessary delay in reaching the responsible person.

Still another is the chain of command for obtaining authority to settle. It takes too long to get to the individual with the power to authorize settlement.

4) *Keep the insured advised of the progress of the case and settlement opportunities, the probable outcome of the case, and the possibility of an excess verdict.* The poor job carriers do in keeping the insured informed is shocking. As earlier stated, a fiduciary relationship exists between the insurer and insured. The insured selects the level of coverage desired and pays the premium. For the payment of an annual premium, the

insured transfers the risk of loss to the insurer up to the limits of coverage. In the absence of a claim, there is never a problem. The problem arises when a claim is made, and the claim carries the risk of exceeding the limits of coverage, thereby transferring what could be a catastrophic event back to the insured. Under the terms of the contract, the insured surrenders control of the case to the insurer.

A carrier is not required to automatically settle a claim that threatens to place the insured at risk for an excess judgment. Rather, the requirement is that it *attempt in good faith to settle* a claim when, under *all* the circumstances, it could and should have done so, had it acted *fairly* and *honestly* toward its insureds *with due regard for the insured's interests*.

This requires fair and honest assessment and, when necessary, prompt resolution rather than gamesmanship. It also demands that the insured be part of the process. After all, once moved beyond the policy limits, one is dealing with the insured's pocketbook. Should not the insured be apprised of what is going on and the potential for personal risk? Should not the insured be heard and have an opportunity to reduce the potential risk by offering to participate in the settlement at some level? No one should seriously question the right of the insured to be involved in the process. Jurors certainly do not, and it is not good to hear from the witness stand that no one ever consulted the insured or even informed him of what the carrier was doing in his name.

Notwithstanding, it is rare to find correspondence or notice from the carrier to the insured other than an initial acknowledgment of the claim and a statement to the effect that "we will assign a lawyer to handle your claim and to enter a defense on your behalf" and that "the claim may exceed your limit of liability, so you might want to hire your own lawyer to advise you at your expense," or words to that effect. After that, absolutely nothing. This practice is improper, and jurors do not hesitate to punish for the slight. Is it really that much trouble to copy the insured with information being exchanged between the carrier and its lawyer? Copying clients with everything should be a matter of course. Their file should be an image of their lawyer's. It seems a small "premium" to pay for the carrier to ensure against a claim that the insured was not kept informed.

5) *Act with due regard for the insured's interests*. Some carriers or, more specifically, claims personnel, view claims handling as a game of poker. They spoon out money in the same fashion as does a poker player, raising the pot with the hope that the opponent will fold. The problem is that, often, they are not playing with their own money. Rather, they are risking the insured's money. *Do not gamble* with the money of others.

6) *Give fair and reasonable consideration to a settlement offer that is not unreasonable under the facts of the case and settle, if possible, in a timely fashion where a reasonably prudent person would do so when faced with the prospect of paying the total recovery*. An insurer has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.[13]

Claims handlers are often blinded by the moment. The competitive juices start to flow when the first contact with plaintiff's counsel occurs. This may be by a simple letter of representation, a statutory demand for insurance information, or an offer (demand) made early in the case to settle for policy limits. There seems to exist a "no one is going to tell *me* what to do and when to do it" mentality. It's downhill from that point on.

Time limit demands are simply part of the process. Whether the short window of time constitutes a legitimate "setup" is entirely dependent on the facts of the case and the totality of the circumstances. In some cases, the abbreviated window may be adequate, in others, a "charade."[14]

Under certain circumstances, an insurance company can be in bad faith even before a written settlement offer is sent.[15] Further, the lack of a formal offer to settle does not preclude a finding of bad faith.[16] The absence of

an offer to settle is merely one factor to be considered in the totality of circumstances. Where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations.

Any question about the possible outcome of a settlement effort should be resolved in favor of the insured, with the insurer having the burden of showing not only that there was no real possibility of settlement within policy limits, but also that the insured was without the ability to contribute to whatever settlement figure that the parties *could* have reached.

Bad faith lawsuits are an occupational hazard. There is nothing that really can be done to avoid the occurrence. Nevertheless, a carrier can maximize its chances of prevailing through appropriate claims handling practices. Unfortunately, however, insurance companies continue to set themselves up for bad faith liability. Think "bad faith" the moment the claim is received. Handle the claim in a prompt, reasonable fashion. Defensive claims handling is the key. q

[1] **Stephen S. Ashley, Bad Faith Actions Liability and Damages** §7.26 (2d ed. 1998).

[2] **Fla. Stat**. §624.155(1)(b)(1); *see also* **Fla. Std. Jury Instr.** (Civ.) 3.1.

[3] *See generally* Roger C. Henderson, *The Tort of Bad Faith in First-Party Insurance Transactions: Refining the Standard of Culpability and Reformulating the Remedies by Statute*, 26 **U. Mich. J.L. Ref.** (Fall 1992).

[4] *Id.* at 8.

[5] *Baxter v. Royal Indem. Co.*, 285 So. 2d 652 (Fla. 1st D.C.A. 1973), *cert. discharged*, 317 So. 2d 725 (Fla. 1975).

[6] *See Auto Mut. Indem. Co. v. Shaw*, 184 So. 852 (1938).

[7] *Government Employees Ins. Co. v. Grounds*, 332 So. 2d 13 (Fla. 1976); *Swamy v. Caduceus Self Ins. Fund, Inc.*, 648 So. 2d 758 (Fla. 1st D.C.A. 1995); *see also* **R. Keeton and A. Widiss, Insurance Law**.

[8] *Id.*

[9] *Nationwide Property and Casualty Ins. Co. v. King*, 568 So. 2d 990 (Fla. 4th D.C.A. 1990).

[10] *DeLaune v. Liberty Mutual Ins. Co.*, 314 So. 2d 601 (Fla. 4th D.C.A. 1975).

[11] *Talat Enterprises, Inc. v. Aetna Casualty & Surety Co.*, 952 F. Supp. 773 (M.D. Fla. 1996).

[12] *Thomas v. Lumbermans Mutual Casualty Co.*, 424 So. 2d 36 (Fla. 3d D.C.A. 1983).

[13] *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783 (Fla. 1980); *Auto Mutual Indemnity Co. v. Shaw*, 134 Fla. 815, 184 So. 852 (Fla. 1938).

[14] *Hartford Accident & Indemnity Co. v. Mathis*, 511 So. 2d 601 (Fla. 4th D.C.A. 1987), *cert. denied*, 518 So. 2d 1275 (Fla. 1987); *DeLaune v. Liberty Mutual Ins. Co.*, 314 So. 2d 601, 603 (Fla. 4th D.C.A. 1975).

[15] *Hartford Accident and Indemnity Company v. Mathis*, 511 So. 2d 601 (Fla. 4th D.C.A. 1987), *cert. denied*, 518 So. 2d 1275 (Fla. 1987).

[16] *Powell v. Prudential Property & Casualty*, 584 So. 2d 12 (Fla. 3d D.C.A. 1991).

**Rutledge R. Liles** received his B.A. (1964) from Florida State University and his J.D. (1966) from the University of Florida College of Law. He is a board certified civil trial lawyer with more than 36 years of experience. He has served as president of both the Jacksonville Bar Association and The Florida Bar and is a fellow in the American College of Trial Lawyers and the American Bar Foundation.

*A version of this article previously appeared in the November 2002 issue of Harris-Martin's* COLUMNS-Mold *(www.harrismartin.com). Reprinted with permission.*

[Journal HOME](#)

[Revised: 05-31-2005 ]

© 2005 The Florida Bar