IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JOSH M. BRYANT,                          )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )        No.  07-1285 WEB
                                         )
EMCASCO INSURANCE CO.,                   )
                                         )
                                         )
                    Defendant.           )
_____ )


## MEMORANDUM AND ORDER

This matter comes before the Court on the Defendant EMCASCO Insurance Company's ("EMCASCO") Motion for Summary Judgment (Doc. 75).  The Defendant's motion was filed on November 24, 2008.  The Plaintiff, Josh Bryant, filed a response (Doc. 79) on January 22, 2009.  The Defendant filed a reply (Doc. 84) on March 31, 2009.  Upon review of these documents and their respective exhibits, the Court finds that with respect to the issues raised in the Motion for Summary Judgment there is no genuine issue of material fact.  For the reasons set forth herein, the Court finds that the Defendant is entitled to summary judgment as a matter of law.

The Defendant argues that it did not act negligently or in bad faith in negotiating the settlement of the Plaintiff's claim because EMCASCO offered to settle for the  policy limits four separate times.  Defendant asserts that the only opportunity to settle the claim within the policy limits was conditioned on Plaintiff's additional term which required EMCASCO to pay the

money to Plaintiff's attorney–despite Wesley's asserted lien–which would constitute a breach of statutory duty. The Plaintiff argues that there is triable issue of fact as to whether EMCASCO acted negligently or in bad faith when handling the settlement negotiations.

**Standard of Review**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.*

The Court views the evidence and all reasonable inferences in favor of the non-moving party. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1108 (10th Cir. 2001). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler,* 144 F.3d at 670-671. The movant can meet this burden by demonstrating a lack of evidence on an essential element of the nonmovant's claim. *Id.* at 671. When the

> movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.

*Id.*, *citing* Fed. R. Civ. P. 56(e).

"To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F. 3d at 671 (internal citations

and quotations omitted). The nonmoving party cannot defeat a properly supported motion for summary judgment by relying on conclusory allegations; rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. *Anderson*, 477 U.S. at 256.

"The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance." *Wade v. EMCASCO Ins. Co.,* 2004 WL 5550384 (D.Kan.), *citing Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

<u>**Facts**</u>

The Court finds the following facts to be substantively uncontroverted. To the extent that requested findings of fact are not included here, it is because the Court finds that the requested findings are unsupported in the evidence, irrelevant, or duplicative of other requested facts. The presentation of repetitive, irrelevant, and cumulative evidence does not create any triable issue of material fact.

1. On July 8, 2002, a collision occurred between a pickup being driven by plaintiff – Josh Bryant – and a motorcycle being ridden by Jim Nungesser. (Stipulation, PTO 4 a i.)

2. Bryant was a minor at the time of the accident. (Josh Bryant 3-29-04 Depo. 7:3-13.)

3. Bryant was an insured under a policy of insurance issued by EMCASCO to Bryant's parents. The Bryant family's auto policy with EMCASCO had a $300,000 single liability limit. (Stipulation, PTO 4 a iii.)

4. For a period of time after the accident, Nungesser was hospitalized at Wesley Medical Center in Wichita. (Stipulation, PTO 4 a ii.)

5. After Nungesser was discharged, Wesley filed notice of a $45,532.85 hospital lien and served Nungesser, Bryant, and EMCASCO. (Stipulation, PTO 4 a ii; RFA to Bryant 7-9.)

6. EMCASCO received notice of the collision and Nungesser's claim two days after the accident, and its claims adjuster, Bruce Fischer, began his investigation. (Stipulation, PTO 4 a iv.)

7. During the week of August 2002, when Fischer learned the extent of Nungesser's injuries, he suggested to EMCASCO that potential liability to Nungesser would exceed the policy limit and that EMCASCO should settle the claim. (Stipulation, PTO 4 a v.)

8. On August 27, 2002, EMCASCO – through Fischer – extended an offer to settle for the policy limit. (RFA to Bryant 10, 12-13.)

9. On August 27, 2002, Fischer also sent a letter to Bryant's parents advising them of the potential for excess exposure beyond the policy limits. (JT Tx. Vol. III, 52:16 through 54:9 and Ex. 65.)

10. Fischer confirmed EMCASCO's earlier offer to settle for the policy limit in a September 4, 2002, letter to Crockett, Nungesser's attorney, which stated in part:

"As we discussed, we are tendering our $300,000.00 combined single limit of coverage on our insured's auto policy to your client in settlement of this claim." (Stipulation, PTO 4 a vi; JT Tx. Vol. II, 70:19 through 71:14, Ex. 64.)

11. Crockett never responded to Fischer's September 4 letter. (JT Tx. Vol. II 78:17-22.)

12. On September 25, Fischer called Crockett to inquire as to the progress of the matter. (Crockett 6-23-08 Depo. 22:3-6.)

13. On October 23, 2002, Fischer sent another letter to Crockett stating in part: . . . We

are again writing to you tendering our $300,000.00 policy limit to settle this matter in exchange for a release of all claims. (RFA to Bryant 14.)

14. Bruce Fischer made four offers of the policy limits, two written and two oral. (RFA to Bryant 11.)

15. EMCASCO's policy limits offer was never withdrawn. (JT Tx. Vol. II, 222:7-9.)

16. On October 23, 2002, Fischer sent a letter to Mr. and Mrs. Bryant advising them that the policy limits had been offered in exchange for a release of all claims. (JT Tx. Vol. I, 54:10 through 56:19 and Ex. 62.)

17. On October 28, 2002, Wesley served on Nungesser, Bryant, and EMCASCO an amended lien notice in the amount of $49,993. (Stipulation, PTO 4 a ix.)

18. Graybill was first retained to represent Nungesser in November of 2002. (Stipulation, PTO 4 a ix.)

19. When the case first came to Mr. Graybill, he viewed it as a case in which the insurance company was offering to pay the limit of insurance. The hang up was the hospital lien. (Graybill 6-5-08 Depo. 57:25 through 58:6.)

20. After Graybill was retained by Nungesser he began getting ready to sue Wesley for consumer protection violations in connection with the assertion of the lien. Graybill believed that claim was worth "six figures." (Graybill 6-5-08 Depo. 66:12 through 67:4.)

21. Graybill was excited about the prospect of the claim against Wesley. (Graybill 6-5-08 Depo. 66: 7-11.)

22. Graybill intended to sue Wesley even if the case against Bryant settled for the policy limits. (Graybill 6-5-08 Depo. 66:12 through 67:4.)

23. Graybill believed that if Wesley's name was included on the settlement check it would interfere with and cause complications with the contemplated claim by Nungesser against Wesley. (Graybill 6-5-08 Depo. 71:4-10.)

24. On December 18, Fischer and Crockett had a telephone conversation in which Crockett indicated that Nungesser was willing to accept the policy limit but wanted the settlement check to be issued to him or his law firm and Mr. Nungesser without Wesley's name on the check. (Fischer 6-6-08 Depo. 6:2-10.)

25. Crockett's notes of the December 18 conversation state: "Told him we'd like to work out payment without paying Wesley because we dispute their position. Could we reserve some of the Wesley claim, for example, e.g., in my trust account? He didn't think so because Curtis Loub had been so aggressive, but he's leaving for vacation later this week and he'll get back to me tomorrow. Told him a letter would be great." (JT Tx. Vol. I 80:10 through 81:10.)

26. In previous conversations, Fischer and Crockett had discussed the lien but December 18 was the first time Crockett had conveyed the sentiment that he could not live with Wesley on the check. (Crockett 6-23-08 Depo. 30:18 through 31:5.)

27. Fischer did not consider the conversation with Crockett to be an offer but an inquiry as to how the check would be issued. (JT Tx. Vol. II, 184:24 through 185:1; 202:8-22.)

28. Following the December 18 conversation with Crockett, Fischer's understanding was that it had been agreed that the policy limits had been offered and were available to conclude this matter and the only wrinkle was whether Wesley's name needed to be on that check. (Fischer 6-6-08 Depo. 6:23 through 7:7). ( Exhibit 19:"I told you that we were willing to accept your offer of coverage limits in the above matter but that we needed to make some arrangement with EMC

in order that we could do so without allowing Wesley Medical Center to control the settlement proceeds.")

29. Graybill considered it a "likelihood" that if EMCASCO issued a check without Wesley's name, it could goad Wesley into suing on the lien. (Graybill 6-5-08 Depo. 71:21 through 72:16.) 31. Graybill stated that it "makes all the difference in the world in a Consumer Protection case where you're trying to collect a Consumer Protection violations if you – if the – if the wrongdoer files suit against the innocent person." (Graybill 6-5-08 Depo. 71:24 through 72:10.)

30. Crockett understood that a possible consequence of issuing a settlement check without Wesley's name could be that EMCASCO and/or Bryant would be sued by Wesley. (Crockett 6-23-08 Depo. 46:15-21.)

31. Wesley has in the past sued insurers who issued settlement checks without Wesley's name on the check. (Loub, JT Tx. Vol. III, 65:10-25.)

32. After talking to Crockett on December 18, Fischer contacted attorney Steve Pigg for his opinion on whether EMCASCO could issue a settlement check that did not include Wesley's name in light of its claimed lien. (Pigg Depo. 8:8-20; Fischer 6-6-08 Depo. 11:19 through 13:17.)

33. Pigg understood from his conversation with Fischer that the case had been settled and they were in the process of issuing payment. (Pigg Depo. 11:17-22; 17:10-12.)

34. Neither Pigg nor Fischer knew Crockett or had worked with him before. (Pigg Depo. 11:23 through 12:18.)

35. Pigg advised Fischer in a telephone conversation and an e-mail that Wesley's name

should be on the settlement check or EMCASCO could remain liable to Wesley for the amount of the lien. (Fischer 6-6-08 Depo. 21:25 through 22:10; 24:1 through 25:25, Ex 1.)

36. On December 19, Fischer called Crockett. Crockett was not in and Fischer left a phone message with Crockett's receptionist indicating that EMCASCO could not issue a settlement check without Wesley's name on it. (Crockett 6-23-08 Depo. 9:22 thru 10:6; Crockett 3-2-04 Depo. 57:16-22 )

37. Bryant has admitted that EMCASCO "had a legitimate concern in protecting itself from having to pay the lien in addition to the policy limits." (RFA 38-39; JT Tx. Vol. II 89:8-16.)   38. There would be a risk to EMCASCO associated with issuing a check without Wesley's name on it. (Sharp Depo. 73:10 through 75:5.)

39. Crockett did not call Fischer back in response to the phone message. (Crockett 6-23-08 Depo. 31:13-15.)

40. On December 31, 2002, Crockett sent a letter to Fischer which stated in part:  "This letter will recap our conversation on December 18 and your telephone message on December 19. . . . When we spoke on December 18, I told you that we were willing to accept your offer of coverage limits . . . but that we needed to make some arrangement with [EMCASCO] in order that we could do so without allowing Wesley Medical Center to control the settlement proceeds. . . . I offered to escrow money in my trust account so that we could settle with [EMCASCO] without capitulating to Wesley's demands. You told me you would look into this and call back the following day since you were getting ready to take some vacation time over the holidays. You did express some concern because you said Wesley's attorney, Curtis Loub, had been very aggressive in asserting Wesley's claims against our settlement proceeds. On December 19 you

did call, and you left a message stating that, because of Wesley's demands, [EMCASCO] would not pay the settlement proceeds unless Wesley were named on the check – right along with Jim Nungesser–as a joint payee! Obviously this would mean that the only way Jim could receive any money from [EMCASCO] would be if he surrendered to all the claims of Wesley. . . ."

"It would . . . seem to me that Wesley has interfered with Mr. Bryant's legitimate expectation that the limit of his liability insurance would be available to buy his release from a claim that obviously exposes him to literally millions of dollars of liability."

"By persuading [EMCASCO] to refuse to pay the limit of Mr. Bryant's insurance policy directly to Mr. Nungesser, Wesley has deprived Mr. Bryant of what will probably be the only opportunity he will ever have to purchase his complete release in return for the proceeds of a policy of insurance he paid for. "In light of the foregoing, Mr. Nungesser has no alternative but to evaluate other alternatives." (Stipulation, PTO 4 a x.)

41. Crockett never contacted Wesley to see if they would agree to his suggestion that he hold money in his trust account pending resolution of the lien. (JT Tx. Vol. II 46:10-20; JT Tx. Vol. III, 67:6-18; Crockett 6-23-08 Depo. 46:22 through 47:2.)

42. Fischer received Crockett's December 31 letter on January 2, 2003. (JT Tx. Vol. II 208:14-23.)

43. On January 2, 2003, Fischer contacted attorney Chuck Milsap to see what he could do to get the settlement concluded. (JT Tx. Vol. II 225:18-21.)

44. Chuck Milsap called Crockett on January 2, 2003. (JT Tx. Vol. II 25:9-15.)

45. Crockett did not inform Milsap on January 2 that settlement negotiations were no longer underway and that he intended to file suit in a few days. (Crockett 3-2-04 Depo. 88:13-

17.)

46. Crockett did not indicate to Milsap on January 2 that he no longer had any settlement authority. (Crockett 3-2-04 Depo. 85:24 through 86:2.)

47. In the January 2 conversation, Milsap discussed various ways to deal with the lien issue that would protect EMCASCO. (JT Tx. Vol. II 27:20 through 28:25.)

48. The January 2 conversation between Milsap and Crockett ended inconclusively. (JT Tx. Vol. II. 30:19:23.)

49. Nungesser filed suit against Bryant on January 6, 2003, the Monday following that Thursday conversation between Milsap and Crockett. (Stipulation, PTO, 4 a xi.)

50. The Petition contained only 4 numbered paragraphs. (Petition, 3-CV-49 In The Eighteenth Judicial District, District Court, Sedgwick County, Kansas, attached as Exhibit A.)

51. No summons was issued and service of process was not attempted. (Stipulation, PTO 4 a xi.)

52. When the Petition was filed Crockett did not obtain a summons as he was still hoping to get the claim resolved. (Crockett 6-23-08 Depo. 41:11 through 42:9.)

53. Shortly after the filing of the Petition against Bryant on January 6, active leadership in that lawsuit was taken over by Graybill and Hazlewood. (Crockett 6-23-08 Depo. 42:10-13; 47:11-15.)

54. Graybill believed that if the case against Bryant were settled for the policy limits, the claim against Wesley would have substantially less value. (Graybill 6-5-08 Depo. 70:9 through 71:4.)

55. On January 15, 2003, Graybill sent a lengthy letter to Millsap, enclosing a copy of the

petition filed by Nungesser against Bryant. Among other things, Graybill's letter stated:

If it appears from the facts presented, that a prima facie case can be made that a tortfeasor's liability insuror has, as a result of negligence or bad faith, deprived its insured an opportunity to escape uninsured liability , an attorney representing injured party "must advise his client to terminate negotiations to settle for the limit of available insurance . . . Consequently, I have had no other choice but to give that advice, and Jim has followed that advice and has instructed me to inform you that any further negotiations calculated to relieve Mr. Bryant of the full measure of his liability in return for payment of the limit of EMC's insurance policy are terminated." (Stipulation, PTO 4 a xiii; Graybill 6-5-08 Depo. Ex 19, p.7 para. 1.)

56. Upon receipt of this letter, Fischer sent a copy to Bryant's parents. (JT Tx. Vol I 56:20 through 57:3 and Ex. 48.)

57. Graybill's letter of January 15 indicated that Graybill agreed that Wesley appears to be the "bad guy." (Graybill 6-5-08 Depo. Ex 19, p.7 para. 2.)

58. Until Fischer's phone message of December 19, a claim against EMCASCO for bad faith or negligence was not on Graybill's radar screen or thought about at any level of seriousness. (Graybill 6-5-08 Depo. 59:14 through 60:13.)

59. On January 13, 2003, one week after the suit was filed and before it was served, Wesley filed a second amended lien notice, reducing the amount to $180. It released its lien altogether a month later. Neither Bryant nor EMC received notice of this until late January 20, 2003. (Stipulation, PTO 4 a xii.)

60. On January 20, 2003, Fischer first learned that Wesley's lien had been reduced to $180. (*Id*.; JT Ex. 32, 1/20/03 note.)

61. On January 21, 2003, EMCASCO's attorney sent a letter to Graybill which stated in part: ". . . I was informed that the hospital lien has been reduced to $180.00. I hope that this change in circumstances has removed all obstacles to settlement of Mr. Nungesser's claim. ***EMC continues to be ready to pay its policy limits to settle Mr. Nungesser's claim, and if necessary to absorb the $180.00 hospital lien in addition to those limits." (Graybill 6-5-08 Depo. Ex 20.)

62. When Hazlewood found out about the reduced lien, he gave no thought to how that might affect the possibility of getting the policy limit settlement concluded because, as far as he was concerned, "the horse was already out of the barn." (Hazlewood Depo. 21:5-12.)

63. Graybill does not recall whether he did any substantive work on the case between January 1, 2003, and January 21, 2003, other than the preparation of the January 15 letter. (Graybill 6-5-08 Depo. 74:19 through 78:10.)

64. The only work Crockett did on the case between January 6, 2003, and February 1, 2003, was review Graybill's January 15 letter and participate in a telephone conversation with Milsap on January 20. (Crockett 6-23-08 Depo. 47:16-25.)

65. Hazlewood's work on Nungesser's behalf from January 1, 2003, to January 21, 2003, was in regards to Nungesser's claims against Wesley. (Hazlewood 6-5-08 Depo. 29:15 through 30:20.)

66. The claim against Wesley would have been pursued even if the case against Bryant settled for the policy limits. (Graybill 6-5-08 Depo. 66:12 through 67:4.)

67. Nungesser's claims against Wesley were settled for an undisclosed amount. (Hazlewood 6-5-08 Depo. 32:20-25.)

68. In March 2003, Josh Bryant hired a personal attorney, Jeff Carmichael. (Carmichael Depo. 6:2 through 8:8.)

69. Mr. Carmichael talked to Nungesser's attorney's several times about whether there was any possibility of getting the policy limits settlement back on track to save Bryant from excess exposure. (Carmichael Depo. 24:4-12)

70. The response to Carmichael's inquires about getting the policy limits settlement back on track was that ship had sailed, they had tried to settle the case in a reasonable manner, it had not been accepted and that offer was no longer on the table. (Carmichael Depo. 24:4-12 and 25:13 -21.)

71. Following a trial, verdict, appeal, reversal and remand, on August 17, 2007, the state trial court entered judgment against Bryant, by confession, in exchange for a covenant not to execute, and with EMCASCO's written consent, in the reasonable amount of $2,000,000 plus the costs of the action. EMCASCO paid its $300,000.00 policy limit to Nungesser in partial satisfaction of the judgment. $1,700,000 of the judgment remains unsatisfied. (Stipulation, PTO 4 a xv.)

72. In December 2004, Graybill undertook the representation of Bryant against EMCASCO. (Graybill 6-5-08 Depo. 5:1-19.)

73. On April 30, 2007, Graybill and Hazlewood withdrew from the representation of Bryant. (Graybill 6-5-08 Depo. 5:20 through 6:2 and Depo. Ex 6.)

74. Between December 2004 and the withdrawal in April 2007, Graybill and Hazlewood represented Bryant continuously. (Graybill 6-5-08 Depo. 6:3-7.)

75. Graybill does not remember if he advised Nungesser after January 15, 2003, to accept

a policy limits offer. (Graybill 6-5-08 Depo. 56:8-15.)

76. During the appeal of the State Court case, Graybill represented Bryant. (Graybill 6-5-08 Depo. 79:6-8.)

77. In the State Court proceeding, EMCASCO had also argued that a policy limits settlement had been reached on Bryant's behalf in the December 18 phone call. The finding was also appealed by EMCASCO in its own right and by Bryant through the defense counsel appointed by EMCASCO to represent Bryant. (Carmichael Depo. 43:2 through 46:12.)

78. During the appeal of the state court case, Graybill argued, exclusively on Nungesser's behalf, against a finding that a settlement had been reached for the policy limits. (Graybill 6-5-08 Depo. 79:13-16.)

79. If a settlement had been found to have occurred, Bryant would have been relieved from any liability to Nungesser. (Graybill 6-5-08 Depo. 79:17-20.)

80. Bryant's personal attorney wrote a letter to Bryant's EMCASCO appointed attorney to "straighten out what was happening" and indicate that Bryant did not wish to participate or have his name used in pursuit of the defense that the case against him had been settled for policy limits in 2002. (Carmichael Depo. 43:2 through 46:12.)

81. After the Kansas Supreme Court abrogated all previous agreements between the parties, Graybill and Hazlewood withdrew as attorneys for Bryant. (Graybill 6-5-08 Depo. Ex 10.)

82. Hazelwood and Graybill, then representing Nungesser, began again to negotiate a settlement with Bryant, then represented by Carmichael. (Carmichael Depo, 55:1-15; 59:1 through 60:1.)

83. Hazlewood indicated that the previous agreement for a judgment of $2,000,000.00 may no longer be good and a larger judgment might be sought against his former client. (Carmichael Depo, 55:1-15; 59:1 through 60:1.)

84. Following a renewal of the agreement to confess judgment for $2,000,000.00 in exchange for a covenant not execute, Graybill and Hazlewood entered an appearance for Bryant on June 4, 2008. (Graybill 6-5-08 Depo. 4:11-16.)

85. Bryant caused the accident when he failed to yield right of way to Nungesser. (JT Tx. Vol. 1, 38:2-39:23).

86. Nungesser suffered orthopedic injuries and a serious brain injury in the accident. (Pretrial Order Stipulations 4(a)(I); JT Tx. Vol. 2, 158:12-160:19).

87. Nungesser was a real estate executive earning a six-figure income prior to the accident, which rendered him unable to work. (Carolyn Nungesser Affidavit).

88. Bryant never disputed he was responsible for causing the accident. (JT Tx Vol. 1, 39:11-40:24; 41:14-25).

89. After the accident, Nungesser was transported via ambulance to Via Christi Regional Medical Center, where he was stabilized. (Carolyn Nungesser Affidavit).

90. On or about June 22, 2002, Nungesser was transferred from Via Christi's Surgery Intensive Care Unit to the Surgery Intensive Care Unit at Wesley Medical Center, at the direction of his health maintenance organization ("HMO"). (Carolyn Nungesser Affidavit).

91. Wesley was a contracting provider for Nungesser's HMO. (Pretrial Order Stipulations 4(a)(ii)).

92. When Nungesser's wife, Carolyn, received Wesley's $45,532.85 lien notice, she

assumed Nungesser's HMO had failed to pay his bill, and she contacted the HMO to inquire. Carolyn was told the HMO had already paid Via Christi's charges; that it had not received a claim from Wesley; and that it would pay Wesley's charges if and when the hospital submitted a claim. (Carolyn Nungesser Affidavit).

93. By August 22, 2002, Fischer learned from his investigation that Nungesser suffered a fractured left femur, fractured pelvis, fractured left wrist, fractures of the C-1 and C-2 vertebrae and traumatic head injury in the collision; that Nungesser was in a rehabilitation hospital and was unable to walk or use his arms; that Nungesser spoke, but not intelligibly; that Nungesser was being fed through his stomach, because his swallow reflex didn't work; that it was indicated Nungesser would not be able to return to work; that Nungesser's medical bills already totaled at least $157,000; and that the property damage to Nungesser's motorcycle was around $20,000.00. (Fischer Depo. 8/13/03 at p. 159:23-163:20; JT Tx. Vol. 2, 158:12-160:19).

94. During the third week of August, 2002, Fischer and his superiors concluded from their investigation that Bryant was "clearly at fault" and that Nungesser's claims had a "value in excess of the $300,000.00 policy limit". (Fischer Depo. 8/13/03 at 159:23 - 170:24; Exhibit 35; JT Tx Vol. 2, 198:4-199:14;). Fischer prepared internal reports estimating that there was a "zero percent" chance of a successful defense for Bryant. (Exhibit 35).

95. Fischer never changed his assessment of Bryant's liability. (Fischer Depo. 8/13/03 at 168:1-5).

96. When EMCASCO made its first offer in August of 2002, Fischer understood that there was a "significant risk to [Bryant] of the possibility of exposure from [Nungesser] if the claim went forward." (Fischer Depo. 8/13/03 at p. 184:3 -7).

97. Fischer testified that he understood that as an adjustor for EMCASCO, he had the responsibility to protect Bryant from the possibility of financial exposure on the claim. (Fischer Depo. 8/13/03 at p. 184:16 - 185:11).

98. On August 27, 2002, Fischer sent a letter to Bryant's parents stating, in pertinent part:

Dear Mr. & Mrs. Bryant:
We are handling the above referenced injury auto accident claim in our office. We are writing to advise you that there is potential exposure of up to and in excess of your $300,000.00 combined single limit of liability on your automobile policy with EMCASCO for the bodily injury sustained by James Nungesser. The Nungesser's are now represented by attorney, Dave Crockett.
We thank you for your time and attention to this matter.

(Exhibit 65).

99. David Crockett is a Wichita attorney who does mostly real estate, business, and construction law. Crockett had assisted Nungesser in various real estate matters in the past and was a family friend. Shortly after the accident, Carolyn contacted Crockett for help. (JT Tx Vol. 1, 71:12-73:3).

100. Crockett discussed EMCASCO's August 27, 2002, offer with Fischer, including the Wesley lien. Crockett was investigating the validity of the lien, which he believed was contrary to law. (Finding of fact in *Nungesser v. Bryant*, 283 Kan. at 552, 153 P.3d 1277 ; Crockett Depo. 7/11/03 at p. 29:12-30:19, 49:21-50:11).

101. EMCASCO's offer was always conditioned upon Nungesser's acceptance of a single check made jointly payable to Nungesser and Wesley. (Crockett Depo. 07/11/03 at 54:14 - 55:10; Fischer Depo. 8/13/03 at 44:12-17; Crockett Depo. 3/2/04 at 38:21-39:5, 109:3-10; JT Tx Vol. 1, 81:17-22; Finding of fact in *Nungesser v. Bryant*, 283 Kan. at 552, 153 P.3d 1277).

102. On September 5, 2002, Carolyn Nungesser contacted Quinlynn Foules at Wesley's

business office and asked her to immediately submit a claim to Nungesser's HMO. Foules refused to do so, stating that the hospital did not intend to file a claim with the HMO "in this case." Foules explained that, instead, Wesley intended to seek payment of its charges from auto liability insurance proceeds. (Carolyn Nungesser Affidavit).

103. Crockett concluded that Nungesser did not owe a debt to Wesley; and settling with Bryant for a check made jointly payable to Wesley would significantly impair Nungesser's ability to avoid paying Wesley's lien. (JT Tx Vol. 2, 10:25-12:14).

104. In early October, 2002, Carolyn Nungesser received a document from Wesley suggesting it had billed Nungesser's HMO, and $180 was due from Nungesser. (Exhibit 6).

105. On October 9, 2002, Carolyn hand-delivered a $180 check to Foules, at Wesley, along with a copy of the document she received from Wesley, and a note stating:

> I am enclosing our check for $180.00 to pay the enclosed bill. Your hospital lein [sic], "Wesley's" will not let EMC pay $300,000 to Jim for our settlement. This check should take care of Wesley's bill. Please notify EMC that you have withdrawn immediately so we can conclude our settlement. Thank you so much!

In the memo section of her check, Carolyn noted that it was "payment in full." (Exhibit 7).

106. Wesley rejected Carolyn's check. It did not withdraw its lien as Carolyn requested. On October 11, 2002, it served an amended lien notice, *increasing* its asserted lien by almost $5,000. (Exhibit 8; Exhibit 9). In the Verification of Account attached to Wesley's amended lien notice, the hospital asserted that Nungesser was personally indebted to the hospital for $49,993.00. (Exhibit 9).

107. On October 30, 2002, Fischer wrote to Wesley's attorney, Curtis Loub, acknowledging EMCASCO's receipt of the amended lien notice and stating that EMCASCO

was waiting for Nungesser to accept its policy limit offer. (Exhibit 61).

108. On December 18, 2002, Crockett and Fischer spoke on the telephone. Crockett told Fischer that Nungesser disputed Wesley's lien and would not allow Wesley to control the proceeds of a settlement by refusing to endorse a settlement check. Crockett advised Fischer that Crockett didn't want a check jointly payable to Nungesser and Wesley, because Crockett wanted to push Wesley to obtain payment from Nungesser's HMO rather than through a lien on Nungesser's personal injury settlement. Crockett indicated "we are willing to accept" the policy limits.  (JT Tx Vol. 2 at 186:3-187:13; Exhibit 19).

109. During the December 18, 2002, call between Crockett and Fischer, "Crockett orally offered to settle Nungesser's claim in exchange for a $300,000 check payable to Nungesser and Crockett rather than Nungesser and Wesley.  Crockett also offered to escrow money in his trust account to address Wesley's $49,993 lien." (Finding of fact in *Nungesser. v. Bryant*, 283 Kan. at 553, 153 P.3d 1277 ;[1] Exhibit 242 at p. 13; JT Tx Vol. 1, 88:4 - 90:10; Fischer Depo. 8/13/03 at 65:17-22; Exhibit 19).

110. During the December 18, 2002, call between Crockett and Fischer, Fischer advised Crockett that he was leaving town for vacation at the end of the week.  Fischer expressed doubt that EMCASCO would agree to Crockett's proposal.  Fisher volunteered to look into the matter and get back to Crockett as soon as he could. (JT Tx Vol. 2, 7:6 - 8:5; 187:17 - 188:3; Exhibit 19).

111. Crockett did not set a deadline for Fischer to respond to the December 18, 2002, offer.  (JT Tx Vol. 2, 7:6 - 8:5; 187:17 - 188:3; Exhibit 19).

112. Crockett did request a written response to his December 18, 2002, offer from

Fischer, but he never received one. (Crockett Depo. 3/2/04 at 57:13-15).

113. After speaking with Pigg, on December 18, 2002 or December 19, 2002, Fischer called Crockett's office and left a message to the effect EMCASCO "would not agree to settle unless Wesley was named as a joint payee on the check." (Fact finding in *Nungesser v. Bryant*, 283 Kan. at 553, 153 P.3d 1277 ; Exhibit 19; Fischer Depo. 8/13/03 at 43:13-44:17, 64:23-65:7; JT Tx Vol. 1, 10:25 - 11:12).

114. At trial, Fischer testified that he responded to Crockett's proposal the same day he received it, after discussing the matter with his supervisor and consulting counsel.  (JT Tx Vol. 2, 188:4-16).

115. Crockett testified that escrow arrangements are commonly employed to facilitate the completion of transactions which might otherwise be derailed by issues relating to liens. (JT Tx Vol. 1, 18:12-20:11).

116. Crockett would have preferred to escrow money with EMCASCO's attorney. Crockett would have recommended that alternative to Nungesser if EMCASCO had proposed it. (JT. Tx. Vol 2, 29:10-25).

117. Wesley's lawyer, Curtis Loub considers placing money in an attorney's trust account a viable way to allow a settlement transaction to proceed in spite of a hospital lien if he trusts the lawyer. (JT Tx Vol. 3, at 87:3-88:3). Loub considers Crockett someone acceptable to place $50,000 in his trust account pending a dispute over a hospital lien. (JT Tx Vol. 3, at 88:4-89:9).

118. Fischer understood that Nungesser's claim did not settle, "because [Crockett] would not agree to the way the check was to be issued." (Fisher Depo. 8/13/03 at p. 186:14-19).

119. Fischer never attempted to contact Wesley or Loub to discuss Crockett's proposed escrow arrangement before he rejected Nungesser's offer. Fischer testified as follows:

Q If the Wesley lien and the possibility of having to include Wesley on the check was the only thing that was keeping the settlement from being finalized, why didn't anybody think of calling Wesley?

A Who are you referring to with anybody?

Q Anybody. Why didn't you?

A Really had no reason to. It was at that point up to plaintiff's attorney to agree to the terms of the settlement. We had offered our limit.

(Fischer Depo. 8/13/03 at 55:22-56:7).

120. On December 31, 2003, Crockett wrote to Fischer, recounted his December 18, 2002, conversation with Fischer and Fischer's message, and advised that in light of EMCASCO's refusal to accept Nungesser's offer, Nungesser intended to evaluate other alternatives. Crockett's letter stated, in pertinent part:

Dear Bruce,

This letter will recap our conversation on December 18 and your telephone message on December 19. As you will recall, I had placed a call to you on December 17, which you were kind enough to return on December 18. When we spoke on December 18, I told you that we were willing to accept your offer of coverage limits in the above matter but that we needed to make some arrangement with [EMCASCO] in order that we could do so without allowing Wesley Medical Center to control the settlement proceeds. I explained that we dispute Wesley's claim to the settlement proceeds, and I offered to escrow money in my trust account so that we could settle with [EMCASCO] without capitulating to Wesley's demands. You told me you would look into this and call back the following day since you were getting ready to take some vacation time over the holidays. You did express some concern because you said Wesley's attorney, Curtis Loub, had been very aggressive in asserting Wesley's claims against our settlement proceeds.

On December 19 you did call, and you left a message stating that, because of Wesley's demands, [EMCASCO] would not pay the settlement proceeds unless

Wesley were named on the check – right along with Jim Nungesser – as a joint payee! Obviously, this would mean that the only way Jim could receive any money from [EMCASCO] would be if he surrendered to all of the claims of Wesley.

I don't know what Mr. Loub said to you, nor do I know what [EMCASCO] has done proactively in an attempt to get this matter resolved. It does appear to me that Mr. Loub has interfered with Mr. Nungesser's legitimate expectation that matters concerning subrogation rights of his health insurance are between him and his carrier, and Wesley has no right to interfere.

It would also seem to me that Wesley has interfered with Mr. Bryant's legitimate expectation that the limit of his liability insurance would be available to buy his release from a claim that obviously exposes him to literally millions of dollars of liability.

It would appear to me that Wesley, through its unjustified posturing and threats, has deprived Mr. Bryant of the benefits of his liability insurance with your company and, at the same time, has deprived Mr. Nungesser of his right to his health insurance.

By persuading [EMCASCO] to refuse to pay the limit of Mr. Bryant's insurance policy directly to Mr. Nungesser, Wesley has deprived Mr. Bryant of what will probably be the only opportunity he will ever have to purchase his complete release in return for the proceeds of a policy of insurance he paid for.

In light of the foregoing, Mr. Nungesser has no alternative but to evaluate other alternatives.

(Exhibit 19).

121. "There is no dispute between the parties that Crockett's December 31, 2002, letter accurately described the events of December 18 and 19." (Finding of fact in *Nungesser v. Bryant,* 283 Kan. at 554, 153 P.3d 1277). Fischer testified that Crockett's December 31, 2002, letter accurately reflects what occurred in their December 18, 2002, telephone conversation and in Fischer's subsequent telephone message to Crockett. (Fischer Depo. 8/13/03 at 43:13 - 44:17; JT Tx Vol. 2, 192:6 - 194:8).

122. Crockett decided to file suit against Bryant around December 31, 2002. (Crockett

Depo. 6/23/08 at 17:7-14). He intended the final sentence of his December 31, 2002, letter to communicate that intent. (JT Tx Vol 2, 24:5-20).

123. At Millsap's request, Fischer authorized him to "call [Crockett] to discuss this matter and get a feel for how he intends to put money into a trust account and work out an agreement with Wesley to go after [Nungesser's] health insurance for payment of the hospital bill." (Fischer Depo. 8/13/03 at 51:14-52:7).

124. Millsap understood that he had no specific authority from EMCASCO to resolve Nungesser's claim in any particular manner. (JT Tx. Vol. 3, 148:1-18).

125. Millsap called Crockett to discuss the matter on January 2, 2003. Millsap made no offer of settlement to Crockett. (Crockett Depo. 3/2/04 at p. 89:4-22; JT Tx., Vol. 2, 27:20-31:3).

126. Had Millsap made an offer, Crockett would have conveyed it to Nungesser. (Crockett Depo. 3/2/04, at 89:4-22).

127. Millsap did suggest that Crockett contact Jacob Graybill to sue Wesley. (Crockett Depo. 3/2/04, at 89:4-22).

128. Millsap did not ask Crockett to follow up with him after the January 2, 2003 telephone call. Instead, Millsap told Crockett that he would "think about it and maybe get back to [Crockett]." (JT Tx. Vol. 2, 30:19-23).

129. Millsap was supposed to "get back" with Fischer after discussing the matter with Crockett, but he never did. (Fischer Depo. 8/13/03 at p. 51:22-52:10).

130. Crockett filed suit against Bryant in the District Court of Sedgwick County, Kansas, on January 6, 2003, seeking damages for bodily injury and property damage suffered by Nungesser as a result of Bryant's negligence and/or recklessness. (Exhibit 243).

131. Between January 2, 2003 and January 15, 2003, Millsap had no further contact with Fischer regarding settlement of Nungesser's claim, and no contact of any sort with Crockett. (Fischer Depo. 8/13/03 at 51:22-52:10).

132. EMCASCO first became aware of Nungesser's suit against Bryant when Millsap received a letter from Graybill dated January 15, 2003, enclosing a copy of the Petition. (Exhibit 41).

133. On January 15, 2003, Nungesser filed a 34-page petition against Wesley, asserting claims for abuse of process, tortious interference with economic expectancy, violations of the Kansas consumer protection act, breach of fiduciary duty, and fraud by silence. (Exhibit 244).

134. Nungesser's attorney, Jacob Graybill, delivered a copy of Nungesser's Petition against Wesley to Millsap in a letter dated January 16, 2003. (Exhibit 41).

135. Bryant's parents did not hire personal counsel for Bryant in December of 2002, because they "didn't think it was necessary because [Diane Bryant] had been told by Bruce Fischer that legal counsel would be provided for Josh." (JT Tx. Vol. 1, p. 61:9-21).

136. If Fischer had fully informed Bryant's parents about the status of the settlement negotiations, they would have hired personal counsel sooner. (JT Tx. Vol. 1, p. 62:3-11).

137. On January 21, 2003, Fischer called Diane Bryant and notified her that suit had been filed against Bryant. (JT Tx. Vol. 1, 58:4-17). He followed up the conversation with a letter dated January 22, 2003. The Bryants hired attorney Jeffery Carmichael to represent their son on March 5, 2003, because they were "really worried about the liability part of it." (JT Tx Vol. 1, p. 62:12-16, Carmichael Depo. 5/19/05 at p. 5:24-7:21).

138. The Bryant family retained Carmichael on an hourly fee basis. (Carmichael Depo.

5/19/05 at p. 5:24-7:21, 15:24-16:11; Exhibit 249).

139. Carmichael asserted third-party claims for Bryant against EMCASCO and Wesley in the state district court. (Exhibit 248).

140. On September 12, 2003 EMCASCO filed an action in United States District Court for the District of Kansas against Bryant, Nungesser, Nungesser's wife, and two of Nungesser's insurors who claimed subrogation interests in any recovery that Nungesser might obtain against Bryant. When it filed the federal action, EMCASCO deposited its $300,000 policy limit with the Clerk of the U.S. District Court. EMCASCO's Complaint asserted two causes of action: the first seeking specific performance of an alleged oral settlement agreement between it and Nungesser; the second seeking relief in the nature of interpleader, pursuant to 28 U.S.C. 1335. The federal action was assigned to the Honorable Sam Crow and designated as Case No. 03-CV-04174-SAC.

141. EMCASCO threatened to deplete the funds available to Bryant to satisfy Nungesser's claim against him by seeking recovery of an attorney's fee to be paid out of the $300,000 policy limit it deposited with the clerk of the court. (Graybill Affidavit).

142. On March 4, 2004, Judge Crow granted Bryant's and Nungesser's motions, in part, and ordered that all proceedings in the federal action be stayed until final judgment is entered in this case. In so ruling, Judge Crow held that EMCASCO's conduct had "raise[d] the specter of forum shopping." (*EMCASCO Ins. Co. v. Dairyland Ins. Co.*, No. 03-4174-SAC, 2004 WL 838060, * 4 (March 4, 2004)).

143. On September 22, 2004, in the state case, in response to a defense claim that EMCASCO had reached a pre-suit settlement with Nungesser, he filed a motion for partial summary judgment seeking a determination that he had not agreed to settle or compromise his

claims against Bryant prior to the filing of the action. EMCASCO and Bryant filed counter-motions seeking a summary determination that an enforceable pre-suit settlement had been reached. If granted, EMCASCO's motion would have resulted in dismissal of the state action. (*Nungesser v. Bryant*, 283 Kan. at 556-57, 153 P.3d 1277; Exhibit 242)).

144. On November 4, 2004, all parties participated in a mediation that produced a three-way agreement. The agreement was conditional. It provided in part that if Nungesser were to prevail on his assertion that there was no pre-suit settlement, then: 1) a reasonable estimate of the damages Bryant would be found liable to pay Nungesser would be $2 million; 2) EMCASCO agreed that Bryant could confess judgment in the amount of $2 million in exchange for a covenant not to execute, without impairing any rights Bryant might have against EMCASCO, including a claim of negligence or bad faith. (*Nungesser v. Bryant*, 283 Kan. at 556-57, 153 P.3d 1277).

145. Bryant and Nungesser also entered into an agreement between themselves which provided in part that: if EMCASCO did not prevail on its pending motion for summary judgment, Bryant would confess judgment in the amount of $2 million; Bryant could pursue such claims as he may have against EMCASCO for payment of the judgment; Nungesser would indemnify Bryant for the costs to prosecute the action; Bryant would grant Nungesser a partial assignment of his contractual rights against EMCASCO so Nungesser would have standing to join Bryant as a party plaintiff against EMCASCO; Nungesser would refrain from execution on Bryant's wages or property until a final judgment were entered against EMCASCO. (*Nungesser v. Bryant*, 283 Kan. at 556-67, 153 P.3d 1277).

146. On November 18, 2004, the state district court granted Nungesser's summary

judgment motion, finding that Nungesser had not entered into a settlement contract with EMCASCO. (Exhibit 242).

147. In November of 2004, Bryant delivered $9,500 to Carmichael's firm as partial payment of his outstanding attorney fee obligation, which would ultimately amount to more than $28,000. (Carmichael Depo. 05/19/05 at p. 71:11-18; Exhibit 249).

148. On December 1, 2004, Bryant served Nungesser with an offer to confess judgment for $2 million in the state action. Nungesser accepted the offer the following day, and the state court entered judgment in Nungesser's favor against Bryant in the amount of $2 million. (*Nungesser v. Bryant*, 283 Kan. at 556-57, 153 P.3d 1277).

149. A jury trial had been scheduled to begin January 11, 2005, to resolve Bryant's third party claims against EMCASCO. (Graybill Affidavit).

150. Graybill and Hazlewood began representing Bryant in December, 2004, when it became apparent that Carmichael would be disqualified due to the necessity of his trial testimony and no other counsel were readily available to try Bryant's third party claims against EMCASCO. (Carmichael Depo. 05/19/05 at p. 72:6-73:20, 146:8-149:15).

151. Before agreeing to dual representation of Nungesser and Bryant, Graybill and Hazlewood obtained appropriate written conflict waivers from Nungesser and Bryant, who each consulted with their own personal counsel as necessary to give informed consent. Nungesser and Bryant each retained independent counsel to represent their respective interests in the event a conflict arose. (Graybill Affidavit).

152. On January 11, 2005, Judge Crow entered an order to disburse funds in the federal action in accordance with the parties' agreement. Pursuant to the order, the clerk disbursed

$110,000 to Nungesser's insurers and $190,000 to Nungesser. (Graybill Affidavit).

153. On January 11, 2005, a jury trial of Bryant's third-party claims against EMCASCO was commenced in state court. The jury found EMCASCO had acted negligently, but did not act in bad faith. The state court entered judgment for $2 million against EMCASCO and in favor of Bryant, subject to a credit of $300,000 paid pursuant to the mediated settlement agreement. (*Nungesser v. Bryant*, 283 Kan. at 558, 153 P.3d 1277).

154. On July 29, 2005, the state district court entered judgment to Bryant for his fees incurred in prosecuting his claims against EMCASCO. (*Nungesser v. Bryant*, 283 Kan. at 557-58, 153 P.3d 1277).

155. Bryant had a significant personal interest in seeing the state district court's judgment upheld. Had the state district court's fee award been upheld, Bryant would have been relieved of any further obligation to pay Carmichael's firm for the services he received; and he would have been entitled to recover the $9,500.00 he previously paid. (Hazlewood Depo. at. p. 49:7-24; Carmichael Depo. 05/19/05 at p. 145:14-146:1, 149:18-25).

156. On July 12, 2007, after a journal entry on the Supreme Court's mandate, Nungesser, Bryant and EMCASCO participated in a second mediation, and they entered an agreement under which EMCASCO again consented that Bryant could confess judgment in favor of Nungesser without prejudicing Bryant's right to pursue an excess claim against EMCASCO or his right to assign such a claim. (Exhibit 241).

157. On Dec. 7, 2007, this Court denied Nungesser's and Bryant's motion to remand. Nungesser has been dismissed from this lawsuit, and the parties have been realigned with Bryant as plaintiff and EMCASCO as defendant. (Pretrial Order (Docket 74)).

158. Nungesser has covenanted not to execute on Bryant's wages or property, except his rights against EMCASCO, if and so long as Bryant diligently prosecutes his claims in this action and on appeal. (Graybill Affidavit).

**<u>Discussion</u>**

"The conduct of the insurer must not be viewed through hindsight.  Instead, the offer and strength of the plaintiff's case must be viewed as they fairly appeared to the insurer and its agents and attorneys at the time the offer was refused." *Glen v. Flemming*, 247 Kan. 296, 305-06 (1990) (internal citations omitted).

K.S.A. 65-408 provides in pertinent part:

> Any person or persons, firm or firms, corporation or corporations, including an insurance carrier, making any payment to such patient or to his attorneys or heirs or legal representatives as compensation for the injury sustained, after the filing and mailing of such notice without paying to such hospital the amount of its lien or so much thereof as can be satisfied out of the moneys due under any final judgment or compromise or settlement agreement, after paying the amount of any prior liens, shall, for a period of one year from the date of payment to such patient or his heirs, attorneys or legal representatives, as aforesaid; be and remain liable to such hospital for the amount which such hospital was entitled to receive as aforesaid...

This statute "imposes a duty upon insurance carriers to ensure that hospital liens are paid when compensating a hospital's patients for injuries sustained in an accident...K.S.A. 65-408 imposes liability upon an insurance company that has failed to pay a hospital lien when compensating the hospital's patient." *Kearny County Hosp. v. Allstate Ins. Co.,* 38 Kan. App. 2d 641, 642-43 (2007).  Although Allstate argued, in *Kearny*, that K.S.A. 65-408 did not apply because the money was paid into the trial court for distribution, the court held that if it were to accept this argument:

> an insurance company could circumvent K.S.A. 65-408 and avoid liability on a

> hospital lien by having a third party distribute the insurance policy proceeds to the injured parties. On the other hand, an insurance company sending a check straight to the patient or to his attorneys, heirs, or legal representatives as compensation for the patient's injury would be subject to K.S.A. 65-408. Under both situations, the insurance company has failed to include the hospital in determining the payment of policy proceeds. Nevertheless, the insurance company in the first situation would be able to avoid liability in a properly-filed hospital lien by using an intermediary to distribute the policy proceeds. Such an interpretation of K.S.A. 65-408 would produce an unreasonable result.

38 Kan. App. 2d at 648-49.

"Courts should exercise caution when gravamen of the complaint is not that the insurer has *refused* a settlement offer, but that it has *delayed* in accepting one. This caution arises from the desire to avoid creating the incentive to manufacture bad faith claims by shortening the length of the settlement offer, while starving the insurer of the information needed to make a fair appraisal of the case." *Wade v. EMCASCO,* 483 F.3d 657, 669 (10th Cir. 2007) (internal citations and quotations omitted).

Collateral estoppel applies when four elements are established:

> (1) the issue previously decided is identical with the one presented in the action in question; (2) the prior action has been finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Rhoten v. Dickson,* 40 Kan. App. 2d 433, 445 (2008) (*citing Smith v. Dinwiddie,* 510 F.3d 1180, 1188 (10th Cir. 2007), *cert. denied* 128 S.Ct. 2431 (2008)).

In *Nungesser v. Bryant,* 283 Kan. 550 (2007), the Kansas Supreme Court held that the uncontroverted facts established that Nungesser never accepted the exact terms of EMCASCO's offer, and that EMCASCO refused to modify its offer to accommodate the conditions Nungesser required. The Court further held that there was "never a binding settlement agreement" before

Nungesser's suit against Bryant was filed. *Id.* at 568. This Court accepts the findings of the Kansas Supreme Court.

The Plaintiff, Mr. Bryant, argues that EMCASCO is collaterally estopped from denying that Nungesser made a settlement offer on December 18, 2002, that it subsequently rejected. In the prior state litigation, EMCASCO and Bryant asserted that a pre-suit settlement was effected by the communications between Fischer and Crockett on December 18, 2002. Nungesser filed a motion for partial summary judgment on that issue. On December 23, 2008, Judge Paul Clark entered a Journal Entry on the Issue of Settlement in the state court proceedings, holding that:

> In the present action, the uncontroverted facts, supported by a fully-developed record including the sworn deposition testimony of all participants to the subject negotiations, all relevant correspondence, and candid admissions in EMCASCO's claims file and pleadings, conclusively establish that no settlement of [Nungesser's] claims against Mr. Bryant was reached. In fact, Mr. Crockett and Mr. Fischer, the only individuals who participated in the settlement negotiations, each testified as to their mutual understanding that Mr. Crockett was not authorized to, and never did, accept EMCASCO's settlement offer on [Nungesser's] behalf. Instead, Mr. Crockett made a counter offer to EMCASCO in response to its settlement offer–and EMCASCO rejected the counter offer through the message Bruce Fischer left for Mr. Crockett on December 18, [2002].

(Exhibit 242 at p. 13). This summary judgment ruling was affirmed by the Kansas Supreme Court in *Nungesser v. Bryant,* 283 Kan. 550 (2007).

The Defendant, EMCASCO, asserts that collateral estoppel does not apply because no court has made any finding that a reasonable offer within the policy limits was made on December 18. The above portion of Judge Clark's decision does not address the issue of whether there was an offer within the policy limits. Instead, Judge Clark was addressing the argument of whether the telephone conversation constituted an acceptance of EMCASCO's repeatedly reiterated policy limits offer. Judge Clark held that a counter offer to EMCASCO's

offer of policy limits had been made.  His opinion stressed that the counter offer of December 18 was not an acceptance of EMCASCO's policy limits offer because it had additional terms and conditions attached to it that prevented it from being an acceptance of the policy limits offer that EMCASCO had been repeatedly making for months.  Likewise, the Supreme Court found that Nungesser had rejected EMCASCO's repeated offer of policy limits by making a counter offer with conditions and additional terms attached.  The Defendant argues that this finding does not defeat or even address EMCASCO's claim here--that it has never been provided an opportunity to settle within the policy limits.  The Defendant further asserts that the Kansas Supreme Court's holding that the counter offer had additional terms and conditions actually supports EMCASCO's position because the main condition--the payment of money to a patient's attorney without payment of the outstanding lien--required a breach of statutory duty.

The issue at hand is not whether the series of events in December of 2002 constituted an offer, acceptance, rejection, and/or counteroffer.  While the Kansas Supreme Court held that Nungesser rejected EMCASCO's repeated offer of policy limits by making a counter offer with conditions or additional terms attached, the issue in this case is much broader.  In fact, not even the first element of collateral estoppel is met.  The issue in this case is whether EMCASCO had reasonable opportunity to settle within the policy limits.  Although the previous litigation is insightful into the legal status of the communications between the parties, no court has yet ruled on the issue of whether EMCASCO was ever provided a reasonable opportunity to settle within the policy limits.  Therefore, collateral estoppel does not apply.

EMCASCO's argument is particularly persuasive in that the Kansas Supreme Court held that Nungesser rejected EMCASCO's repeated policy limits offer by making a counter offer with

conditions or additional terms attached. This finding that the counter offer had additional terms and conditions supports EMCASCO's position that it never had a reasonable opportunity to settle within the policy limits, since the additional term–payment of money to a patient's attorney without payment of the outstanding lien–required a breach of statutory duty. The Court must note that while the holding of the Kansas Supreme Court is binding, the issue in this case is much more broad, and therefore, collateral estoppel does not preclude EMCASCO from proceeding with its current arguments.

In *Glen v. Flemming*, 247 Kan. 296 (1990), the insurer rejected a policy limits offer and made a lower, counter-offer. Then, the parties engaged in extensive discovery, hired and deposed expert witnesses. Two years after the initial rejection, the insurer made a policy limits offer. The insured rejected the offer and an excess verdict was awarded. However, the Kansas Supreme Court held that summary judgment in favor of the insurer was proper on the bad faith claim. The Court noted that the claimant's offer was unreasonable because it was premature, imposed conditions, and was only left open for two weeks.

In the case at hand, the claimant's offer similarly contained a condition–that EMCASCO issue the check without the lien holder's name on it. Mr. Graybill's letter, dated January 15, 2003, evidences Nungesser's refusal to pursue further discussions of policy limits offers–which is less than one month after the December 18, 2002 phone conversation between Mr. Fischer and Mr. Crockett discussing the form of payment for the policy limits offer. A few days later, EMCASCO offered to pay both the policy limits and the remaining lien amount, but this offer was rejected.

The court found that judgment as a matter of law was appropriate in *Flemming*, and the

33

facts of this case support the same conclusion.

Similarly, in *Wade v. EMCASCO,* 483 F.3d 657 (10th Cir. 2007), Mr. Graybill sent a letter much like his January 15, 2003 letter in this case. In both letters he expressed that his client would no longer accept a policy limits offer because he believed he had a case of bad faith. *Id.* at 673. In *Wade,* counsel for the insured wrote a letter on August 20, 2001, inviting EMCASCO to make a settlement offer. EMCASCO made such an offer on November 1, 2001. The insured's counsel subsequently rejected the policy limits offer. The Tenth Circuit held that the sole reason for rejecting the offer was "his hope to pursue a bad faith claim against the insurer." *Id.* The Court also noted that the insured's counsel had admitted that he "could not recall having done any additional work or uncovering any additional information" between the August 20th offer and the November 1st offer. *Id.* The Tenth Circuit relied on *Adduci v. Vigilant Insurance Co.,* 98 Ill.App.3d 472 (1981), which held that the court could not "fairly place the blame for failure of settlement upon Insurer" when the plaintiff did "not show why the offer would have been good on May 7, 1986, but was not acceptable on June 18, 1976." "[I]f a claimant arbitrarily withdraws an initial settlement offer and later rejects an identical proposal from the insurer, the claimant's conduct is the legal cause of the failure to settle." *Wade,* 483 F.3d at 674.

Again, in this case, between December 18th and the receipt of Graybill's January 15th letter, Fischer had no reason to believe that the policy limits would not be accepted as soon as the lien was resolved. The uncontroverted facts show that Fischer not only repeatedly offered the policy limits, but, by December, believed that a policy limits settlement had been reached in principal and would be concluded as soon as the lien issue was sorted out. He acted promptly in responding to discussions about the method of payment to facilitate the settlement. Once the lien

issue was resolved, EMCASCO re-extended the policy limits offer.

"An insurance company acting honestly and in good faith upon adequate information should not be held liable because it failed to prophesy the result. Something more than mere error of judgment is necessary to constitute bad faith." *Id. citing Bollinger v. Nuss,* 202 Kan. 326, 341 (1969).

Fischer made four offers to settle Jim Nungesser's claims against Josh Bryant for the policy limits. An oral offer was made to Mrs. Nungesser, and an additional oral offer was made to Crockett. Two written offers were made to Crockett on separate occasions. EMCASCO has repeatedly tendered payment of the policy limits to Mr. Nungesser through his attorneys, who refused to take delivery. These uncontroverted facts (recognized in the Sedgwick County District Court's Journal Entry of Judgment on Issue of Settlement) establish that EMCASCO was attempting to settle by extending the policy limits. There was no indication that the policy limits that had been repeatedly offered was no longer available. Still, when EMCASCO learned of the resolution of the lien impediment, it immediately reiterated its policy limits on Nungesser's term–subjecting itself to the reduced lien amount *and* the policy limits. Although this offer was only a few weeks after the very same terms were offered by Crockett, Plaintiff rejected this offer.

The *Wade* Court relied on *Bollinger* in finding that certain factors should be considered in "deciding whether the insurer's refusal to settle constituted a breach of its duty to exercise good faith,"

> (1) the strength of the injured claimant's case on the issues of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; (4) the insurer's rejection of

advice of its own attorney or agent; (5) failure of the insurer to inform the insured of a compromise offer; (6) the amount of financial risk to which each party is expose in the event of a refusal to settle; (7) the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and (8) any other factors tending to establish or negate bad faith on the part of the insurer.

*Wade,* 483 F.3d at 667 (internal citations omitted). The Court in *Wade* went on to hold that delayed acceptance cases fall under "other factors tending to establish or negate bad faith on the part of the insurer." *Id.* This Court believes that similarly in this case, the fact that the insurer's only opportunity to settle within the policy limits required a breach of statutory duty likewise tends to negate bad faith on behalf of the insurer.

The Court must view "the offer and strength of the plaintiff's case...as they fairly appeared to the insurer and its agents and attorneys at the time the offer was refused," regardless of whether the offer had been rejected or there was a short delay in responding, the insurer believed, at that time, that a policy limits settlement had been reached. *Glen v. Flemming*, 247 Kan. 296, 305-06 (1990). In this case, *even if* Fischer could have accepted Crockett's proposal without violating EMCASCO's statutory duty, he had a valid reason to be concerned about whether he should. In fact, Plaintiff has admitted that EMCASCO "had a legitimate concern in protecting itself from having to pay the lien in addition to the policy limits." (RFA 38-39; JT Tx. Vol. II 89:8-16.) The uncontroverted facts establish that Wesley has sued insurers who have have issued checks without the listing Wesley as the lienholder. (Loub, JT Tx. Vol. III, 65:10-25.) The time lapse between EMCASCO's rejection of Crockett's offer and EMCASCO's reiteration of the very same offer was not significant, and certainly not enough to constitute bad faith. When Fischer made the December 19th call, he believed that the policy limits were acceptable and that all that remained was working out how to write the check. Although the

Kansas Supreme Court held that Fischer's rejection of this method of payment was actually a rejection of the offer, Fischer had no reason to think that the policy limits offer he had made repeatedly (and which Crockett had expressly said he was willing to take) would not be taken once the lien issue was resolved.  It was not until the receipt of Graybill's January 15th letter that Fischer received any indication that the case was not going to settle for the policy limits.

The situation was very similar in *Wade,* where the insurer's agents had no reason to believe a policy limits offer would not be accepted, even though the deadline had run.  In fact, the Court found that this showed a lack of bad faith or negligence on behalf of the insurer. "EMCASCO, through Mr. Cooper, had no reason to believe that Plaintiff's counsel would refuse to accept a settlement offer on account of the additional delay between August 20 and November 1.  The Plaintiffs had extended their offer before, and circumstances had not changed in any relevant respect."  *Wade,* 483 F.3d at 672-73.

The only opportunity EMCASCO had to settle within the policy limits was contingent on its acceptance of the additional terms and conditions imposed–namely that the check be issued without the lien holder's name on it.  The payment of the money as Crockett suggested would violate EMCASCO's duty under the lien statute.  The statute states that the duty is breached if an insurer makes "any payment" to the patient "or to his attorneys or heirs or legal representatives...without paying to such hospital the amount of its lien..." K.S.A. 65-408.

The Kansas Court of Appeals held that the statute imposes a duty upon an insurance carriers to ensure that hospital liens are satisfied when an insurance carrier compensates an injured party.  *Kearny County Hosp. v.  Allstate Ins. Co.,* 389 Kan.App.2d 641, 643 (2007).   The Court in *Kearny* further held that paying money into the Court without paying the hospital lien

would violate this duty because holding otherwise would produce an unreasonable result. *Id. at* 649. Since paying the policy limits as Crockett suggested, without Wesley's name on the check, would require EMCASCO to violate its statutory duty, then it was not a reasonable offer within the policy limits.

The parties in this case are situated much like the parties in *Wade v. EMCASCO*, in fact, many of the players remain the same. Therefore, much like the 10th Circuit held in *Wade,* this Court recognizes that the "cause of action for failure to settle is meant to protect the interests of the insured by requiring the insurer to conduct the litigation, including the settlement negotiations, as if the insurance contract had no policy limits." *Wade,* 483 F.3d at 674 (*citing Bollinger,* 449 P.2d at 511). "It is not meant to create an artificial incentive for third-party claimants to reject otherwise reasonable settlement offers that are within the policy limits. We would be turning the cause of action on its head by holding an insurance company liable where it eventually offered to settle the claim for the policy limits, but a claimant rejected the offer precisely in order to manufacture a lawsuit against the insurer for bad-faith refusal to settle." *Wade,* 483 F.3d at 674.

"[T]he justification for bad faith jurisprudence is as a shield for insureds–not as a sword for claimants. Courts should not permit bad faith in the insurance milieu to become a game of cat-and-mouse between claimants and insurer, letting claimants induce damages that they then seek to recover, whilst relegating the insured to the sidelines as if only a mildly curious spectator." *Wade,* 483 F.3d at 669-70 (*quoting Peckham v. Continental Casualty Insurance Co.,* 895 F.2d 830, 835 (1st Cir. 1990)).

"Permitting an injured plaintiff's chosen timetable for settlement to govern the bad-faith

inquiry would promote the customary manufacturing of bad-faith claims, especially in cases where an insured of meager means is covered by a policy of insurance which could finance only a fraction of the damages in a serious personal injury case." *Wade,* 483 F.3d at 670 (*quoting Pavia v. State Farm Mut. Auto. Ins. Co.,* 82 N.Y.2d 445, 626).

"[I]f a claimant arbitrarily withdraws an initial settlement offer and later rejects an identical proposal from the insurer, the claimant's conduct is the legal cause of the failure to settle." *Id.* at 674.

Regardless of whether the offer was withdrawn (as in *Wade*) or rejected (as the Kansas Supreme Court found was the case here), the Plaintiff in both cases then rejected the identical proposal. The conclusion must also be the same. The claimant's conduct is the legal cause of the failure to settle. Holding otherwise would not only fly in the face of precedent but "turn the cause of action on its head." *Id.*

## Conclusion

Therefore, the Court finds that the insurer did not act in bad faith or negligently when rejecting the only opportunity to settle within the policy limits which was conditioned on the insurer breaching its statutorily imposed duty. Defendant is entitled to summary judgment as a matter of law.

Defendant's Motion for Summary Judgment (Doc. 75) is GRANTED.

IT IS SO ORDERED this 18th day of December 2009.


s/ Wesley E. Brown

Wesley E. Brown, U.S. Senior District Judge